**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JOHN HAROLD ROGERS,**<br><br>**Defendant.** | **Case No. 25-cr-033 (DLF)** |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that the defendant, John Harold Rogers, be detained pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A) of the federal bail statute. The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

As alleged in the indictment (ECF No. 1) and supported by the evidence proffered below, the defendant presents a serious risk of flight. He is charged with conspiring to commit economic espionage on behalf of the People's Republic of China ("PRC"), a country for which he has expressed great personal affinity. Economic espionage carries a maximum statutory penalty of 15 years of incarceration. 18 U.S.C. §1831(a). Should he attempt to flee, the defendant can expect the full support of the PRC government and his co-conspirators, who have facilitated and encouraged the defendant's travels to and from the PRC for years. His present ties to the United States are weak, and there is no extradition treaty between the United States and the PRC. Therefore, no combination of bail conditions will reasonably secure the defendant's appearance.

**BACKGROUND**

On January 30, 2025, a grand jury returned an indictment charging the defendant with one count of conspiracy to commit economic espionage under 18 U.S.C. § 1831(a)(5) and one count of making false statements under 18 U.S.C. § 1001. The defendant was arrested and made his initial appearance the next day. At the initial appearance, the Court granted the government's motion under 18 U.S.C. § 3142(f)(2)(A) to hold a hearing to determine whether the defendant should be detained prior to his trial due to the risk that the defendant will flee. The Court set that hearing for January 4, 2025; that hearing has been rescheduled for February 5, 2025, at the defendant's request.

The speaking indictment alleges the essential facts of this case, and the government proffers those alleged facts in favor of pre-trial detention, along with the proffer of evidence incorporated in the arguments below.

**ARGUMENT**

The Bail Reform Act mandates the pre-trial detention of a defendant if, after a hearing, the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required." 18 U.S.C. § 3142(e)(1).

In determining whether a defendant should be detained pre-trial, the Court should weigh four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). A serious risk of flight alone is sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). "A determination that an individual

is a flight risk must be supported by a preponderance of the evidence." *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permissible and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

A review of the 3142(g) factors confirms that the defendant should be detained pending trial.

## I. **The Nature and Circumstances of this Offense Merits Detention.**

The grand jury charged the defendant with conspiracy to commit economic espionage in support of one of the United States' most powerful and threatening economic enemies: the People's Republic of China. The defendant's espionage targeted the central bank of the United States, an institution "[a]t the core of the health of the U.S. economy and the stability of the U.S. financial system."[1] "China has made no secret of its goal to supplant to U.S. as the global

[1] U.S. Senate Comm. on Homeland Sec. and Governmental Affairs, China's Threat to the Fed: Chinese Influence and Information Theft at U.S. Federal Reserve Banks, Minority Staff Report at 1 (July 2022) (the "Portman Report"), *available at* https://www.hsgac.senate.gov /imo/media/doc/HSGAC%20Report%20-%20China%20Threat%20to%20the%20Fed.pdf.

economic leader and end the U.S. dollar's status as the world's primary reserve currency."[2] "It has been willing to use every tool at its disposal in order to do so."[3] As a former FBI Director stated in 2020, the economic-espionage threat from China is "the greatest long-term" threat to the United States' economic vitality and security, "and by extension, to our national security."[4]

As alleged in the indictment, the defendant gathered confidential, proprietary information from his employer, the Federal Reserve Board ("FRB"), knowing that this information would further the economic goals of the PRC. Typically, defendants in cases of economic espionage are corporate insiders who steal, or otherwise misappropriate, trade secrets belonging to U.S. companies. In cases involving benefits to the PRC, they are often motivated by the PRC's prestigious awards, grants, and other economic incentives intended to lure technical talent from the United States along with technology to which they have access.

The defendant is different. He was a government insider, handled by professional intelligence and security operatives in the PRC who used traditional espionage tradecraft to achieve their goals. His handlers—who the indictment alleges are also his co-conspirators—used cover identities to conduct the conspiracy. They offered Rogers bulk cash. They offered him vacations to tourist destinations in China. They sent him requests for specific information about the internal workings and deliberations of the U.S. government. And they conducted information exchanges with the defendant in hotel rooms under the guise of the defendant teaching purported

[2] *Id.*

[3] *Id.*

[4] Christopher Wray, Director, Fed. Bureau of Investigation, Remarks at the Hudson Institute, Video Event: China's Attempt to Influence U.S. Institutions (July 7, 2020).

"classes" and grading "homework" that the PRC operatives—the defendant's purported students—created.

The punishment the defendant faces reflects the seriousness of the crimes with which he is charged. Economic espionage carries a potential maximum term of imprisonment of 15 years. 18 U.S.C. § 1831(a). If convicted after a trial, the defendant's guidelines sentencing range would likely justify imposing the full 15-year statutory maximum sentence. Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes "a substantial incentive to flee the United States." *See*, *e.g.*, *United States v. Hong Vo*, 978 F.Supp.2d 41, 43 (D.D.C. 2013) ("the serious nature" of the offenses charged and "the punishments Congress has provided for those offenses" provided the defendant—who had substantial ties to a country with which the United States has no extradition treaty—"a substantial incentive to flee the United States.").

Finally, deception was central to the defendant's crime and deception was the defendant's first instinct when confronted by his employer about his connections to the PRC when he was interviewed by the FRB Office of the Inspector General ("OIG") in February 2020. This Court has no reason to trust his word that he will return to Court to answer the charges against him.

## II. The Weight of the Evidence Against the Defendant is Formidable.

The United States' evidence against the defendant is strong. Much of the evidence is sourced from WeChat messages between the defendant and one of his co-conspirators in China, along with emails recovered from the defendant's Federal Reserve and personal email accounts. Those messages show—in the defendant's and his co-conspirators' own words—the workings of the conspiracy, its covert nature, and its illegal objectives. The content of many of the most

incriminating messages are alleged as overt acts in the indictment. *See* ECF No. 1, ¶ 17a-rr. The United States highlights below some of that evidence.

The government's evidence includes messages where the defendant's co-conspirators task him with collecting information about topics of interest to the PRC government. On May 2, 2018, for example, one of the defendant's co-conspirators sent the defendant photographs of sheets of paper with questions he had "collected" for a "report" the co-conspirator was working on:

1、The Dollar and The Exchange Rate

(1) The Fed raised interest rates several times during the past two years. Why is the dollar not showing significant changes in appreciation, but has always been at a low level? How does the Fed evaluate this?

(2) Does the Fed be satisfied with the current trend of the dollar? What is The Fed' s expectation for the future trend of the dollar? What measures is The Fed planning to achieve this Expectation? Is there a specific plan and timetable?

(3) How the Fed raises interest rates will affect the dollar flow back to the United States? Whether it will help the U.S. domestic economic development or not? Whether the recent economic performance data indicators have successfully achieved the expected goal or not?

2、About China

(1) How does the Fed evaluate China's financial liberalization, especially the openness of the stock market and exchange rate? What is the Fed's expectation for China's financial liberalization? What are the specific measures the Fed will take to promote China's financial liberalization? What are the specific goals the Fed wants to achieve?

(2) How does the Fed evaluate Internet finance in China,

especially the online payment technology such as Alipay, WeChat pay? Does the Fed think they are harmful to the national security or financial security of the United States? Will the Fed take steps to limit their use and development in the United States?

(3) How does the Fed evaluate the trade war with China proposed by Trump? Will the Fed adjust the monetary policy to cooperate with the trade war? What specific measures will the Fed take?

The questions include requests for information that would be incredibly valuable to the PRC:

- Does the Fed be satisfied [sic] with the current trend of the dollar? What is the Fed's expectation for the future trend of the dollar? What measures is the Fed planning to achieve this Expectation? Is there a specific plan and timetable?

- How does the Fed evaluate the trade war with China proposed by Trump? Will the Fed adjust the monetary policy to cooperate with the trade war? What specific measures will the Fed take?

Upon sending those questions, the defendant's handler messaged "I'm wondering if you could help us to collect answers from your colleagues or documents, and teach us when we me[e]t."

The WeChat messages show the defendant and his co-conspirators coordinating the cover they would use for their meetings. In September 2018, for example, the defendant responded to his handler about setting up a time for "teaching us" by stating in part: "But there has to be a lot more done to make this legitimate in the eyes of the Fed. Remember, it has to be teaching and not consulting. I am only allowed to teach." The defendant then proposed a series of steps, such as having a course title, having a list of students, "[e]ven if it is only 2 or 3," producing a syllabus, having exams and homework, and giving a grade. The defendant said: "I know this sounds like a lot. But think about what would happen if I was asked to produce information on any of these . . . items and I had no answer. That would cause me a lot of trouble!"

Unlike real classes, the "classes" the defendant would "teach" to his handlers were in hotel rooms at ad-hoc times whenever was convenient for him and his co-conspirators. In October 2018, for example, the defendant messaged about meeting on a Wednesday "[m]aybe before dinner?" The defendant proposed: "I was thinking that if you guys have made progress on the homework, it is legitimate to meet in Jinan and have me 'grade' it." The defendant himself put "grade" in scare quotes, because he knew that was just a cover for their covert discussions. Similarly, on June 1, 2019, the defendant asked about scheduling the next "class," using scare quotes around the word: "What are your thoughts on doing the next 'class'. In Beijing when I arrive on the 15th or 16th." On June 16th, 2019, the defendant sent a photo taken inside of a hotel room, of his "class" (faces redacted):



The two people on either side of the TV are the defendant's co-conspirators and handlers, who work for the security and intelligence services of the PRC.

The WeChat messages also demonstrate that the defendant used the purported "classes" in the PRC to convey valuable, trade-secret information belonging to the FRB and the Federal Open Market Committee ("FOMC")—two components of the Federal Reserve System. On June 19, 2019, the defendant sent his primary handler a copy of the FOMC's public announcement, released at 2 pm on that day. In that announcement, the FOMC announced it had "decided to maintain the federal funds rate at 2-1/4 to 2-1/2 percent." The defendant's handler responded the same day: "Same as you predicted! But there's some slight changes in the statement, like deleting the word 'patient', some economists said it's preparing for declining the interest rate." The defendant responded "Exactly!!!!" Pre-publication information about what the FOMC will say before it says it are some of the most highly guarded secrets within the Federal Reserve.

As it often does, the financial markets responded to the FOMC's announcement. The chart below illustrates the rapid rise in the value of 10-year Treasury notes at 2 pm on June 19, 2019, the precise time the FOMC released its public statement:



The defendant's emails are another powerful source of evidence. In one instance, the defendant asked a colleague to send him a confidential briefing book intended for designated governors of the FRB, purportedly to help him prepare to "give yet another talk about the Fed, this time to Masters students in Finance." The colleague sent the defendant the briefing book after asking the defendant to remove the defendant's personal email account from the email chain. The defendant agreed, but then promptly forwarded the briefing book to his personal email account, in contravention of FRB policy and his colleague's request. The second page of the briefing book had a large confidentiality designation:

**Nonpublic Information**

**FOR YOUR USE ONLY**

**DO NOT DISSEMINATE**

Finally, the defendant's recorded interview with the FRB OIG is another important source of evidence. As alleged in the indictment, the defendant lied and told half-truths to cover up the conspiracy and conceal its objectives. But he also made critical admissions about his knowledge and intent to benefit a foreign government. In speaking about his handlers/co-conspirators, the defendant said told the FRB OIG:

> They do a lot of reports for the provincial government, they're in Shandong Province, and boy the Chinese, they're watching everything that the U.S. does. I don't mean that in an espionage way, I'm sure they are doing espionage but I don't confront that. They just want to know what's . . . the Fed thinking. So a Fed guy, you know, pretty good to have in, they knew a well trained economist. But, you know, I, I was offered money, they'd come out with packets of hundred dollar bills.

This factor weighs heavily in favor of detention.

## III. <u>The Defendant's History and Characteristics Merit Detention.</u>

As alleged in the indictment, the defendant was a senior official at the FRB who served as a high-level and covert human asset for the intelligence and security services of the PRC. The PRC compensated the defendant handsomely for his services, both financially and with prestigious awards and honors in the PRC. In the United States, the defendant is a retired economist employed by foreign university who has been charged with economic espionage and faces a 15-year maximum sentence in prison. In the PRC, the defendant is a distinguished and highly-paid professor with minimal teaching responsibilities, who took great personal risks to benefit the economy of PRC and advance its interests on the world stage. In weighing the choice between staying in the United States to face trial or fleeing to Shanghai, the answer for the defendant is clear. The risk of flight, therefore, is high.

Since his forced retirement from the FRB in Spring of 2021, the defendant has spent increasing amounts of time in the PRC. In March 2021, the defendant signed a full-time contract

to teach at Fudan University, which is listed as the defendant's current employer on the Pretrial Services Report, with a contracted salary of approximately $300,000. In April 2021, the defendant was invited to apply for the Cheung-Kong Special Professorship Grant, with an estimated $150,000 additional salary and $455,000 research funds over three years. In August 2021, the defendant was awarded a High-Level Talents (Category A). In December 2022, the defendant signed a part-time contract with Fudan University to continue teaching there with a salary of about $144,492. The contract required the defendant to spend 180 days per year in the PRC. A salary-verification letter for the defendant dated April 15, 2024, stated that the defendant received a total salary of CNY 3,399,012.87 for his work for Fudan University, which is roughly $448,000 U.S. dollars. According to legal process sent to the defendant's U.S. bank, the defendant's salary is not paid into his U.S. accounts. Consistent with Chinese currency controls, therefore, savings from this Fudan teaching salary is in his Chinese bank account.

Prior to his arrest, the defendant had been planning to return to China to resume his teaching duties this past Monday—February 3, 2025. The defendant told FBI agents as much during his booking after his arrest on January 31, 2025. The defendant has previously traveled to the PRC around this time of year to teach at Fudan University in the semester that starts in early February for the last several years.

Roger's footprint in the United State is small, especially since leaving the FRB in 2021. He sold his house in Vienna, Virginia, in December 2021 and moved into a one-bedroom apartment. His current and second wife is a PRC national with legal permanent resident status in the United States based on her marriage to the defendant, which occurred in Hong Kong. Apart from the daughter she has with the defendant, she has another daughter in the PRC and spends significant time there while the defendant is in the United States.

The defendant has some family connections in the United States. He has four adult children in the United States from a previous marriage, at least one of whom is estranged from him. His former wife has re-married. The defendant's elderly mother lives in Delaware, and the defendant is known to visit her prior to boarding flights to the PRC. The defendant's father has passed away.

The defendant has great personal affinity for the PRC, its culture, and its people. FBI agents located a note dated December 3, 2018, written on the defendant's personal iPad expressing his love for the PRC. The note begins with Pinyin words that translate to "Dear Chinese People" and states, in part:

> I love your kindness, your generosity, and your humbly hard working, high-achieving society.
>
> I love you unconditionally Shanghai. Your universities, your food your buildings, your Bund, your skyline and trains, your chic malls and flowing open-air markets; your grandparents everywhere with the toddlers they're raising; Daxue Road, Wujiaochang, Jianweng stadium, Nanjing road, Century Park, Yuyuan, Hongqiac, Pudon; your safe and clean streets, your insane traffic and endless queues, your ubiquitous deliver scooters, and your unfortunate pollution. Zhongguo ren rightfully adore you.
>
> ***
>
> To [name of primary handler], without whom NONE of this would be happening, and [name of other handler], the dynamic duo. It's always a blast when the gang comes to Shanghai.

The note describes the United States as "[n]ot 'perfect country' but beautiful country." In a podcast interview the defendant gave in March 2024, he stated about living in the PRC:

> I've been struck by many things about being here and living here. And I would say that . . . includes things like democracy and freedom of the press and kind of state oversight into economic and financial matters, which maybe coming from the West, you have

somewhat skeptical views about.[5]

The defendant's status as high-value asset of the PRC intelligence services makes it likely he will have help should he flee from prosecution. Foreign intelligence services can go to extreme lengths to extract assets who may be in trouble in their home countries. Enabling the defendant's flight would not only ensure he can continue teaching in the PRC on topics of great concern to it. It would also send a message to other covert assets in the United States—both current and future—that they can expect to be taken care of should they get caught. But extreme lengths would not be required for the defendant to flee. He need only cross the border into Canada or Mexico and contact his handlers in the PRC, who would surely arrange for his return to the PRC. The evidence shows they have arranged and paid for the defendant's travel to and from the PRC numerous times in the past, along with providing numerous other favors.

Where the defendant to successfully flee to China, the government would have no legal means to secure his return to face the charges against him. This has happened before: Defendant Gang Liu, indicted in this jurisdiction in *United States v. Shan Shi*, 17-cr-110-3 (CRC), was placed on personal recognizance with an ankle monitor after arraigned on charges of economic espionage. *See* Minute Order June 12, 2017. While on pretrial release, Gang Liu, who had ties to the PRC government, cut his ankle monitor and boarded an Air China flight to China, even though he no longer possessed his U.S. passport. Liu fled to China in November 2017 and remains on the FBI's Most Wanted List. Courts in other cases in this district have held that the mere fact that no extradition treaty exists with a foreign government supports the conclusion that there is a strong likelihood of flight, and that there are no conditions or combination of conditions that could ensure

[5] EconVue, *John Rogers—An American Economist in China: The Hale Report.*

a defendant's continued presence for purposes of trial. *See United States v. Tajideen*, No. CR 17-46 (RBW), 2018 WL 1342475, at *7 (D.D.C. Mar. 15, 2018), aff'd, 724 F. App'x 6 (D.C. Cir. 2018); *Vo*, 978 F. Supp. 2d 41, 45 (D.D.C. 2013) (finding defendant's overseas assets and contacts in Vietnam, a country which maintains no extradition treaty with the United States, gave her the ability to evade capture); *United States v. Myers et al*., No. 9-00150 (D.D.C. June 10, 2009) ECF No. 16 at 16 ("The United States does not have an extradition treaty with Cuba; indeed the two countries do not have diplomatic relations."); *United States v. Butina*, No. 18-00218 (D.D.C. July 24, 2018) ECF No. 15 at 6 ("A defendant's citizenship of a country with which the United States has no extradition treaty is a factor relevant to an assessment of the defendant's history and characteristics."); *United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018) (finding that a defendant who was a citizen of a country with which the United States had no extradition treaty had a "plausible destination to which to flee).

Where, as here, the defendant can expect the support of the United States' most powerful economic adversary, there is no combination of conditions that will secure the defendant's appearance.

## IV. <u>The Lack of Danger Posed by the Defendant Does Not Alter the Analysis of the Risk of Flight</u>

The government does not assert that the defendant poses a danger to the community or any person. Nor does the government seek pre-trial detention on that basis. In such circumstances, Courts in this district have held that this factor is neutral and "has little bearing" on the determination of imposing pre-trial detention due to flight risk. *See Hong Vo*, 978 F.Supp.2d at 46; *United States v. Bikundi*, 47 F. Supp. 3d 131, 137 (D.D.C. 2014).

**V. Other Courts Have Ordered Pre-Trial Detention in Cases Involving Economic Espionage.**

This Court should follow other the example of courts that, in considering economic espionage cases, have ordered defendants preventively detained. As one example, the Court in *United States v. You,* 19-cr-14 (E.D. Tenn) ordered *You's* pretrial detention based on charges of trade secret theft, even before a grand jury returned a superseding indictment charging conspiracy to commit economic espionage. Like the defendant here, *You* held a Ph.D. and had been awarded prestigious grants in the PRC designed to lure technical talents to relocate there. The government alleged she stole trade-secrets chemical technology from seven U.S. victim companies and planned to use those trade secrets to start a new company in the PRC. *See United States v. You*, No-2:19-CR-14, 2019 WL 2426659 at *2-3 5 (E.D. Tenn. June 10, 2019). In ordering pre-trial detention, the court noted, among other things, the "devastating loss amount" under the sentencing guidelines; *You's* "extensive connections with China"; that she was "willing and planning to permanently relocate to China"; her employment contract with a Chinese company; and her "substantial financial means" allowing her to flee. *Id.* at *3-5. When the court later granted *You's* release due to early concerns about COVID-19, the Sixth Circuit reversed, ordering the continued pre-trial detention of *You* due to the risk of flight. *United States v. You*, 2020 WL 3867421, at *2-3 (6th Cir., May 15, 2020).

LIkewise, in *United States v. Xu*, pre-trial detention appears to have been all but a foregone conclusion in light of *Xu's* affiliation with the PRC's Ministry of State Security ("MSS"), the PRC's primary intelligence agency. In the handwritten explanation for the Court's order of detention, the Court stated:

> Defendant is alleged to be a Deputy Division Director for the Ministry of State Security for the People's Republic of China. Defendant informed pretrial services that he is a graduate student

> and his wife's legal counsel informed his legal counsel who informed Pre-trial that he works at Nanjing Loud Te Technology and Information Center. The defendant provided a background that is in contrast to the indictment.

*United States v. Xu*, No. 1:18-cr-42, Order of Detention Pending Trial at 3 (Oct 12, 2018), Doc. No. 21. Like *Xu*, the defendant in this case is alleged to be affiliated with the PRC intelligence apparatus and has operated in that role using the cover of teaching academic classes.

The defendant's actions on behalf of the PRC resemble those of other defendants charged in this jurisdiction with acting as an agent of a foreign government, in violation of 18 U.S.C. §951. Those defendants who posed a risk of flight similar to this defendant were also detained pre-trial. *See, e.g.*, *United States v. Mariia Butina,* 18-cr-218 (TSC) (Russian national with deep ties to Russia, access to funds, an apartment with boxes packed, was charged with acting as an agent of the Russian government and detained pending trial); *United States v. Ahmadreza Doostdar and Majid Ghorbani*, 18-cr-255 (PLF) (Iranian nationals with deep ties to hostile foreign regime were charged with acting as an agent of the Iranian government and detained pending trial, where both defendants had family ties to the United States and one, Majid Ghorbani, resided in the United States, but had recently travelled to Iran.)

## CONCLUSION

In light of all of the evidence proffered by the government, and the facts alleged in the indictment, the defendant presents an extreme risk of flight. Given his affinity for the PRC and the expected support of its government were he to desire to flee, there is no reasonable combination of conditions that will reasonably assure his appearance.

Respectfully submitted,

EDWARD R. MARTIN
UNITED STATES ATTORNEY

Dated: February 4, 2025

By: /s/ Kimberly L. Paschall

KIMBERLY L. PASCHALL
D.C. Bar No. 1015665
Assistant United States Attorney
United States Attorney's Office for D.C.
601 D Street NW, Room 5.104
Washington, D.C. 20530
E-mail: Kimberly.Paschall@usdoj.gov
Telephone: (202) 252-2650

*/s/ Nicholas O. Hunter*

NICHOLAS O. HUNTER
D.C. Bar No. 1022355
STEVEN J. MARZEN
N.Y. Bar No. 2007094
Trial AttorneyS
National Security Division, U.S. Dep't of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
E-mail: nicholas.hunter@usdoj.gov
Telephone: (202) 353-3434