BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .
                                   .   Case Number 25-cr-33
          Plaintiff,               .
                                   .
     vs.                           .
                                   .   Washington, D.C.
JOHN HAROLD ROGERS,                .   January 30, 2026
                                   .   9:26 a.m.
          Defendant.               .
- - - - - - - - - - - - - - - - -

TRANSCRIPT OF JURY TRIAL, MORNING SESSION
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:      THOMAS SAUNDERS, AUSA
                            United States Attorney's Office
                            601 D Street Northwest
                            Washington, D.C. 20579

                            NICHOLAS HUNTER, ESQ.
                            ADAM BARRY, ESQ.
                            YIFEI ZHENG, ESQ.
                            U.S. Department of Justice
                            950 Pennsylvania Avenue Northwest
                            Washington, D.C. 20530

For the Defendant:          STEPHEN SALTZBURG, ESQ.
                            2000 H Street Northwest
                            Washington, D.C. 20052

-- continued --

APPEARANCES (CONTINUED):

For the Defendant:          JONATHAN GITLEN, ESQ.
                            Law Office of Jonathan K. Gitlen
                            900 19th Street Northwest
                            Suite 500
                            Washington, D.C. 20006


Official Court Reporter:    SARA A. WICK, RPR, CRR
                            333 Constitution Avenue Northwest
                            Room 4704-B
                            Washington, D.C. 20001
                            202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

TESTIMONY

BRADLEY SETSER          Direct Examination...............   5

JOHN ROGERS             Direct Examination...............  29

P R O C E E D I N G S

(Call to order of the court.)

(Jury not present.)

COURTROOM DEPUTY:  We are on the record in Criminal Case 25-033, United States of America versus John Harold Rogers.

Starting with the government, please approach the podium and state your appearance for the record.

MR. SAUNDERS:  Good morning, Your Honor.  Thomas Saunders for the United States.  I am joined by AUSA Adam Barry and trial attorneys Nick Hunter and Yifei Zheng.  Thank you.

THE COURT:  Good morning, everyone.

MR. SALTZBURG:  Good morning, Your Honor.  Stephen Saltzburg and Jonathan Gitlen for the defense, assisted by Erica Lorenzana and Ashley Hill, and the defendant Dr. Rogers is here.

THE COURT:  Good morning to all of you.

Anything we need to address before your final witness testifies?

MR. SAUNDERS:  No.  But just to make sure we are on the same page, this witness will be very short.

THE COURT:  New information?

MR. SAUNDERS:  Yes, Your Honor.

THE COURT:  Not retread the old stuff that --

MR. SAUNDERS:  It is a focus on China's holdings of U.S. Treasury marketable securities --

THE COURT:  Okay.

MR. SAUNDERS:  -- and why, in light of that, Federal Reserve information would be especially valuable to the Chinese government.  A tight 20 minutes, and that's it.

THE COURT:  Great.  All right.

MR. SAUNDERS:  What I wanted to say was, after that, the government will rest, and I think the jury will need to be excused while we discuss the defense's case.

THE COURT:  Okay.  Sounds good.  So we will take an early break this morning.

(Jury entered courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.

We are going to resume with the government's case.  The government has one more remaining witness, and if the testimony from that witness is not completed by 10:00 a.m., we will need to take a very brief break at 10:00 a.m. again.

MR. SAUNDERS:  Yes.  Thank you, Your Honor.

The government calls Dr. Bradley Setser to the stand.

BRADLEY SETSER, WITNESS FOR THE GOVERNMENT, SWORN

THE COURT:  Good morning, sir.

THE WITNESS:  How are you?

DIRECT EXAMINATION

BY MR. SAUNDERS:

Q.   Dr. Setser, in a loud, clear voice for the jury and the court reporter, could you please state and spell your name for the record.

A.    My name is Bradley Setser, B-r-a-d-l-e-y -- I usually go by "Brad" -- S-e-t-s-e-r.

Q.    Dr. Setser, you've been called today to testify about a very limited topic, that is, China's holding of U.S. Treasury marketable securities.

My first questions for you are about your qualifications and background to talk about that subject.  Could you please explain to the jury something about your background and why it qualifies you for this discussion.

A.    I was educated at Harvard, Oxford, and Sciences Po, a French school.  I studied economics throughout.

I've worked on China's role in the global economy and China's holdings of U.S. treasuries since roughly 2005, initially as a -- in a private market position at Roubini Global Economics, where I wrote very frequently about China's very rapid accumulation of foreign exchange reserves and how that was impacting the U.S. economy.

I continued to track China's reserve growth and its accumulation of U.S. foreign -- of U.S. securities when I worked on the National Economic Council and National Security Council and then when I was the chief international economist at the U.S. Treasury from 2010 to 2016.  I continued to follow these issues as a senior fellow at the Council on Foreign Relations and then when I returned to the U.S. government in 2021, and I follow them today.

These are China's impact on the global economy, China's impact on the foreign exchange market, China's impact on government bond markets is a topic of great interest, not just to many of the public, but to many in the financial markets.  So it's something that I work on almost daily.

Q.    Are you being compensated in connection with the preparation and work you've done to prepare for your testimony here today?

A.    Yes, I am.

Q.    And did you prepare a report with your conclusions about China's holding of U.S. Treasury marketable securities as preparation for your testimony today?

A.    I did.

Q.    What is your hourly rate for the work you've done in connection with this case?

A.    $250 an hour.

Q.    And at the end of this entire experience, approximately how many hours will you have worked?

A.    Probably eight.

Q.    Okay.  Let's dive into the heart of the matter.

Could you briefly explain, in layman's terms, what are U.S. Treasury marketable securities?

A.    U.S. Treasury marketable securities are the bonds, the IOUs that the Treasury issues to fund the U.S. government.  We run a big budget deficit.  We have to sell -- we could take out a

loan, but in the modern economy, governments generally fund themselves by selling bonds or securities.  The U.S. government sells a lot of them, and it sells them in a global market, and one of the biggest buyers traditionally has been the People's Bank of China.

Q.    And you've done research trying to quantify, to find out how much the Chinese government owns of U.S. Treasury marketable securities; is that correct?

A.    Yes, it is.

Q.    Can you tell us, what is your conclusion about the amount that the Chinese government owns and how you reach that conclusion?

A.    So the U.S. Treasury produces on its website on a monthly basis data on China's direct holdings of U.S. securities; that is, the holdings that are held in U.S. custodial institutions that have to report directly to the Federal Reserve System and to the U.S. Treasury.  The biggest one, most important of these custodians is the New York Fed itself.  State Street, a bunch of other institutions perform that service.

Though -- that data set shows that China holds 700 billion, a little less right now, in U.S. Treasury securities.  China is well known, though, to make use of custodians that are not based in the United States.  And for a custodian like Euroclear, like Clearstream, big financial institutions that are not based in the U.S., all they tell the U.S. is we as a institution hold a

certain number of treasuries.  They don't spell out who they are holding those securities for.

But based on historical patterns and how China's reserves have evolved, I strongly believe that China holds another $400 billion of Treasury securities, primarily in Euroclear, a large custodian based in Belgium -- it's been in the news a lot because of its role in connection with Russia reserves -- also possibly in Clearstream, possibly in London.  There's a bit more uncertainty around that estimate, but combined, that would suggest that China holds $1.1 trillion in Treasury securities. It also holds another $150 billion in the bonds issued by Freddy Mac and Fannie Mae, the U.S. agencies which are thought to have an implicit -- the implicit backing of the U.S. government.

Q.   Now, all told, what is the dollar amount of the holdings of the Chinese government in these sorts of instruments?

A.   A little less than $1.5 trillion.

Q.   Now, million, billion, trillion; these numbers can be hard to understand the scale.  Can you, in layman's terms, help us understand the size of something like that to a government like the Chinese government or the U.S. government.

A.   A million dollars is a lot of money to most people.  A trillion dollars is a big sum of money for even a really big economy like the United States or like China.  A trillion dollars is, roughly speaking, the U.S. trade deficit.  It is, roughly speaking, the budget of the Pentagon.  It is -- if you

want to do an analogy, it's a sum that would be about half the size of Canada's economy, about a quarter of the size of Japan's economy.  It's genuinely a big number.

When you see sums in the hundreds of billions or a trillion, in financial markets and when you're thinking about the U.S. economy, you're thinking about something that really matters; it has a real impact.

Q.   Okay.  Let me get to the last part of what I'm going to ask you about today.  Given that the Chinese government has such a significant holding of U.S. Treasury marketable securities, what, if any, interest does the Chinese government have in what happens at the United States Federal Reserve?

A.   Well, you know, if I were the governor of the People's Bank of China, the head of China's central bank, I would probably want to know one thing above all when I woke up every morning, and that is, more or less, what's going to happen to U.S. interest rates, and what's going to happen to the U.S. dollar.  And no institution has a bigger impact on the dollar and on U.S. interest rates than the Fed.

Now, I'm sure China and China's government has an interest in what goes on in the Pentagon; what happens at the Seventh Fleet, the part of the U.S. Navy that's based in Asia; what goes on at the Central Intelligence Agency.  But I have absolutely no doubt that the Chinese government has a deep interest in institutions like the Federal Reserve.  Changes in Fed policy

directly impact the value of China's holdings of treasuries, which are the largest in the world.  They give China information about how the Fed is thinking.  How the Fed may move will give China an advantage in how it manages its reserves to get a higher return.  And since China links its currency to the dollar, information about how the Fed is adjusting its interest rates has a direct bearing on how China's central bank has to adjust its own policies, its own interest rates.

So, you know, this is -- the Federal Reserve in -- the U.S. is the world's biggest economy.  The Federal Reserve sets short-term interest rates and influences long-term interest rates for the world's biggest economy.  China is our biggest single creditor.  It's no doubt that China pays a great deal of attention to the Fed and would like to have as much information about the Fed as possible, as would any bond market participant. Information about what the Fed is going to do is the kind of information that is most valuable in financial markets.

MR. SAUNDERS:  Just a brief moment.

No further questions, sir.

Thank you, Your Honor.

THE COURT:  Any cross?

MR. SALTZBURG:  I have no questions of this witness, Your Honor.

THE COURT:  All right.  Thank you.  May this witness be excused?

MR. SAUNDERS:  Yes, Your Honor.  Thank you.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

MR. SAUNDERS:  Your Honor, at this time the government rests.

THE COURT:  All right.  So, ladies and gentlemen, we're going to take an even earlier break than I thought, but I will ask that you come back at 10:15.  If you can be back in the jury room at 10:15, I would appreciate it.

As a reminder, no discussion about the case, no research.

(Jury exited courtroom.)

THE COURT:  All right.  You may be seated.

Thank you, Mr. Saunders.  That was succinct, to the point, and clear.  I appreciate it.

MR. SAUNDERS:  Thank you, Your Honor.

THE COURT:  All right.  Are there any motions?

MR. SALTZBURG:  Yes.  The defense moves for a judgment of acquittal.

THE COURT:  All right.  I am going to reserve on any ruling on that at this time.

MR. SALTZBURG:  And we have a suggestion, Your Honor. While we're on this break, if there's time for the Court, this might be a good time to address jury instructions.

THE COURT:  Okay.

MR. SALTZBURG:  And for the record, we are okay with

the instruction you circulated, the 404(b) instruction, yesterday.

THE COURT:  All right.  It occurred to me last night, something to think about, whether that instruction covers what the jury might take into account based on the nude photos. That's an ethics violation, but whether you would want something specifically highlighting that or not.

MR. SALTZBURG:  I don't think so.  I think we would rather not have the Court focus on that.

THE COURT:  All right.  I just wanted to offer that.

MR. SALTZBURG:  We appreciate that.

THE COURT:  The jury should approach it the same way, but if you would prefer not to have an instruction on that, that's fine, too.

MR. SALTZBURG:  We would prefer not to have that specifically mentioned.

THE COURT:  All right.  Before we turn to jury instructions, is there anything about the anticipated exhibits that I can address now, or are we just going to have to wait? Are there certain exhibits that the government knows that they're not even appropriately referenced to show the defendant's state of mind?

MR. BARRY:  Our understanding from talking with counsel is that the only exhibit they plan to introduce that has not already been introduced into evidence is Dr. Rogers's CV,

which we do not plan to object to. So as long as that's the scope of exhibits, there shouldn't be an issue on the hearsay.

THE COURT: All right. I thought yesterday you suggested you might offer some not for the truth of the matter, but to show state of mind.

But that's not the case?

MR. SALTZBURG: When we started, we thought we might have to, but it turns out that we believe that except for the CV, that everything that we want to rely on is already in evidence.

THE COURT: Okay. Great. Let me just find my paper on the jury instruction.

So correct me if I'm wrong, Mr. Saltzburg, but I understand that based on the red-line copy of the jury instructions that we sent back via e-mail, with respect to the substantive charge and, in particular, the elements of the conspiracy, which is the one that you continue to have objections to, as I understand it, following that circulation of that red-line copy, there are just two remaining issues?

MR. SALTZBURG: That's our understanding.

THE COURT: Is that correct? You don't have other objections at this point?

MR. SALTZBURG: No.

THE COURT: Okay. So for the -- as I understand it, you object to the current instruction. Point one, you argue

that to be convicted, Mr. Rogers has to know what a trade secret is as defined by the governing statute.

The government submits that this is an inaccurate statement of the law, that the current draft instruction is accurate but should be modified slightly to avoid confusion.  And the government has again suggested truncating the definition of "trade secret" and adding it to the red-line version.

Let's talk about first your point.  Willfulness is not an element of the statute.

MR. SALTZBURG:  True.

THE COURT:  So it's not like a tax offense where the government has to show that Mr. Rogers had knowledge of the specific law and understood that his actions violated a particular statutory provision or a particular definition.

MR. SALTZBURG:  Our position is he had -- there's a big difference, as you've seen, I think, between proprietary information, much of which is not a trade secret -- trade secret has a very specific definition under the statute.  In our view, he had to know or believe that what he was doing was misappropriating not just any information but things that qualify as trade secrets.

THE COURT:  Right.  Understood.  So why doesn't the language that's in the current instruction that says "The government must prove that the defendant and one other person conspired to misappropriate information that" -- I think the

original says "was a trade secret."

Okay. "To commit the crime of economic espionage, the government must prove, one, that two or more persons, including the defendant, conspired, agreed to, knowingly without authorization, to obtain, copy," et cetera, et cetera, "one or more trade secrets; two, the defendant knew or believed that the information was a trade secret; and three, the defendant knew or intended that his actions would benefit a foreign government, instrumentality, or agent."

So you have an issue with point two?

MR. SALTZBURG: No, we would be perfectly comfortable with that, as long as the Court defined for the jury "trade secret." We think it should be defined there so that they know what it is that a trade secret is. I think in another instruction, it's going to lay out what the statute says, but we think it should be done there.

THE COURT: So it's more of a placement where I define "trade secret"?

MR. SALTZBURG: Yes.

THE COURT: So you don't object to the element "The defendant knew or believed that information was a trade secret"?

MR. SALTZBURG: We're fine with that.

THE COURT: You're fine with that. You just want me right at that point to define "trade secret"?

MR. SALTZBURG: Yes, so the jury knows --

THE COURT:  But I'm not -- I need to give the three elements together.  But you're suggesting -- let me look at this.

Are you objecting to the paragraph that is in the current instruction that says "It's not necessary for the government to prove that the defendant or his alleged co-conspirators knew about the Economic Espionage Act or how the act defines trade secret"?

MR. SALTZBURG:  I don't object to that as long as the Court is clear to the jury on what a "trade secret" is.

THE COURT:  Okay.  So I say, "Instead, the defendant must prove that the defendant and one other person conspired to misappropriate information that met the definition of a trade secret as I will define in a moment."

You want me to define right then what a "trade secret" means?

MR. SALTZBURG:  If the Court will do that, we think that will help the jury understand what the case is all about.

THE COURT:  All right.  But as the instruction is currently drafted, the next paragraph explains, and you agree, the government need not prove that the information was in fact a trade secret?  You agree with that paragraph?

MR. SALTZBURG:  Yes.

THE COURT:  But you're just asking that I move that definition up in the jury instruction immediately following --

MR. SALTZBURG:  Yes.

THE COURT:  -- what I said?

And the government, similarly, has asked me to define "trade secret" here, but the government is doing so by taking just the two elements of a trade secret and not giving the full definition, which means all types and forms of financial business, whatever, information.

So it sounds like the two of you are in agreement, except you want the full-blown language from the statute right there, along with the two elements that the government wants me to instruct on right there.

MR. SALTZBURG:  Yes, Your Honor.

THE COURT:  Okay.  Let me hear from the government.

I don't love the idea of moving a definition up, because usually the judge instructs the jury and then says "Now I'm going to define some of the terms."

But trade secret is the key here, and I'm willing to do this, but I'm confused by the government's request that the Court truncate the definition.

MR. SAUNDERS:  Yes, Your Honor.  If I could just step back and say, it feels like there's been a bit of a moving target in terms of what the defense's position is.  And until I just heard Mr. Saltzburg today, the clear message I was getting from the defense was that they intended to argue and wanted to use the jury instructions to argue that the defendant did have

to know the statutory definition.

It sounds like that's resolved.

THE COURT:  So maybe you all are on the same page, and I should just give the full definition of trade secret right after the paragraph that ends with "Instead, the government must prove that" -- oh, wait.  He's asking that I insert the definition right after "Instead, the government must prove that the defendant and one other person conspired to misappropriate information that met the definition of trade secret."  And instead of saying "as I will define in a moment," that I go ahead and define "trade secret" there.

If I do that, then I'm going to circle back and tell the jury that the government need not prove that the information was in fact a trade secret.

MR. SAUNDERS:  Your Honor, I think that given the shifting stands, that would be appropriate.

THE COURT:  And are you still asking that I truncate the definition of "trade secret," or are you in agreement with the defense and, I think, the Court that I should insert the whole statutory definition right there?

MR. SAUNDERS:  I think that the whole definition should go, and we -- with the understanding that the language "it is not necessary for the government to prove" will be a part of the instruction.

THE COURT:  Right.  It will follow the definition.

And then I will give the jury the additional definitions with states of mind and the like.

So that leaves me with the question of the bracketed paragraph that's -- at the end of the definition of "trade secret" that includes language "The term trade secret can include compilations of public information," et cetera.

Are there objections from the defense on that language?

MR. SALTZBURG:  We suggested different language, Your Honor, but right now, to move this along, we don't -- we will withdraw our objection.  That language is fine.  We want to get -- be able to get these jury instructions agreed upon.

THE COURT:  All right.  I appreciate that, but I don't want you to give up an objection that you think is warranted here.

I just want to be clear about what paragraphs I'm inserting where.  So I think what we should do is we should modify the instructions to make this change, give you all red-lines back so everyone can look at it.  I think it's hard to discuss without seeing it.

So it sounds like we are maybe on the same page, but again, Mr. Saltzburg, you don't have to --

MR. SALTZBURG:  I appreciate that, Your Honor.

THE COURT:  -- give up your objections.

MR. SALTZBURG:  I'm not waiving anything I don't want to waive.

THE COURT:  All right.  I just want to be sure.

So the second issue was on page 33.  The government proposed an instruction -- all right.  This second issue is the one I just addressed, but the issue is whether the Court should add this language of "Information, when combined or compiled in a truly novel way, even if a portion or every individual portion of that compilation is generally known, as long as the combination creates economic value that does not attach to any item of public information standing alone."  And then later in that paragraph again, the insertion of the word "novel."

And actually, this is the government seeking these -- the defense seeking these additions; is that correct?

MR. SALTZBURG:  We suggested that, but --

THE COURT:  And the government doesn't object to the additions of the words "truly" and "novel" but does object to the longer insertion that begins "As long as the combination creates economic value that does not attach to any item of public information standing alone."

Where are you getting that, Mr. Saltzburg?

MR. SALTZBURG:  I drew that from the statute.  I think that's a fair reading of the statute.

But to be clear, right now, we're happy to go along with the government's version, adding the two words that we added.

THE COURT:  Okay.  So you're comfortable withdrawing the phrase "as long as the combination creates economic value,"

et cetera?

MR. SALTZBURG:  Yes.

THE COURT:  So long as I include the "truly novel" and later in the paragraph "novel" --

MR. SALTZBURG:  Correct.

THE COURT:  -- then you're in agreement?

MR. SALTZBURG:  Yes, Your Honor.

THE COURT:  Okay.  Great.  So we will make these changes, circulate it back one more time to make sure we are all on the same page.

Also, we need to address, and it doesn't have to be now, but those standard instructions that should be added.  For example, if the defendant is still taking the stand, we need to add an instruction for that; the "other acts" instruction that I proposed that it sounds like you all are in agreement with.

Any other issues that you all have identified?  Think about it.  You think we've got it covered adding the standard instruction from the Red Book --

MR. SALTZBURG:  Yes.

THE COURT:  -- that the defendant's testified and how the jury should consider that testimony?

MR. SALTZBURG:  Yes, Your Honor.

MR. SAUNDERS:  Yes, Your Honor.  Thank you.

THE COURT:  So we have 15 minutes.  Is there anything else to do?  If not, we may go make these changes and bring it

back out here, just so you have them.

MR. SAUNDERS:  The government would appreciate any clarity on how the rest of the day is going to go.  We received initially a 15-person witness list from the defense, but I'm not sure if today is going to be one witness or four or we might get to closings.

THE COURT:  I think it might depend on how Mr. Rogers's testimony goes.

Mr. Saltzburg, can you add anything more to your representation in terms of your case?

MR. SALTZBURG:  I think what Your Honor said is exactly right.  It may depend on how his testimony goes.

THE COURT:  All right.  Do you have witnesses available here in the event you want to call them?

MR. SALTZBURG:  We do.

THE COURT:  Who are they?

MR. SALTZBURG:  We have two, and possibly three, witnesses from the Federal Reserve.

THE COURT:  Are they on the witness list?  I don't think I have a copy of your witness list.

MR. SALTZBURG:  We've given the names last night to the government.  Whether we call them or not is in the air.  We are not calling our experts.

THE COURT:  You're not?

MR. SALTZBURG:  No, they will not testify in this

case.  And it is possible that we will rest after the defendant's testimony.

THE COURT:  All right.  So that's helpful.  The government has the names of the three Fed -- Federal Reserve employees?

MR. SALTZBURG:  Yes, it does.

MR. SAUNDERS:  Yes, Your Honor.

THE COURT:  Very well.  We're going to take a 15-minute break now, if there's nothing else.

MR. SAUNDERS:  Just two additional things.  If we could see a proposed verdict form, that would be helpful for the parties to see.

THE COURT:  Did you all propose one?  I can't remember.

MR. SAUNDERS:  No.  We can, if the Court would like us to do one.

THE COURT:  Yeah, I mean, it probably would be helpful.

MR. SAUNDERS:  We can do that.  And then if the defense rests at, say, lunchtime and decides not to call these witnesses, should the parties be prepared to do closings today?  That feels a little bit like gamesmanship on the part of -- hearing such a large witness list and now going down to two hours of a case.  We're prepared.  We can do it, but --

THE COURT:  Mr. Saltzburg, is Mr. Rogers only going to

be on the stand this morning, you think?  I would expect it might be longer than that.

MR. SALTZBURG:  I think we can close today.  Our view has been, since I ended ten minutes early on Wednesday and you made very clear that we should be prepared --

THE COURT:  No, I did; I did.

MR. SALTZBURG:  -- to move forward, we are prepared to move forward.

THE COURT:  You're prepared to close, if need be?

MR. SALTZBURG:  Yes.  We would prefer that, actually, if we could complete this today rather than have to come back simply for closings on Monday after the jury has had a weekend away from the case.

THE COURT:  Well, I do instruct before closings.  So that takes some time.  I don't want to instruct and not complete the closings today.  I don't think it's fair, for example, to give either you or the government a chance to come back on Monday and respond to the other.

So I think we're going to have to play it by ear.  I think if there's -- if Mr. Rogers is on the stand for two hours, I'll give you a little extra time during the lunch break, but if that's the way -- if he's done by noon, then I think we come back at -- give you extra time at lunch and come back and instruct, start the closings, and try to wrap it up today.

I'm not going to do that unless we can complete all of the

arguments.

MR. SALTZBURG:  That makes perfect sense to us, Your Honor.  We don't want an advantage for us; we don't want an advantage for the government.  We just want to be able to conclude without wasting time.

THE COURT:  All right.  I will get you the revised instructions.  If the parties could look at a verdict form and agree to one, that would be helpful.

MR. SAUNDERS:  Yes, Your Honor.

THE COURT:  And we will just address the closings once Mr. Rogers is off the stand.  And as I said, I will give you a longer period at lunch.  I know your expectation was, based on what Mr. Saltzburg said, that the case was going to go into Monday.  But that's trial; things change.

MR. SAUNDERS:  We understand, and we will do as the Court instructs.  But as we watch the clock, we would ask the Court, if there's any ambiguity either way if there's enough time, we would lean in favor of both sides having time to prepare.

THE COURT:  Understood.

(Recess taken from 10:03 a.m. to 10:21 a.m..)

(Call to order of the court.)

(Jury not present.)

THE COURT:  All right.  Before you is a red-lined copy of the conspiracy count that makes the changes we discussed.

You all don't have to respond immediately, but at the next break, I will have you take a look at it.  We can also talk about where the additional instructions should go in the packet, in what order.

And with respect to an instruction with respect to the defendant testifying, there's a couple different versions.  There's a question whether there's even a need for one.  I'm interested in what you're asking for, if at all.  Okay?

I would like to have Mr. Rogers on the stand before the jury comes in.  Is there anything else we should address before we do that?

MR. SALTZBURG:  I don't know whether Your Honor wants to do this, but we want the Court to be clear that Mr. Rogers is knowingly, voluntarily, and intelligently deciding to take the stand.

THE COURT:  You mean you think I should engage in a colloquy with him?  I typically don't unless they're not testifying, but I am happy to do so.

MR. SALTZBURG:  I would like it for the record.  We can put him on the stand for this.

THE COURT:  No, it's fine to do it at the podium.

Mr. Rogers, if I could have you come up to the podium.  I just want to ask you some questions.

THE DEFENDANT:  Okay.

THE COURT:  So you understand that you have an

unconditional right to testify or not to testify at trial?  You understand that?

THE DEFENDANT:  I do.

THE COURT:  All right.  And you understand that you alone control the decision whether to testify or not?

THE DEFENDANT:  Okay.  Right.  I understand that.

THE COURT:  And have you had adequate time to discuss this decision with your attorney?

THE DEFENDANT:  Yes.

THE COURT:  And as I understand it, you are voluntarily deciding to testify; is that correct?

THE DEFENDANT:  Correct.

THE COURT:  All right.  Do you need any more time to think about this decision?

THE DEFENDANT:  No.

THE COURT:  Do you feel any pressure from anyone to testify?

THE DEFENDANT:  No.

THE COURT:  All right.  Anything further?  Is that adequate?  Okay.  All right.

So shall we have Mr. Rogers go ahead and get on the stand?

MR. SALTZBURG:  Yes.

THE COURT:  All right.  Mr. Rogers, you can -- do you have water?  All right.  Are we ready to bring in the jury?

MR. GITLEN:  Yes, Your Honor.

THE COURT:  Good to see you, Mr. Gitlen.

MR. GITLEN:  Hello, Your Honor.

(Jury entered courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.  We are now going to begin with the defense case.

Let me have Mr. Rogers sworn in.

JOHN ROGERS, WITNESS FOR THE DEFENSE, SWORN

THE COURT:  Mr. Gitlen?

MR. GITLEN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. GITLEN:

Q.   Dr. Rogers, can you please state and spell your name for the record.

A.   John Rogers.  J-o-h-n R-o-g-e-r-s.

Q.   And how old are you?

A.   64.

Q.   Where are you from?

A.   Originally born in Buffalo, New York, grew up in Wilmington, Delaware.

Q.   Did you go to college?

A.   Yes.

Q.   Where did you go?

A.   University of Delaware.

Q.   And what degree did you earn?

A.   Economics and political science.

Q.   And when was that?

A.   1983.

Q.   Do you have any advanced degrees?

A.   I do, a PhD in economics from the University of Virginia.

Q.   And what year did you earn your PhD in economics?

A.   1989.

Q.   After you earned your PhD in economics, what was your first job?

A.   Assistant professor in the Economics Department at Penn State University.

Q.   And what were the responsibilities that you had there?

A.   Teaching, research, and service.  So teaching PhD students, undergrads, research, publishing in academic journals was certainly the most important component of the professor's job. And service would be things like serving on committees, various committees in the department, like PhD dissertation committees, in particular.

Q.   And did you stay at Penn State?

A.   Well, yeah, I did, for five years.

Q.   And after you left Penn State, where did you go next?

A.   The Federal Reserve Board in Washington, D.C.

Q.   Why did you decide to accept a job at the Federal Reserve Board?

A.   There were a few reasons.  Certainly, the Fed had attracted me very much.  I had an offer from the Fed when I originally

came on the job market but chose Penn State over that.  The Fed has a really large group of economists, and that appealed to me. I like to work with other people coauthoring.

My wife at the time -- we were in graduate school together -- she was also on the faculty at Penn State, had a nice offer from the Congressional Budget Office in Washington, D.C.  So in some sense, she led the way.

Q.   So this was sort of like a couples move to D.C.?

A.   Yeah, I went on leave from Penn State for two years.

Q.   And when was this approximately?

A.   1994.

Q.   What was the first job that you had at the Federal Reserve?

A.   Economist in the International Finance Division.

Q.   And what does that mean?  What were your job responsibilities?

A.   So it's an entry-level position on the, you know, economics staff, and the job responsibilities were largely the same as a new Fed employee that they were on the faculty at Penn State. Just replace the teaching component with some contribution to policy.  It was mostly research and service at the Fed, just like research and service at Penn State, and some policy work would be involved.  When you're brand-new on the staff at the Fed, you really don't know enough to do much policy work.

Q.   Now, I know we've heard from, I believe, Dr. Judson that there are different divisions at the Fed.  What division were

you in?

A.    International Finance Division.

Q.    For your entire tenure at the Fed, were you always in International Finance?

A.    Yeah, uh-huh.

Q.    Now, did you stay at the level or rank of economist, or was there cause for promotion?

A.    I got promoted first to senior economist, then to section chief, and then to the official staff, starting as an associate director.

Q.    Could you take the jury through each of those steps and what those steps do in terms of changing your responsibilities at the Fed.

A.    Right.  So the movement from economist to senior economist is not a big change, but you are expected to be more of a self-starter.  You've figured out how things work at the Fed: Be a self-starter in the sense of proposing -- exhibiting success in doing research, proposing ideas to division management instead of always being asked to do something by division management.

Q.    So that was the shift from economist to senior economist?

A.    Uh-huh.

Q.    And then from senior economist, what was the next step?

A.    Section chief.

Q.    As a section chief, what would you do?

A.    So that's your first management responsibility.  So that is actually a big step, because you're managing the economists and senior economists in your section.

Q.    When you say that you manage them, what does that mean? Does that mean that they have research goals, and you supervise those?  Is it more of a logistical sort of thing?

A.    It's certainly the research, policy, and service aspect, but research at the Board really is not managed much from top down.

So when you become a section chief, it's more of the policy work -- it's mostly the policy work, management responsibility, some of the service.

Q.    I believe you said that you then had another promotion?

A.    Right, to associate director, further up the chain in terms of the official staff management responsibilities.  And then I became advisor, and then senior advisor was my final position.

Q.    Let's perhaps jump a little forward.  Is it fair to say that each time you're doing this, it's just more management responsibilities, or are there other things that I'm missing?

A.    Right.  So for most cases, that is actually true.  In my case, it was a bit different, because I stayed primarily on the research side of the International Finance Division rather than the policy side in the International Finance Division.

And as I explained just a minute ago, the research really is being done with the economists's own ideas.  And while the

managers can give you some guidance on your research, because they have more responsibility -- they have more experience, I should say, doing research, you know, you're expected to publish novel papers, contributing to the literature.  If the section chief has a good idea, he or she may want to work in a coauthored form.

Q.   So let's get to your terminal position.  What was that?

A.   Senior advisor.

Q.   And as a senior advisor, what were your job responsibilities?

A.   So managing the research component of the International Finance Division, so making sure that the research side of the International Finance Division was running smoothly.

Q.   Did you still have research responsibilities for yourself?

A.   Oh, yes, certainly.

Q.   Were there any other -- let me rephrase that.

How productive were you as a research economist at the Fed?

A.   Very productive.  I enjoyed research very much.  I was highly productive.

Q.   How do you know?

A.   Probably the most direct way is that there was an internal study conducted, I believe in the summer of 2020, in one of the other divisions, and I was ranked number 1 of all of the Board staff.

Q.   Now, you sort of explained that your path was unique in the

sense that there was policy work and there was research.

So at this point, what year did you become a senior advisor?

A.    I believe that was 2010.

Q.    All right.  So in 2010, you were a senior advisor.  You're talking about how there was the policy work and there was research.

How much policy work were you doing in your role?

A.    At that point, it's fair to say none.

Q.    From 2010 until your retirement in 2021, how much policy work had you done at the Fed?

A.    Essentially, none.

Q.    Now, I want to talk about other potential responsibilities you had as a senior advisor.  Were you responsible for any type of recruiting?

A.    Oh, yeah, that was the main service contribution I had.

Q.    And can you explain that to us.

A.    So by recruiting, that means hiring new staff, you know, leading up the efforts to hire new staff.  Now, of course, there are staff of many different ages, levels.  So my particular contribution to the recruiting efforts was hiring new PhD economists.

Q.    And how would you do that?  Would that require any travel?

A.    Oh, yeah, plenty of travel, yeah.

Q.    Now, as I understand it, there's travel as a part of the

recruiting.  Was there any other travel that was involved as a part of your job?

A.    Yes.  Most of the travel I did was to present research at conferences and seminars, either in the U.S. or abroad.

Q.    Now, when you say you present research, what do you mean by that?  Does that mean that you had a paper?  How does that work?

A.    Yeah, typically, it's that.  So you're working on your own research papers while on the staff at the Board.  Conferences are organized that may consist -- last for a couple of days, consist of 20 papers or so.  That would actually be a big conference.  Or -- that's one sense in which one travels to present research.

The other would be to give one-off seminars on your own at a particular university or institution.

Q.    Where would you travel?  Is this confined to locally? Domestically?  Internationally?

A.    All of the above.  Right?  So it's within the U.S.  There's a lot of economists in Washington, D.C.  The International Monetary Fund is right up the street.  The World Bank is right across from the International Monetary Fund.  And as large as we were -- we are, those two institutions are even larger.  So lots of economists in Washington, D.C.  Lots of lawyers in Washington, D.C.  So plenty of opportunities to travel very much locally, great universities like Georgetown and Maryland, but also, I would go frequently to Boston, Philadelphia.  So that

would be the domestic travel, and then lots of international travel as well, especially given I was in the International Finance Division.

Q.    Now, for all this travel, was all this travel approved by the Fed?

A.    Uh-huh.

Q.    What was your understanding of what the Fed's interest was in supporting travel like you've described?

A.    It helps establish the reputation of the institution, and at the Board, I would always tell this to the new PhDs I was recruiting.  We, meaning the Fed, care about our reputation at least as much as universities do.

        MR. GITLEN:  At this time I have what's been marked as Defense Exhibit 95 for identification.  I would like to show it only to the witness.

        THE COURT:  It's Exhibit 95?

        MR. GITLEN:  That's correct, Your Honor.

    Thank you, Ms. McQuaig.

        BY MR. GITLEN:

Q.    Dr. Rogers, do you see this document that's been marked as Defendant's Exhibit 95 in front of you?

A.    Yeah.

Q.    Do you recognize it?

A.    Yeah, it's my CV, and it's dated --

Q.    Excuse me.  What is it?

A.    It's my curriculum vitae, what we call a CV, and it's dated June 2024.

Q.    Do you see that scrolling?

A.    I do.

Q.    All right.  Does this look like a true and accurate copy of your CV?

A.    Yes.

MR. GITLEN:  Thank you, Ms. McQuaig.

At this time the defense offers Defendant's Exhibit 95 for identification into evidence.

MR. BARRY:  No objection.

THE COURT:  95 is admitted.

(Defendant Exhibit 95 received into evidence.)

BY MR. GITLEN:

Q.    Is it fair to say that at this point in time, you were an internationally recognized and accomplished economist?

A.    Yes.

Q.    All right.  I would like to now ask you four direct questions.

A.    Uh-huh.

Q.    Dr. Rogers, are you a spy for the Chinese?

A.    No.

Q.    Two:  Dr. Rogers, did you enter into agreements with Hummin Lee or his name is Jin Chuan or whatever his true name may be to provide the Chinese with Federal Reserve trade secrets?

A.    No.

Q.    Three:  Dr. Rogers, did you make any agreements with the individual we now know -- or we only know as Ricky or anyone else in China to provide to the Chinese Federal Reserve trade secrets?

A.    No.

Q.    Four:  Now, we've heard already that on February 4, 2020, that you had an interview with the OIG.  That's with Agent Hershkowitz there and his boss John Perez.

A.    Uh-huh.

Q.    They interviewed you.  Did you knowingly lie to them about sharing sensitive Federal Reserve documents with others?

A.    No.

Q.    All right.  We've been talking about Hummin Lee, so we're going to focus on Hummin Lee now.

A.    Okay.

Q.    When did you first meet Hummin Lee?

A.    May 2013.

Q.    Where were you?

A.    In Shanghai; at a conference at Fudan University in Shanghai.

Q.    And what was this conference?

A.    This was a conference sponsored by the Federal Reserve Bank of Dallas, and one of their staff economists invited me to come and talk about international aspects of Fed monetary policy.

Q.   And when did you first interact with Hummin Lee?

A.   He came up and introduced himself to me during one of the breaks.

Q.   And what did he tell you?

A.   That he was a PhD student at Shandong University.

Q.   Did you exchange contact information?

A.   Yeah.

Q.   And after you met him in 2013, did you initiate any contact with him, or did he initiate any contact with you?

A.   He initiated it.

Q.   How did he do that?

A.   Over e-mail.

Q.   Do you recall what the e-mails generally said?

A.   He was thanking me for a nice talk at the conference, enjoyed meeting me, and hoped that I could give that type of talk or some talk about my research at his university in Shandong.

Q.   So what is your understanding of what he seemed to want from you when you met him in 2013?

A.   So, you know, the typical conference or seminar invitation that one gets.  And during our time together at the conference in Shanghai, we also exchanged ideas about research topics that he might be able to use in his PhD dissertation.

Q.   Now, when you were exchanging research ideas, did that give you any cause for concern?

A.    No.   I mean, he seemed to be familiar with the basics of everything I was talking about.

Q.    All right.   Now, I want to remind you that we've all listened to the clips that were played from your OIG interview with Agent Hershkowitz.   And when he asked you -- do you recall this question:  "Is there anything odd about your interactions with Hummin Lee?" and you said something like, "Yeah, it seemed like he wanted me to write his dissertation for him"?   Where is that coming from?

A.    Right.   Hummin was very persistent in his reaching out to me, communication with me, and very persistent in his wanting me to come to his job.   And one meets lots of PhD students who kind of struggle at the dissertation stage.   PhD in economics typically takes six years.   He was at the third year.   So he was just beginning his -- the research component of his PhD degree.

Q.    Now, at this point, are you inclined to accept his offer to visit Shandong University?

A.    Well, at first, no.   I mean, I politely declined or, you know, took a while to get back to him.

Q.    All right.   Now, when was the next time you saw Hummin Lee in person?

A.    June 2016.

Q.    Where was that?

A.    Beijing.

Q.    Why were you there?

A.    I was invited to a conference at Tsinghua University that was organized by the Federal Reserve Bank of St. Louis to participate on a panel discussing Fed monetary policy.

Q.    And did you see Hummin Lee there?

A.    Yeah.

Q.    Did you have conversation with him?

A.    Uh-huh, yeah.

Q.    What did he tell you?

A.    He reiterated the invitation to me.  He was -- wanted me to be sure to know that the host would pay all the expenses for my travels.

Q.    And when you then met him in 2016, was there a change in -- let me rephrase this.

      What, if anything, did he tell you about whether he had earned his PhD?

A.    Well, he told me that now that, I guess it was, three years almost to the day, three years had passed, he was finished.  He was now a PhD, and he had moved into an assistant professor position at a nearby university.

Q.    When you say "nearby university," which university are you talking about?

A.    Shandong University of Finance and Economics.

Q.    And this is what we've been seeing on these -- on the ELMO, and that's where you see Jinan.

      Can you tell me the relationship between these two schools,

as you understood it?

A.   They're geographically reasonably close.  I mean, Chinese cities are big.  Even Jinan is actually quite big. Geographically close.  I think they also had connections at the academic level; like students from one university could take classes at the other.  And Shandong U was actually higher ranked.

Q.   Now, in 2016, did Hummin Lee introduce you to anyone when you were at this conference?

A.   He did, yes, one of his colleagues.

Q.   Who was that?

A.   He went by the name "Professor Cui."

Q.   So Professor Cui that we heard about in the OIG -- there's been lots of different ways pronouncing that -- that's who we're talking about?

A.   Uh-huh, yes, yes.

Q.   All right.  And what was your interaction like with Professor Cui?

A.   So he was extremely friendly, outgoing.  He always had a smile on his face.  He spoke no English, and he understood no English.  So everything was being translated by Hummin.

Q.   Now, believing that Hummin Lee was now an associate professor at this RIIPE institute, as I think you previously said, did that cause you to change your opinion about the offer that you also already described about teaching a seminar at

Shandong?

A.    Significantly so.

Q.    How so?

A.    In the sense that he was now a faculty member.  Faculty jobs are really competitive, difficult to get.  So I was quite impressed for him going from somebody who seemed a little bit lost on what topics he would work on for his PhD dissertation, now to have earned a faculty position at the admittedly lower ranked Shandong University of Finance and Economics, but still, a good university.

Q.    So did you then accept the offer to visit Shandong University?

A.    I did.

Q.    Did you inform your Fed -- did you inform the Fed about this?

A.    Yes.

Q.    Was there any sort of approval process?

A.    There is.

Q.    Can you explain to us what that approval process is?

A.    Right.  So the way travel gets accomplished is the economist fills out, you know, a fairly straightforward form online, giving details of the trip, basic things like dates that you will be traveling; method of travel; who will pay for the travel; the topic of your presentation if you're giving a seminar like I tended to do.

Q.   Is this a quick process, or does it take some time?

A.   It's relatively efficient, but it can take some time, but I wouldn't say too bad; the Fed approval part of the process.

Q.   So with the approval, when do you then go to visit Shandong University and, I believe, Shandong University of Finance and Economics?

A.   May 2017.

Q.   Where did you fly into?

A.   I flew into Shanghai.

Q.   And as we've seen again on the ELMO, Shanghai is three and a half hours away by high-speed rail to get you over to Jinan. That means you're dropping off at a train station.

     Was anyone there to meet you at the train station?

A.   Yes, Hummin was.

Q.   Did you get there in the morning?  In the evening?  Do you recall roughly what time you had gotten there?

A.   Evening.

Q.   And as a part of this, were there any arrangements made for your stay and accommodations?

A.   Yeah, yeah, at a hotel.  Hummin took me to the hotel.

Q.   Did you have dinner that night?

A.   So it was fairly late, I think around 9:30 or so, but we had some dumplings.

Q.   When you say "we," who was there?

A.   Hummin and Professor Cui again.

Q.    So presumably, you go to bed.  The next morning, you're now going to have an itinerary.

Did anyone discuss with you what the schedule of activities would be while you were there visiting?

A.    Yeah, like any good host would do, Hummin discussed the outline of the two-day schedule while we were having dumplings.

Q.    So the next morning when you're about to do the schedule, was anyone there to pick you up and shuffle you to where you need to go next?

A.    Uh-huh, Hummin.

Q.    And what types of things do you recall that you were doing when you were there visiting?

A.    So we first dropped off my stuff in Hummin's office, and then he escorted me around to meet the various faculty that wanted to talk to me on that day.  And then it was either right before lunch or right after -- I kind of forget, but that's a the typical seminar time -- I gave my first seminar and met faculty at the end of the day too.

Q.    Now, when you gave the seminar, was that done in a normal classroom?

A.    Yeah, yeah.

Q.    Were there people in the audience?

A.    Yes.

Q.    How many people do you recall, if you recall, were in the audience?

A.    I want to say 50.

Q.    And what was your understanding of their role or relationship with the universities that you're visiting?

A.    Most of them were students at the university.  I forget which one I did first:  Shandong U or SDUFE.  But at both places, it was a mixture of mostly students but faculty as well.

Q.    As Hummin Lee was shepherding you around to all these activities, did you have occasion to observe Hummin Lee's interactions with other faculty members?

A.    I did.

Q.    Did you observe his interactions with students?

A.    Yeah.

Q.    As you think back on it, was there anything about his interactions with staff, with professors, with students that would give you reason to doubt that he was an associate professor at this university, as he represented to you?

A.    No.  I mean, I sat in his office, left my stuff there.  He sat in on one of my meetings, a joint with a female faculty member.  I can't remember her name.  But it was like the two of them met me kind of in a more, you know, quiet one-on-one, as it were, discussion.

Q.    Now, at the end of this visit, did you have a meeting with Professor Cui?

A.    Yeah, it was -- I believe it was at the end.  Yeah, it was end.  So Professor Cui and some of the other more senior faculty

wanted to meet me and take a lot of photos and stuff like that.

Q.   You spoke about -- there was this question about packets of money and an honorarium.

A.   Uh-huh.

Q.   Did anyone offer you an honorarium or something like this during this visit?

A.   Yeah, uh-huh.

Q.   Who did that?

A.   Professor Cui.

Q.   Was anyone else there when he made this offer?

A.   I don't remember, to be honest.  Hummin probably was, because he was always translating for us.  So he must have, yeah.

Q.   I think you said that Professor Cui didn't speak any English?

A.   Yeah, right, he didn't speak any English, yeah.

Q.   And so when they offered you the honorarium -- let me rephrase that.

     Are you allowed to accept honorariums?

A.   No, not as a government employee, no.

Q.   And why is that?

A.   It's undue influence over potential policy, conflict of interest.  It's just in the rules that -- unlike academics who can accept honoraria all the time, so it's very common to offer honoraria to academics -- Federal Reserve employees, that's

strictly a no-no.

Q.    Did you accept the honorarium when it was offered to you by Professor Cui?

A.    No.

Q.    What, if anything, did you do?

A.    I explained to them the rules against accepting honoraria and the rationale for it as well.  I mentioned that the Federal Reserve pays me to conduct research and go and present research because it enhances their reputation and that they compensate me very well.

Q.    Did you get the impression that they understood what you were saying?

A.    Yeah, eventually, yeah.

Q.    You say "eventually."

A.    Yeah.

Q.    Does that mean initially --

A.    They were persistent; Cui was persistent.

Q.    And what did you do in light of that persistency?

A.    I persisted right back and explained to them I can't take the honoraria.  This is not the first time we were -- I was offered an honoraria and had to -- honorarium and had the exact same conversation.

Q.    Now, at the end of this, did they finally understand that you could not accept this honoraria?

A.    Yeah, uh-huh.

Q.    Did you then return back to the United States?

A.    Yes.

Q.    When is the next time you went back to Asia?

A.    October 2017.

Q.    And what were you doing?

A.    In Asia, I was one of the organizers -- the Federal Reserve Board, along with the Federal Reserve Bank of Atlanta and the Hong Kong Monetary Authority, sponsored a conference in Hong Kong in October of that year.

Q.    Can you -- do you remember, can you run us through what the itinerary was for that trip?

A.    So that was a very complicated trip.  So I had been invited to give a talk at Oxford University in London, I believe towards the end of September, still in September.  And my original plan was to go D.C., London, and right back, and then, you know, chill out for a week or so, and then go D.C. to Hong Kong.

However, in the middle of that, I also got invited by the Federal Reserve Bank of Chicago to attend a conference there. And the timing worked out pretty well for me to go D.C. to London to Chicago to Asia, Chicago actually being significantly closer to Asia than Washington, D.C., that kind of thing.

And so I wanted to do Chicago to Asia, but the gap between the Chicago Fed conference and the Hong Kong conference was pretty large.  So I was looking to fill that gap, ideally in Asia, so that I could adjust to the time differential.

Q.    All right.  Now, let me take a quick step back.

A.    Uh-huh.

Q.    At the end of your first visit at Shandong, how would you characterize the relationship that you had with Hummin Lee?

A.    It was a great visit, and I was impressed by his colleagues at the universities.  And so it was, you know, fairly, you know, professional, professionally rewarding.

But there was a shift around that time towards becoming closer as friends as well, and that was for a few reasons.

Q.    What were those reasons?

A.    So one, probably least important, is that we shared a lot of common interests, in sports in particular, but also, I had met a Chinese woman by then.

Q.    All right.  Before we get into that, I want to focus you back on the trip in October of 2017.

Now, did you have another invitation to teach or to have one of these seminars at Shandong?

A.    Yeah.

Q.    And when was that in this whirlwind trip that you were taking?

A.    It was in between the Chicago Fed conference and the Hong Kong conference.

Q.    Who invited you?

A.    Hummin Lee.

Q.    Now, as you just sort of alluded to, that you had this

nascent relationship with a woman, did that in any way contribute to why you were going to visit Shandong University the second time?

A.    Yeah.

Q.    How would you characterize the relationship that you had with this woman?

A.    It grew quickly and fairly intensely over the course of that first part of 2017.

Q.    Let me just ask you, who is she?  Who is this woman we're talking about?

A.    My current wife, Yu Liu.

Q.    So in October 2017, had you met her before?

A.    Yeah, on that May 2017 trip, because I flew into Shanghai.

Q.    Would this be the second time that you met her in person?

A.    The October trip was the second time I met her in person. The first time was in May of 2017 in Shanghai.  She lived in Shanghai.

Q.    What was your initial attraction to Yu Yu?

A.    I thought she was -- so we met on a dating website, and as is typical, one shares photographs and descriptions of their personal interests, a general description of themselves.  So I found her physically very attractive.  I still remember her profile photo taken in front of a very iconic spot in Shanghai, you know.  I thought she had a beautiful smile.  Her eyes were lovely and her hair.  So I was physically attracted to her.

But in addition, we seemed compatible at first blush in terms of our longer term goals, you know, "Why are you on the web site?  What are you hoping to find?"

Q.   Were you contemplating a future with Yu Yu at that point?

A.   Certainly, after I met her in May of 2017, yeah, certainly. Prior to that, it was all communication electronically.  So I actually joined the website on the memorable New Year's Eve of 2016.

Q.   And why was that memorable to you?

A.   I was all by myself.  I had four kids from my first marriage, three of whom were out of the house, by which I mean in college.  And it was New Year's Eve, so they were all out anyway, and here I was at home and kind of felt like a loser.

Q.   Now, in October of 2017, on that visit, were you physically intimate with Yu Yu?

A.   In October, yes.

Q.   When I say "physically intimate," let's be very clear.
     Did you have sex with Yu Yu?

A.   I did.

Q.   Did you use any protection?

A.   No.

Q.   Why?

A.   I didn't think it was going to be necessary.  I didn't think I could get her pregnant.

Q.   All right.  After this visit where you've been physically

intimate with her, did your feelings about Yu Yu change in any sort of meaningful way?

A.   They certainly did.  I mean, the physical aspect of our relationship, you know, took a significant step up from our first meeting in May, and I felt that our longer term goals, especially with respect to having a family, were quite compatible.  And so I became more attracted to her certainly.

At the same time, you know, the distance was large, the geographic distance between us.

Q.   Did you then at some point ask her to marry you?

A.   Yeah.

Q.   Why did you ask her to marry you?

A.   Well, I felt -- again, I felt that we were compatible, and we were both very attracted to each other.  And I also wanted to give her some incentive, so to speak.  That's a little bit of a crass word to be using for this type of relationship, but what I mean by that is to, you know, not give up on me as a potential partner, given all the difficulties we were likely to have, especially in terms of her being able to come to -- get a visa and being able to come to America.

Q.   When you say "difficulties," what kinds of difficulties were you contemplating?

A.   All right.  So not only was I contemplating them; I witnessed them personally.  So between the May and October visit, so summer of 2017, we applied -- I wrote a letter for her

to be the sponsor for her visa to come to America.  In that type of letter, you need to discuss in fairly detailed terms what will be done during the visit to America.  But her application was denied.

Q.   At this point, you spent time with Yu Yu.  Does Yu Yu speak English?

A.   No.

Q.   Do you speak Chinese?

A.   No.

Q.   And so you were exchanging these messages.  How were you guys communicating?

A.   Primarily in English, and she was doing the heavy lifting and doing the translating on her side.

Q.   When you say she was doing the translation on her side, what do you mean by that?  How is she functionally able to do this?

A.   Presumably, using something like Google Translate.  It wouldn't have been literally Google Translate.  But writing her message to me in Chinese and then getting it translated and then sending it to me.

So the first few months, I actually thought she spoke English.  There were beautiful translations of the e-mail messages.

Q.   Now, you asked her to marry you.  Were you contemplating a shortened engagement or a long engagement?

A.   Oh, long engagement.  Given all those difficulties of her coming over here -- I really wanted her to meet my mother and father, sisters and brother, see how she would adjust to America, how she would take to America.  I didn't want to separate her from her family.  She has a daughter from her first marriage, who was about eight years old at the time.

So it was going to be a very complicated union of the two of us, and I wanted to be patient about that.

Q.   Now, after you proposed, was there anything that changed your general plans of what was going to happen next?

A.   Yeah.  I got her pregnant on that October trip.

Q.   And how did you feel about that?

A.   Ecstatic.  I mean, it was certainly consistent with my longer term goals.  I love being a father.  I had four kids.  And so I always regarded the opportunity to become a father again at age 57 as really a gift from God.

Q.   Knowing that now Yu Yu was pregnant, how did that affect your timetable, if at all, about getting married?

A.   Oh, it sped it up dramatically.

Q.   Why is that?

A.   Well, for one thing, we -- you know, we needed to make a lot of plans.  The most important thing is that ultimately, we decided to get married in Hong Kong, and Hong Kong has a rule that pregnant women from the mainland are not allowed to enter after their 20th week of pregnancy.

Q.   I guess I'm a little confused.  How does that affect why the urgency?  Why do you now need to get married?

A.   Oh, I see what you're saying.  So I wanted our child to be a U.S. citizen, and the law was that if one of the parents is already a U.S. citizen, that no matter where the child is born, he or she has the option to be a U.S. citizen.

Q.   Now, you've now decided that you all need to get married. Can you describe -- well, before this, did you have any familiarity with what this process would entail?

A.   No.  I was learning quickly.

Q.   When you -- at some point, you learned that the process would be cumbersome; is that fair to say?

A.   Uh-huh, yes.

Q.   Was there anyone in China that you then went to for help with this process?

A.   Yes, yes, Mr. Hummin Lee.  He was the only person I knew in China outside of my wife.

Q.   And what did you tell him?

A.   I told him the great news, that Yu Yu was pregnant.  He was ecstatic and said, you know, "Anything I can help you out with, buddy, just let me know."

Q.   Was there any concern that you were not in fact the father?

A.   There was, and friends of mine in America, in particular, urged me, "Look, you met her on a dating website.  She's now pregnant.  Just make sure you are the father."

Q.    And are you?

A.    Yes.

Q.    Now, what sorts of things -- when you talked to Hummin Lee, what sorts of things did he assist you with vis-a-vis the wedding?

A.    So the first thing I remember him assisting us with was the verification.  So we went to an OB-GYN visit in Shanghai together.

Q.    Excuse me.  You said "verification."

What do you mean?

A.    Verifying that I was the father of the baby, yeah.

Q.    And you say that it's at an OB-GYN.

What was that process?

A.    Right.  So we visited a Chinese hospital.  So Chinese hospitals multitask like crazy.  You go there for everything. You name it; you always go to the hospital.

And we went to the OB part of it to get the sonogram done, get a better handle on the due date, and that all checked out. I mean, I remembered the date I got her pregnant and all that kind of stuff.

Q.    I want to make sure that I heard you right.

Who went with you?

A.    Yeah, so it was Hummin and I and Yu Yu.

Q.    Aside from that, was there anything else that Hummin helped with?

A.    That was probably the easiest part of it, the one I just described.

So we had to do a lot of paperwork, me being on one side of the world, Yu Yu being on the other side of the world, and us not having a common language.  So Hummin was instrumental in helping me navigate this cumbersome paperwork burden.

Q.    All right.  Now, you just said that you were each on other sides of the world.  So I think I may have made the assumption that you were both in China.

Is that not accurate?

A.    So I went and visited -- once I found out Yu Yu was pregnant, I wanted to accompany her to this visit to the hospital, you know, be supportive, get everything checked out to satisfy my skeptical friends, in part, but that was a very quick trip.  I think that was around -- I think it was around Thanksgiving of that year.  I remember having to come back pretty quickly from that.

Q.    Now, initially, what did you think this wedding was going to look like?

A.    Initially, I thought it would be a small civil ceremony in Shanghai, like me, Yu Yu, and her parents and Hummin.

Q.    Now, did you then ask Hummin Lee to be your best man?

A.    Uh-huh, yeah, at that time, yeah.

Q.    And why did you ask him to be your best man?

A.    Because I didn't know anybody else in China.

Q.   And at a certain point, it sounds like you didn't do the small civil ceremony.

A.   Right.

Q.   You did something else.  So what did you do?

A.   So ultimately, the wedding was held in Hong Kong at a really nice hotel.  So rather than just a small civil ceremony that I thought we would settle for for convenience sake, it was a much larger wedding in Hong Kong with, you know, a couple dozen, probably 30, 35 guests.

Q.   Now, at the wedding in Hong Kong, who did you ask to be your best man?

A.   Well, much before the wedding in Hong Kong, I asked my brother Tom to be the best man.

Q.   And was your brother Tom the best man?

A.   Uh-huh, uh-huh.  That's him right there.

Q.   Was your brother the best man at your wedding?

A.   Yes, he was.

Q.   I want to now talk about some of the guests that you invited.

     Did you invite this Professor Cui to your wedding?

A.   Uh-huh, yes.

Q.   Why?

A.   Well, he was very supportive of my travel to his university in Shanghai.  He was a very kind, very generous individual.  So I didn't have a large guest list.  I didn't know very many

people in China, a few more in Hong Kong.  So yeah.

Q.    Did he come to your wedding?

A.    No, no.

Q.    Did anyone else come to your wedding?

A.    Yeah, I mean, like I said, it was about 30, 35, but in his place, in Professor Cui's place, a guy named Ricky came.

Q.    And who told you about Ricky?

A.    Hummin.

Q.    What did Hummin Lee tell you about Ricky?

A.    So essentially, that Ricky had assumed Hummin's role at this research institute in Shandong and, you know, following Hummin's promotion to assistant professor.

Q.    And were there things that Hummin Lee did for you to help with this wedding in Hong Kong?  I mean, more specifically, day-of activities.

A.    Yeah, yeah.  I mean, he was indispensable all along.  One of the things was we had to go to the wedding -- sorry, the Marriage License Bureau in another part of Hong Kong.  So that was me, Hummin, and my 20-weeks pregnant wife in the already hot weather in March of 2018.

Q.    Ricky who was there, did Ricky do anything to help you, again day-of sorts of activities for your wedding in Hong Kong?

A.    Uh-huh, yeah.  So Ricky kind of watched over Yu Yu's parents.

Q.    Do you get married?

A.    Yeah.

Q.    All right.  Now, at this point, you're married.  Yu Yu is pregnant.

Do you stay in Asia or China at this point in time?

A.    Not for very long after the wedding.  So I think I was only able to stay like three days.

Q.    Where did you go?

A.    I came back to D.C.

Q.    I don't think I got this.  When was this wedding?

A.    March 3, 2018.

Q.    Now, knowing that Yu Yu was pregnant, did there come a time when you took paternity leave from the Fed?

A.    Yeah, so I wanted to be there for the birth of the baby. The due date was early July.  Yu Yu wound up having a C-section. So the exact date was kind of planned in advance, being July 5, and I applied to the Fed for paternity leave starting July 1.

Q.    And what's the process to do that at the Fed?

A.    You contact your supervisor.  You explain your request. There's an established paternity leave program already, and I applied under that.

Q.    All right.  So as you described, you returned back to China.

A.    Right, on July 1, yeah.

Q.    And was anyone there to meet you at the airport?

A.    Yeah, Hummin and Ricky.

Q.    And what kind of assistance, if any, did they provide you now that you're back in China for the birth of your daughter?

A.    So, you know, ride in from the airport.  I didn't know where Yu Yu had rented an apartment.  So I remember to this day getting out on the street and kind of looking for the apartment.

      And they hung around -- at least Hummin did, hung around in Shanghai, and we didn't really have much to do until the July 5 C-section date.  But Hummin accompanied us to the hospital for the birth of the baby.

Q.    At this point, Hummin Lee has come with you to the birth of the baby.  He's been lining all this up.

      In your mind, how would you characterize the relationship you had with Hummin Lee?

A.    So the personal side of the relationship, our friendship had grown much, much closer.  So I regarded him as a great friend.

Q.    With a new baby and your new wife, did that affect your plans for where you wanted to live in the short term?

A.    Yes.

Q.    How so?

A.    Well, I wanted to be there not only for the birth of the baby, but also to help out with raising the newborn, you know, taking care of the newborn.

      I remember when I left after the wedding being incredibly stressed about getting child care assistance for Yu Yu, kind

of -- in Chinese culture especially, the family does it.  I mean, they were all looking at me like I was crazy, that someone steps in to help with the baby, that being the mother in particular, mother or mother-in-law, or a sister, sister-in-law.

Q.    And did this affect your job at the Fed?

A.    Yeah, I mean, it did in the sense that my desire to help raise the newborn led me to apply for a sabbatical.

Q.    Now, can you explain to us, what is a sabbatical?

A.    So a sabbatical is an official policy that the Fed has that allows staff to take off up to four months, visit some other institution or just stay at home, and typically to hang out and do their research -- you do have to work -- and still get paid.

Q.    Had you ever taken a sabbatical before?

A.    No.

Q.    Now, can you run us through what the process is to apply for a sabbatical from the Fed?

A.    Right.  So the staff member proposes a plan of what you will be doing -- when you will be away, and what you will be doing when you are away.

Q.    And did you create a proposal?

A.    Yeah.

Q.    Now -- Dr. Rogers, are you all right?

A.    I am, yes.  Thank you for asking.

Q.    Now, to your mind, were there any limitations on what you can do during the sabbatical?

A.    Yeah, there were very well-spelled-out limitations as to what you could do.

Q.    What were they?

A.    So the main issue evolved around getting paid from somebody else, given that you were already getting paid by the Fed.

Q.    Now, you had said that there was a proposal that you had drafted.

What was your proposal?

A.    So my proposal was to spend my four-month sabbatical in Shanghai, and the host institution would be Fudan University.

Q.    Now, to do that, does that mean you have a contract with Fudan?

A.    Yeah, yeah, you did, and you had to include that in your sabbatical proposal, say, you know, here's what I will be doing while being hosted by this institution; here's the amount of pay that I will receive; and that pay was allowed only if you were teaching.

Q.    Was there another school in Shanghai that you were also going to teach at?

A.    Yes, Shanghai University of Finance and Economics came on board second.

Q.    So would there also be a contract for that?

A.    Yeah.

Q.    Was that all disclosed to the Fed?

A.    Yeah, okayed by the Fed.  I included it in my official

66

sabbatical proposal.  It had to be revised.  And it was okayed.

Q.    And once you decided that you were taking a sabbatical, you get your Fed approval, did you ever talk to Hummin Lee about this?

A.    Oh, yeah, yeah.  We were really close friends.  I kept him involved with the news, yeah.

Q.    And what, if anything, did he say in reaction to your news about the sabbatical?

A.    So certainly, he was quite happy that I was coming and said, "Hey, you know, if you're already teaching at Fudan and SHUFE, how about teaching in Shandong at my university?"

Q.    Were you willing to do that?

A.    Yeah.

Q.    Now, as we've seen, Shandong University is in Jinan.

A.    Uh-huh.

Q.    You're otherwise teaching at two universities that are in Shanghai.

A.    Uh-huh, right.

Q.    Is there any requirement that you had to teach -- if you were going to teach for Hummin Lee's university -- in Jinan, or was it supposed to be in China?

A.    Once Hummin proposed that I teach his PhD students, the PhD students at his research institute, I said, "Why don't you come down and sit in on my PhD class at SHUFE."  It was a PhD class at SHUFE, and it was like an M.B.A. teaching at Fudan.

Q.    And was he amenable to that?

A.    Not really.  I mean, he didn't shoot it down initially, but he said he had to check, you know, with the dean, with the students, would he be able to make that commitment.  It was twice a week that I was teaching at SHUFE.

Q.    Ultimately, does he agree to have his students sit in these classes at Shanghai?

A.    Not at the ones with SHUFE, no.  He just said it was not going to work out, in part because they were Thursday and Friday evenings, and that would just conflict with a lot of things in Shandong.

Q.    So ultimately, what was the resolution about teaching classes for Shandong?

A.    I agreed to create a separate class for them, for his PhD students, in Shanghai.

Q.    And when would they meet?

A.    They would meet on evenings or weekends, you know, consistent with Fed requirements, but it turned out to be not regular meeting days during the particular week.  So we started off trying to do it at fairly regular intervals, you know, like Saturdays once a week, but that didn't work.

Q.    Is there a contract that was drafted up for this teaching?

A.    Eventually, yes.

Q.    All right.  Can you pull up what's been already entered into evidence as Government 3D, please.

Do you see this, Dr. Rogers?

A.    I do.

Q.    Do you recognize it?

A.    Yeah.

Q.    What is it?

A.    It's the offer letter from a dean at Fudan, at Hummin's university.

Q.    Do you tell the Fed about this -- these classes?

A.    No.

Q.    Why not?

A.    Because ultimately -- So I got the contract too late. By "late," I mean, I believe it was November.  So I tried to get the contract from Hummin to revise my official sabbatical offer for a second time so that I could accept reimbursement for the teaching.  But the offer letter came too late.  There was nothing I could tell Sean Croston.

      And furthermore, although we started the semester, you know, kind of every couple of weeks, I think, the first two classes were, that soon slipped.  So, you know, ultimately, it didn't meet -- the class didn't meet the six or seven requirements that I had laid out to Hummin that, look, the course has to satisfy these criterion which I had taken from some internal Fed website about what constitutes outside teaching, getting compensated for outside teaching.  So I knew that was just not going to happen.  I was not going to be able

to be compensated for this.

Q.   And yet, you still were teaching these classes?

A.   Yeah.

Q.   Why?

A.   I mean, Hummin was my friend, and I owed him a lot.

Q.   All right.  Now, can you pull up what's been entered into evidence as Government Exhibit 3E and 3F, if we can do the side by side.

Now, Dr. Rogers, do you recognize this exhibit?

A.   I do.

Q.   This is the exhibit that the government has been saying is taskings that you were given.

When you look at this -- and I'm going to also add that what we've heard is we've heard from various experts saying that when you look at these, quote/unquote, taskings or, scare quotes, taskings, that basically, this is asking for specialized and sensitive Fed material information.

My question to you is, when you look at this, is there a way to answer these questions without using any Fed sensitive materials?

A.   Certainly.  So when I looked at this, I felt that these were bread-and-butter classic questions in international finance and macroeconomics, and they not only could be addressed without using any sort of Fed sensitive information, but these questions have been addressed in the literature for dozens of years,

myself working on such topics.

Q.   So, for example, with number 1, what do you mean by that when you say this stuff has already been out there?

A.   So, "The Fed raised interest rates several times during the past two years.  Why is the dollar not showing significant changes in appreciation," dah, dah, dah, dah, dah.

So there is literature in international finance, whose first seminal contribution was 1979, known as the interest rate parity theory and evaluating the validity of this theory.  I've written on the topic itself.

No secretive, classified information is necessary to address this question.

Q.   If we could pull up what's been entered into evidence as Government Exhibit 351.

Dr. Rogers, do you recognize this exhibit?

A.   I do.

Q.   And what is it?

A.   So this was an e-mail exchange between me and two colleagues at the International Finance Division at the Fed, Anna Wong and Alain Chaboud, and I was asking for their advice, Anna especially because she's our China expert, about how to go about -- how to go about having discussions with folks in China who is interested on Fed views on various international finance issues.

Q.   In the response here in the first paragraph, do you see

where it says, "DesiGov Note also contains some broad discussion of current account imbalances and rebalancing. I think it should be okay to share the views in there"?

Did I read that correctly?

A. Yes.

Q. What did you understand that to mean?

A. That it would be okay trying to discuss what's the content of this note, the sort of, you know, nuts and bolts of this, with people in China.

Q. Thank you. Can you now put up -- sorry.

Do you notice that in the attachment line, there are two attachments to this e-mail?

A. Right.

Q. I would like you to pull up, please, what's been entered into evidence as Government Exhibit 351B.

Do you recognize this document, Dr. Rogers?

A. Yes.

Q. What is it?

A. This is an "Economic Development and Challenges in China." So this, I believe, is one -- this is the DesiGov contribution from Anna on, you know, economic developments and challenges in China, so what's been going on in the Chinese economy, Chinese financial markets.

Q. Did you review this document at the time?

A. Yeah, uh-huh.

Q.   All right.  Now, what the government has already shown is that you then forwarded these documents to Hummin Lee.

A.   Right.

Q.   Why did you do that?

A.   For use in the class, you know, conducting these lectures. I was giving lectures on bread-and-butter issues in international finance, and this was -- these recent economic developments in China were something that I could use to motivate some of these more academic discussions, lectures that we would have in class.

Q.   Did you have a belief about whether these documents had any sensitive information or not?

A.   I did.  I had the belief that there was no sensitive information in this document.  It's just a description of what's been happening in the Chinese economy that can be used to motivate an academic discussion of some of these classic theories in international finance.

Q.   All right.  Thank you.

A.   That was the subject of our classes.

Q.   Next, can you please pull up what's been entered into evidence as Government 353.

     Dr. Rogers, do you see this exhibit?

A.   I do.

Q.   Do you know what it is?

A.   Yes.  This is an e-mail exchange between me and my Fed

colleague Aaron Flaaen.

Q.   And what was the background for you to send this e-mail and for the response?

A.   Well, Aaron had e-mailed me while I was in -- on the sabbatical in Shanghai and said, "Hey, I've been working on this new research topic.  I'd like to get your feedback on it.  Can we meet for coffee some time?" that sort of thing.

     And I said, "Well, I'm not sure if you know it, but I'm actually on sabbatical in Shanghai," and I said, you know, "While I've got you here, can I bend your ear, get something in writing from you about your recent work on the effects of U.S. tariffs on Chinese goods."

Q.   And what did he do?

A.   He sent me these attachments that you see here in the e-mail exchange.

Q.   Now, if you're able to zoom up in that first paragraph.

     Now, do you see where it says, "All of the material in what I've attached is from publicly available data.  From that perspective, there are no constraints in sharing."

     And then it says, "I'm simply not sure whether material that has been submitted through the chain is thereby restricted from sharing outside the system.  I assume you would know the rules better than I."

     What did you understand that to mean?

A.   That I could use my judgment, should use my judgment, and

if my judgment was such that there was no sensitive material in here, publicly available data, that I could share it.

Q.   Thank you.  Can you now pull up Government Exhibit 353B. For the Court, that's in evidence.

Now, Dr. Rogers, do you see this exhibit?

A.   Yes.

Q.   And what is it?

A.   So this is a memo from Aaron to his boss, the division director of the division known as Research and Statistics.

Q.   All right.  Now, is this the memo that was described in the previous e-mail?

A.   Yes.

Q.   Did you review this document?

A.   Yes.

Q.   Now, did you have an opinion as to whether it had sensitive information or not?

A.   Yes.  I came to the opinion that it did not.

Aaron became very famous in academic circles for publishing a paper on this exact material, the paper examining the effects of the U.S. tariffs in one particular industry, that being washing machine imports from China.

Q.   Now, the government has also shown that this is one of those e-mails that, again, you took the washing machine tariffs and you sent it to Hummin Lee.

Why did you send this to Hummin Lee?

A.    To -- as a part of the discussion in our class.

Q.    Now, when are these classes occurring roughly?  What's the time frame of the sabbatical?

A.    August 29 through December 29.

Q.    Now, did there come a point in time when you ended up meeting up with Professor Cui during that time period?

A.    During that time period, yeah, once.

Q.    Where did you meet him?

A.    Jinan.

Q.    Why had you gone to Jinan?

A.    So Jinan is in between Shanghai and Beijing.  I had an invitation to give a seminar at Tsinghua University in Beijing and was interested in going to Jinan to visit Hummin, either on the way to Beijing or returning from Beijing.

Q.    And what happened after this meeting, after meeting with Professor Cui?

A.    So Professor Cui was his usual jovial, you know, "Cheers to John Rogers, he's the greatest guy ever" self.  And that all got translated through -- by Hummin.

    But he also made me feel a bit uncomfortable, not only with all the praise -- that alone made me feel very uncomfortable -- but through a request.

Q.    What request did he make?

A.    So it got translated by Hummin to either rumors or gossip; he wanted to know rumors or gossip about the Federal Reserve.

Q.    And what did you do in response to his request about rumors or gossip from the Federal Reserve?

A.    I believe my exact quote was, "I don't know any rumors at the Federal Reserve."

Q.    Did this change your opinion about Professor Cui?

A.    Oh, yes, significantly so.

Q.    How so?

A.    I just felt that it was a completely inappropriate statement to make, you know.  Here we were, you know, with Hummin and Ricky having substantive discussions about economic research, economic policymaking, and here comes jovial Professor Cui to, you know, pour cold water on it all with that question.

Q.    We've heard about spillover effects.  Were there any spillover effects here about what you thought about Professor Cui that you then brought over to Hummin Lee?

A.    So yeah, I mean, I think there was a sort of good cop/bad cop kind of thing, for lack of a better word, where Hummin felt obligated to translate for Professor Cui, him being more senior to Hummin, but that Hummin didn't really have any appetite for this type of conversation either; so sympathetic with me in that sense.

        MR. GITLEN:  Your Honor, if I may inquire.  It's quarter to 12:00.  I could continue, and I probably would be able to finish in maybe another hour or so.

        Would you prefer to take a break now, or what would the

Court --

THE COURT:  You mean a mid-morning break or for lunch?

MR. GITLEN:  I mean the mid-morning break.

THE COURT:  Okay.  We've been going for, what, an hour and a half?  Let's take a ten-minute break, ladies and gentlemen.

(Jury exited courtroom.)

(Recess taken from 11:46 a.m. to 12:01 p.m.)

(Jury not present.)

MR. GITLEN:  Just so the Court is aware, we're switching from the government helping with the exhibits to now having the litigation support staff for the defense monitor the remainder of the exhibits.

THE COURT:  Okay, so long as the exhibits are identical to the ones that have been admitted.

MR. GITLEN:  They are.  I had heard from the courtroom deputy that there sometimes is connection issues on this table.  So I wanted to -- that's why there might be more of a delay, I think, with propping these up, but I do have them all teed up.

THE COURT:  All right.  Well, let's hope that we don't need to call IT.  If we do, do you need your paralegal to be doing it to highlight certain things, if we run into that problem?

MR. GITLEN:  No.  It really just is to pull up the exhibits.  That's exclusively what I'm really looking for.

THE COURT:  All right.  We will hopefully not have to address the IT issue, but if we do --

MR. GITLEN:  I agree.  I just remembered sitting there, and I looked over to Your Honor and said, "I've touched nothing."

THE COURT:  It's a recurring problem.  It's a mystery.

MR. GITLEN:  Thank you, Your Honor.

THE COURT:  Thank you for letting me know.

(Jury entered courtroom.)

THE COURT:  Mr. Gitlen, you may continue.

MR. GITLEN:  Thank you, Your Honor.

BY MR. GITLEN:

Q.   Very briefly, just by way of recollection, where we left off was towards the end of the sabbatical.  I had asked you about meeting with Professor Cui.  You told me that you met him in Jinan.

A.   Right.

Q.   And that was the meeting where he had asked you about rumors, and that you told him you had no rumors.

A.   Right.

Q.   And that very much soured the relationship.

A.   Yeah.

Q.   Did you ever see Professor Cui again after that?

A.   I don't think so.

Q.   All right.  Now, we've come toward the end of the

sabbatical period.  I want to make sure that I understand this correctly.

You're teaching at Fudan.  Are you getting paid for the work that you're doing at Fudan?

A.   Yes.

Q.   Okay.  You're teaching at SHUFE, so the Shanghai University of Finance and Economics.  Are you getting paid for that?

A.   No.

Q.   Why not?

A.   I didn't have the right visa when I first arrived in Shanghai for the beginning of the sabbatical.  I was on a tourist visa.  And I was unable to open up a bank account in China on a tourist visa.  I tried to allow -- so I asked is what I mean -- if they could just deposit my paycheck into my wife's Bank of China account.  Nope.

So I actually had to go back to the U.S. -- so I faced the decision, go back to the U.S. and change my tourist visa to a work visa or not get compensated for the teaching.  Ultimately, I chose to go back to the U.S. and change my visa.

But by the time I accomplished that, SHUFE told me I was too late in filing the paperwork.  They were very, very sorry, but I had kind of missed the boat on getting reimbursed.  They would try to make it up for me in the future somehow with a similar arrangement, but that was that.

Q.   So does this explain why SHUFE does not appear on that 2019

reimbursement form that you filed with the Fed?

A.   Right.

Q.   And the reason for that was because you didn't get paid?

A.   Right.

Q.   But you did do the teaching?

A.   Uh-huh, yeah, yes.

Q.   To the best of your recollection, is that what you communicated with Sean Croston, or was it not quite in those words?

A.   Yeah, no, Sean called me, asked me about it, and I told him I didn't teach for pay.

Q.   Would you agree that that phrase "didn't teach for pay" might be misunderstood, that you didn't teach at all as opposed to you did teach but not for pay?

A.   It seems to be how it was interpreted, yeah.

Q.   Let's back up.  Do you return to the United States immediately after?

A.   Yeah, towards -- just before Christmas.

Q.   Are you able to bring Shu-Shu and Yu Yu with you?

A.   No.

Q.   Why not?

A.   The paperwork had not been completed either for my wife's visa, nor had Shu-Shu received her U.S. passport.

Q.   What steps did you need to take in order to allow them to travel to the United States?

A.   So we had finished all the paperwork with Shu-Shu's passport application, but Yu Yu still needed to have an in-person interview for her, you know, ultimately Green Card application, the first step of which is a visa.

Q.   Were there any other problems that came up during this process?

A.   Later in the process.  So ultimately, the paperwork for the visa and Shu-Shu's passport came through in, like, end of January, and I was swamped with recruiting.  Economists recruiting happens in January and February every year.  So I wasn't able even to come and get them until the beginning of March, and that's precisely what I did.  I flew to Shanghai, I believe it was March 1st.

Q.   I believe the government had this photo of you from Facebook where you said something about "This little illegal alien can't come into the United States."

     Do you recall that?  Can you explain that post?

A.   So I had made flight reservations for us to return to the United States on March 15.  So I took off from March 1 -- off work for the Fed from March 1 to March 15 to make sure it gave plenty of time to get all the paperwork done, or so I thought.

     But when we arrived at the airport to check in for our March 15 flight, the ticket agent told us that we couldn't go, that my wife and I could go to America but the baby could not.

Q.   And confronted with this new-found difficulty, what did you

do?

A.    So I -- you know, it's one of these cases where you're so knocked out of air that you can't even breathe enough to complain, and I just felt helpless.

Hummin and Ricky accompanied us to the airport to help with our luggage.  Remember, we're relocating everything to America.  So we had huge pieces of luggage.  Hummin seemed to understand why we were not allowed to leave, why the baby was not allowed to leave.

Q.    Did you think that was odd?

A.    Say that one more time.

Q.    Did you think that was odd that he seemed to understand why the baby would not be allowed to leave?

A.    That guy seemed to know everything, yeah.

Q.    Now, you said that you were moving, relocating from China to the United States.

Is that the reason why Hummin Lee and Ricky were in the area?  Were they helping you move, or did it happen to be that you had a problem at the airport, and you called them up, and they happened to show up?

I'm trying to understand where they were --

A.    Oh, I see, during the March 15 thing.  They were helping us with the suitcases, lugging them to the airport, and one of us held the baby.  And then they were there listening in on everything when the ticket agent kept looking for Shu-Shu's

visa.  I said, "Why does she need a visa?  She's a U.S. citizen. Here's her passport."  It turns out we needed a visa.

Q.   So was there anything else that Hummin Lee did to solve this problem or assist you in getting whatever exit visa was required for Shu-Shu to ultimately leave China?

A.   Right.  So at the airport, the agent explained that Shu-Shu couldn't leave because she needed an exit visa from China.  And we tried first going to the Shanghai Entry/Exit Bureau to get a retroactive exit visa for Shu-Shu.

Q.   And did you get that?

A.   No, not in Shanghai.

Q.   What happened next?

A.   You need to get that exit visa in the hometown of the mother, not where the mother is living, because that was Shanghai, but in her birthplace.

Q.   And did you go to her birthplace?

A.   We did.

Q.   And when you say "we," who was that?

A.   Hummin, baby, me, Yu Yu.

Q.   Did Ricky go, too, or is it just the people you identified?

A.   Yeah, I think just Hummin.  I don't quite remember.

Q.   Now you've gone to Yu Yu's birthplace.

A.   Uh-huh.

Q.   Did that finally solve your problem?

A.   Yeah, uh-huh, but it still took a while, yeah.

Q.    So when did you then come to the United States as one big happy family?  When did that actually happen?

A.    April 1st of that year.

Q.    Now, when you say April 1, I want to make sure.  Were you at that time in China, or were you in the United States?

A.    So I came back -- once we -- with the tremendous help of Hummin, once we filled out the paperwork in Hanzhong City, my wife's birth town, I had to come back to -- for a couple of reasons.  One, I had run out of medication -- I foolishly brought only 15 days' worth -- and I had work obligations.

So I actually came back without my baby and wife, waited out the paperwork process -- paperwork completion process that was happening in Hanzhong City, while my wife and Shu-Shu stayed with my mother-in-law in Xi'an, which is near Hanzhong City, and I waited for news about the completion of Shu-Shu's exit visa.

Q.    When you got the news, what did you do?

A.    I flew to Beijing.  So that's the most convenient place to fly to if your aim is to, you know, meet up with someone in Xi'an, and basically turned right around with my wife and the baby and came back to D.C.

Q.    Basically, did you leave the airport?

A.    Not really.  So there's a hotel that we stayed at attached to the -- essentially attached to the airport.

Q.    All right.  So you now return to the United States, and I want to talk about that.

When you all came now back to the United States -- Shu-Shu, the baby; Yu Yu, your wife -- was married life with Yu Yu what you expected?

A.   No.

Q.   How was it not?

A.   So she had a very difficult time adjusting to the new life, and understandably.  I was very, very sympathetic.  In particular, she developed symptoms of paranoid schizophrenia.

Q.   Now, you're back in the United States; new wife, you just said paranoid schizophrenia.

Were you sharing a marital bed?

A.   At first, we did, but that changed probably within the month.

Q.   So April, May thereabout?

A.   Uh-huh, yes.

Q.   And when you no longer are sharing a marital bed, where are each of you sleeping respectively?

A.   So I was in the larger bedroom, the master bedroom.  We had a house.  And Yu Yu slept in the guest room.

Q.   You're no longer sharing the marital bed.

Are you physically intimate?

A.   No.

Q.   Let me be more explicit.  When was the last time you had sex with Yu Yu?

A.   The night I got her pregnant.

Q.   Now, at certain points -- are you all right?

A.   I'm good.  Thank you.

Q.   Now, at a certain point, did you seek comfort elsewhere?

A.   Yes.

Q.   What did you do?

A.   I had an Instagram account, and I very foolishly responded to scam e-mails, scam messages over Instagram.

Q.   And when you say "scam messages," what are you talking about?

A.   Yeah, so I would get a message indicating interest in me on the part of very beautiful women; at least photos of them were very beautiful.  And I responded and ultimately poked the bear, for lack of a better expression.

Q.   When you say "poked the bear," what do you mean?

A.   Well, you know, some of these e-mails -- messages, I should say.  Sorry.  Some of these Instagram messages were kind of obviously fake, and I would say things like, "Oh, why would a beautiful woman like you be interested in an old, boring guy like me?"  And they would reply, "Oh, no, age is just a number," seems to be a well-used quote.  "What really matters is compatibility and shared goals."

    And I continued to engage, sometimes in a receptive way; other times in a, you know, confrontational way, like, "You're not real, come on," kind of thing.

Q.   Now, with any of these individuals, did you believe them

to -- while we all can understand that some of them were scams, did any of these people that you were interacting with, did you believe them to actually be the beautiful woman that they appeared to be?

A.    I mean, there were some I wasn't sure about.

Q.    And in your conversations with them, would you exchange photos?

A.    Yes.

Q.    And what would this photo exchange sort of look like?

A.    Well, it would start with, you know, the woman showing me a fairly risque photo and me reciprocating, say, with my shirt off, and then she would reciprocate with her shirt off, and it sort of evolved, devolved from there, becoming even more risque.

Q.    Now, how are you taking these photos?

A.    With my phone.

Q.    Did you ever take them with your iPad?

A.    Phone and iPad, sure, two devices.

Q.    Your iPad, who owns that?

A.    My iPad was a personal iPad, and it was actually linked to my phone to the degree -- so like the photos were all linked.

Q.    Now let's turn to the phone.

A.    Right.

Q.    Who owned the phone?

A.    The Fed; the Fed.  I didn't have a personal phone.

Q.    So to be clear, what you're doing is you're taking nude

photos of yourself with your Fed phone?

A.    Yep.

Q.    Where would you take these photos?

A.    Typically, in my home, but not only there.

Q.    You say "not only there."

Where else did you take some of these photos?

A.    At work.

Q.    So when you say "at work," do you mean at the Fed, the offices at the Fed?

A.    In particular, at the gym that is in the same building as my office at the Fed.

Q.    Now, at a certain point, did the tenor of these communications with these people that you're talking to change from the solicitous sort of flirtations to something else?

A.    Yes.  They turned very seriously threatening.  So whereas at first, "Oh, you're so handsome, and age is just a number, I'd love to meet up with you," it changed from that to very threatening.

Q.    So before we get to the threatening one, let me just take a step back, because I think a lot of us are familiar with these scamming kind of interactions.

Did you ever pay anyone?

A.    I did.

Q.    Can you tell us about any of the payments that you made?

A.    So I remember paying one scammer who posed as a beautiful

woman, and when I made these challenges about his/her true identity, much to my surprise, I received a black-and-white photo of a young male in Nigeria who revealed his true identity. And I felt sorry for him, and I paid -- it was like a $50 gift card or something like that, iTunes gift card.

Q.   Did you ever pay anyone else?

A.   I think there may have been one other of a similar nature, yeah.

Q.   Do you recall what kind of money we are talking about that you paid them?  Are we talking about thousands of dollars? Hundreds of dollars?

A.   No, it was like a $50 -- they seemed to all want iTunes gift cards.  And so I think it was two $50 -- to two different people, $50 iTunes gift card.  The first guy said, "Oh, it didn't work, can you send me another one," which I did not do.

Q.   Turning back to the threatening one you were talking about, can you talk to us a little bit more about what that message looked like?

A.   Right.  So they demanded money from me by sometime later that day, and that if I didn't pay up -- so we're talking maybe $1,000, around that range.  If I didn't pay up, it would rise to $4- or $5,000, and every hour, it would continue to rise up. Most worrisomely, they also threatened to kidnap Shu-Shu, who was 18 months old at the time.

Q.   Dr. Rogers, when you got that message, what was your

reaction?

A.    I called my -- one of my supervisors at the Fed -- or wrote him an e-mail.

Q.    All right.  That's what you did.  I'm really more asking, how did it make you feel when you got that message?

A.    Very scared and wanting to protect my family.  They said they knew where I worked, when I worked, the kind of car I drove.  They knew a bit about my family and, like I say, threatened to kidnap Shu-Shu.  So it made me very frightened and in need of protection.

Q.    So you said that you talked to your supervisor at work.

A.    Uh-huh.

Q.    Who was that?

A.    Brian Doyle.

Q.    What did you tell him?

A.    Brian Doyle expressed sympathy and recommended that I contact the law enforcement unit at the Fed, LEU, and that they have lots of FBI contacts, and they can be of help.  And so I contacted -- it might have even been the same day.  I remember it was Super Bowl Sunday of 2020.  And so then I contacted the Office of Inspector General, the OIG.

Q.    And that's the meeting on February 4 that we all have been hearing clips from through Agent Hershkowitz; is that right?

A.    That's correct, yeah.

Q.    All right.  Now, from your perspective, what was the

purpose of that meeting?

A.    Seeking that protection that I just described, protection of my family.

Q.    Now, the government has talked about how -- they've said that you were asked about the photos, salacious photos, but you don't initially say you have these photos, and then upon expert interrogation, they then -- you then reveal that you did have these kinds of photos.

My question to you is, why did you not tell them from the very beginning that you had these photos in your phone or your devices?

A.    I was embarrassed.

Q.    Before you went to that meeting, did you have any idea what agents for OIG or the FBI would want to do with any of your devices?

A.    Not really.  I mean, I brought to work that day both of my devices, so the Fed iPhone, which of course I always bring, but I also brought the personal iPad, which is something I never typically do in going to work.  So, you know, there was certainly the expectation that they would want to see that device, as well as my phone.

Q.    And at that point, did you know -- well, at that point, you knew that there were these nude photos that you had taken of yourself on these devices?

A.    Uh-huh.

Q.    Is that fair?

A.    Correct.

Q.    All right.  Knowing that, when you then, at the end of that interview, gave consent to have OIG for whatever purpose image your devices, did you think that there was any chance they were not going to find these photos?

A.    No, I knew they would find them.

Q.    And knowing that, why did you still give consent for the government to search these devices?

A.    Because I wanted their protection.

Q.    All right.  In the same interview, who brought up Hummin Lee?

A.    I did, in response to questioning from Agent Hershkowitz.

Q.    And why did you bring up Hummin Lee?

A.    Well, the agent was asking me about all my contacts.  I described to him the nature of my work and that I did a lot of traveling, both domestically and abroad, and the conversation then turned towards that travel and the people that I met when I was overseas.

Q.    The culmination of this, is it a fair characterization that you were then given a choice, which was basically to be allowed to retire, but if you did not do that, you would be terminated?  Is that accurate?

A.    Yeah, that's what happened at the end, yeah.

Q.    And what did you choose?

A.    To retire.

Q.    And did that mean you had to sign separation agreements?

A.    Yes.

Q.    Now, we've heard about the good-bye e-mails that were sent. Did you have authorization to send good-bye e-mails to your colleagues at the Fed?

A.    Yeah, so they had cut me off from all access to Fed materials during the meeting in which they urged me to agree to the separation. So I was cut off. But through Brian Doyle and my Gmail, so my contacting Brian through my Gmail, I was encouraged to write a farewell e-mail to all my colleagues; very common thing to do when people retired from the Board.

Q.    And in that farewell message, did you explain the true reason of why you were retiring?

A.    Yes and no. I mean, I certainly didn't reveal all the embarrassing, you know, photos and the consequences of my going to the OIG, no, but I revealed my next steps, which was to, you know -- I had accepted a job by then.

Q.    And why didn't you tell them about the photos?

A.    It was very embarrassing.

Q.    All right. Now, for this next step -- I want to get into that. What was the next step for you as you saw it?

A.    If I remember the timing right, I had the meeting in which I was informed of my decision, my choice, and I think it was March 15, and so we're talking about 20 -- we're talking about

2021 here.  And I was -- I had to, you know, come to a decision by the end of April of 2021.

In the interim, I looked around for possible places to continue my work.  So I did a small job search and had interest from a couple of places, most decisively from Fudan where I had done my sabbatical three years earlier.

MR. GITLEN:  Can you please pull up -- excuse me.  Court's indulgence.

THE COURT:  No problem.

BY MR. GITLEN:

Q.  I'm showing you what has been marked as Government Exhibit 315A, which is in evidence.

Dr. Rogers, can you see that?

A.  I can, yes.

Q.  Do you know what it is?

A.  That is the contract I signed to become a professor at Fudan University following that job search I just described.

Q.  And what was your understanding of the compensation that this -- well, hold on.  Let me take a step back.

At the top of it, it says, "Fanhai International School of Finance, Fudan."

This is the Fudan contract?

A.  Correct.

Q.  What was your understanding about the compensation that you would receive if you accepted this academic appointment at

Fudan?

A.    That they were going to match my Fed salary.

Q.    What was your Fed salary at the time?

A.    Approximately $300,000 a year.

Q.    All right.  Now, at some point did anyone talk to you about a grant that you would be able to apply for once you were in China?

A.    Right.  So a big, big part of a professor's responsibilities is to solicit grant money funding the professors' research.  And I was encouraged when I arrived to apply to three -- for three research grants in particular.

Q.    Now, when you were told about these grants and you have the Fudan contract, did this raise any sort of ethical concern for you?

A.    Ethical concerns?

Q.    Yes.

A.    No.  I mean, it's a regular part of the job.  It enhances the university's reputation.  In many cases, the research grant money goes to the university.

Q.    No, Dr. Rogers, I think perhaps my question was not specific enough.

I'm saying, were there any ethical concerns that you had as a former Fed employee about whether you could accept or apply for grants --

A.    Oh, oh, I see what you are saying.  Right, right.  And I

was wondering about that, and actually, I contacted Sean Croston about that and the specific question, yeah.

Q.    Can we please pull up Government Exhibit 315.

Dr. Rogers, do you see this document?

A.    I do.

Q.    Hold on a moment.  I think you said that you had e-mailed Sean Croston?

A.    Right.

Q.    What do you recall about that e-mail?

A.    I asked him if it was okay to apply for grants; is there anything in my, you know, retirement from the Board that would prohibit me from seeking research grant money.

So there are a lot of restrictions on what staff can do when they leave the Board, and I was made aware of that from colleagues who had left, and, in particular, when they go and work on Wall Street.

Q.    What was your take-away from your communication with Mr. Croston?

A.    That the Board had no problem with me applying for these grants.

Q.    Now, at some point in time, did you -- were you awarded any of these grants?

A.    Yes.  I think all three that I applied for, I was successful.

Q.    Now, I want to go through the money that you had made when

you were at Fudan.

What was the first year that you worked there?

A.   So you may have noticed -- it sticks out in my mind -- that that contract was to begin in July, July 1, 2021.  We did not ultimately -- by "we," I mean me and Shu-Shu did not ultimately arrive in China until the very end of 2022 because of COVID-related hassles.

Q.   And for that first year, how much money did you make?

A.   So the first year -- and by "year," I actually mean calendar year rather than academic year.  My pay started January 1, 2022.  I made the amount specified in that contract, which met my Fed salary of $300,000 a year, which translated to 2 million RMB per year as a full-time faculty member at the university.

Q.   The next year, were you still a full-time faculty member?

A.   No, no.  Fanhai knew of my family situation, the sort of continued ties to family in America, and my desire to spend a lot of time in the U.S. outside of teaching responsibilities.

So all along, right from the beginning, we sort of said, "Let's just do this year by year, and for the first year, I'll be full-time, I'll teach the full load, four courses per year, and then we will revisit the issue in the second year," which is 2023.

In that second year, in no small part because of all the COVID-related hassles now in China -- when things got better in

the U.S., they got much worse in China -- I switched to half-time for 2023.

Q. So how much did you make --

A. Half of the salary. So 1 million RMB, approximately 150,000 U.S. dollars, and my teaching load was cut in half commensurately.

Q. So the following year, what were your teaching responsibilities?

A. So I had actually taught five courses in my first year, so one above the full-time load. So I was required only to teach one course in 2023.

Q. And how much were you compensated?

A. So that was, you know, half of the original contract, so about 150,000 U.S. dollars.

Q. All right. So let me get to 2024, and what was your compensation for 2024 --

A. Well, so in -- so I stayed at --

Q. Dr. Rogers, I didn't finish asking my question.

In 2024, what was your compensation from Fudan?

A. Well, right. From Fudan, I stayed on the half-time contract. So it was still 150,000 U.S. dollars.

Q. Now, that same time for 2024, were you awarded grants?

A. Yeah, so the grants came through, and I think it was even in 2023 that they were awarded. So they wanted me to apply right away when I began in 2022. So if I'm remembering the

timing right, I applied for all these grants in 2022, my first year there -- these take a while to get, you know, decided on. They're very, very competitive grants.  I was awarded a grant, the largest one being a three-year grant from China's equivalent of the U.S. National Science Foundation.

Q.   How much was that grant for?

A.   So that grant was a lot.  That was translating to about 300,000 U.S. dollars.  So it's for three years, and -- but it was paid all up front in one year.

Q.   So when you say it's three years paid all up front, is the total award of this grant $300,000, or was it $300,000 every single year?

A.   No, one-time payment up front.

Q.   Was that your understanding of how that was supposed to be paid out?

A.   Yeah.

Q.   Now, do you have any continuing contact with Hummin Lee?

A.   Yeah, yeah.

Q.   Now, we saw earlier that there had been WeChat messages from Hummin Lee asking you to meet with an individual.

Do you recall this?

A.   Yeah.

Q.   And what was that?

A.   He suggested that we get together and that he was going to bring along somebody who I had not met yet but was interested in

meeting me, learning more about myself, and I declined.

Q.    Why did you decline?

A.    I declined, in no small part, because I just didn't feel like doing it or maybe doing it around the particular time.  But I also pointed out to Hummin the restrictions that were placed on me and all Federal Reserve employees when they retire from the Board, and that is, they can't meet with any government officials.

Q.    Now can we pull up Government Exhibit 315.

Dr. Rogers, do you see this exhibit?

A.    Yeah, I can read this, yeah.

Q.    All right.  And what do you understand this e-mail to say?

A.    So in particular, I was asking Sean about, you know, the job offer that I had.  So this is the 7th of April, so probably only recently received it.  I still had time to decide on whether I would retire, which ultimately of course I did, and I just wanted to make sure that there would be no problem from the perspective of Board ethics in me taking the job and applying for these research grants.  If there was a problem, I would have continued my small job search elsewhere.

Q.    Do you see the second bullet point where it says, "For one year after your retirement, you cannot represent the Chinese government before any U.S. government employee with the intent to influence their official actions, and you cannot advise the Chinese government behind the scenes with the intent to

influence any U.S. government employee's official actions.  For example, during this one-year period, you cannot represent China in discussions with the Treasury Department regarding economic sanctions, and you could not advise the Chinese government behind the scenes about the best ways to influence the Board or Treasury officials."

Did I read that correctly?

A.    Yes.

Q.    Is this, in part, why you were disinclined to meet with the individual that Hummin Lee suggested?

A.    Uh-huh, yes.

Q.    All right.  I just have a couple more questions for you, and then I will be done.

Can you please pull up Government Exhibit 413A in evidence.

All right.  Dr. Rogers, do you recognize this exhibit?

A.    Yes.

Q.    All right.  Did you ever transfer this exhibit to anyone in China?

A.    No.

Q.    Did you ever convey the information in this exhibit to anyone in China?

A.    No.

Q.    All right.  Thank you.  Can you pull up Government Exhibit 333.

Dr. Rogers, do you see this exhibit?

A.    Yes.

Q.    Do you recognize it?

A.    Yes.

Q.    Now, the same question:  Did you ever transfer this exhibit to anyone in China?

A.    No.

Q.    Did you ever share the contents of this exhibit to anyone in China?  I think that's what the government was calling the "oral transmission."

A.    No.

Q.    Now I would like you to pull up Government Exhibit 335 in evidence.

Dr. Rogers, do you recognize this exhibit?

A.    Yes.

Q.    All right.  Did you ever transfer this exhibit to anyone in China?

A.    No.

Q.    Did you ever convey the substance of the information in this exhibit to anyone in China?

A.    No.

Q.    Now, please pull up Government Exhibit 33 -- Government Exhibit 421.

Dr. Rogers, do you recognize this exhibit?

A.    Yes.

Q.    All right.  And this is the March 7 ECB policy easing

announcement; is that right?

A.    It is right.

Q.    If you look at the top, you will see that it's been forwarded from you to wenbinwu@fudan.edu.cn.

A.    Right.

Q.    Who is Wenbin Wu?

A.    A colleague of mine at Fudan.  We've written lots of research papers together.

Q.    How many papers would you say that you've written with him?

A.    Three or four.

Q.    And Fudan, this is what the government's expert says is one of the elite of the elite universities?

A.    Yes.

Q.    Now, let me ask you, why did you share this document with Wenbin Wu?

A.    I was interested in the factual details of the ECB policy announcement itself, public information, and I was just lazy in not just kind of copying the actual details of this public announcement.

Q.    Now, there's been some oblique mentions to requests for data sets that have been identified as "tight and wide."

A.    Right.

Q.    What are they?

A.    These are Excel spreadsheets that are very similarly -- that are very closely related.  These are spreadsheets that are

maintained by the Federal Reserve Board staff and that I had used in several papers, a couple of papers at least, that I had published while on the staff at the Federal Reserve Board.  And I was interested in new work updating some results out there in the literature that had also made use of the underlying data in tightandwide.xls.

Q.   So the underlying data, was that publicly available?

I guess I'm a little confused when you say you were trying to replicate data.  What do you mean?

A.   So these -- so the data in tightandwide.xls are essentially very, very similar to those graphs that Officer, Agent -- I forget his title -- Kistler showed yesterday that showed big spikes.

And so these -- the underlying data is all publicly available information.  I think their chart from yesterday came from Bloomberg or something like that.  And like I said, I had used this data before in my academic research and was interested in starting a new paper on this.  And so I asked the Fed staffer -- her name is Edith Liu -- for access, if they were allowed to give people outside of the Fed access to this data, noting that the paper, the particular paper in the literature that I was trying to update the results from had said in their data appendix that they used tightandwide.xls.

Q.   By tightandwide.xls, you mean the exact same data set from the Fed, or is this just a common nomenclature for this kind of

data?

A.   No, so tightandwide.xls are the name of the spreadsheet. They take the publicly available, but expensive, raw data of the type that Officer Kistler showed you yesterday, and they do a little bit of mathematical manipulations to it and construct the cell entries of these spreadsheets.

Q.   So you made the request for it.  Did, I think, Dr. Liu -- did she actually provide you with these data sets?

A.   No, no, she didn't.

Q.   For your research purposes, did you then collect the same information from another source?

A.   Yeah.  We had to buy it.

Q.   How much was it, if you recall?

A.   I don't really recall, but I used my research grant money. And that's the point of having these research grants.  It was probably on the order of, I don't know, $7- or $10,000.  So it doesn't break the bank, but a bit of an academic discount, $7,000.

Q.   I just have one final question to ask you about.  You've been sitting here -- well, I may have one more.

     I almost forgot this.  Can you please pull up Government Exhibit 418A in evidence.

     Dr. Rogers, do you see this exhibit in front of you?

A.   Yes.

Q.   Do you know what it is?

A.   I do, yes.  So this is a employment contract from SHUFE.

Q.   That's the Shanghai Institute of International Finance and Economics?

A.   Right.  So this is an institute within Shanghai University of Finance and Economics.  It's a research institute within the university.

Q.   And I believe when we saw this earlier, if we were to scroll all the way down to either page 5 or 6, we will see that right there in the "Foreign Expert (Party B)," there's a signature.

Is that your signature?

A.   Yes.

Q.   Now, you agree that you signed this?

A.   Right.

Q.   Did you ever get compensated from this contract?

A.   No.

Q.   Did you ever report this contract to the Fed?

A.   No.

Q.   Why not?

A.   Because I -- when I signed it, I informed the -- I informed SHUFE that I had to get approval for this from my Board supervisor.  I ultimately never got that approval, and so I voided the contract.

Q.   All right.  I want to go briefly back to the OIG interview that you had on February 4, 2020.  And when you were asked about

sending -- whether you had sent -- and there was that whole list:  FR, FR internal, FOMC Class II.  There was the whole list of those things.  Right?  And they said, "Had you sent it to anyone?" and you said, "Never."

When they asked you that question, did you remember sending the sensitive document that we've now already shown you, that we've already discussed, to your Fudan coauthor during that interview?

A.   I did not remember it, no.  I just didn't remember it during the interview.

Q.   When you think back on the interview, did you think that they were asking you questions that were more about the blackmail, the extortion, the kidnapping, or did you think they were asking you more questions about Hummin Lee and Professor Cui?

A.   The initial -- certainly, the motivation for my being there was to talk about the blackmail, the extortion, the threat to kidnap my little daughter, and to seek their protection, which is what, you know -- the reason I thought I was there.

But yeah, I mean, the conversation then shifted to Hummin, my foreign contacts, you know, could they be involved, and so the conversation shifted towards them and how that relates or could potentially relate to my work at the Fed.

Q.   All right.  So at this point, you've been sitting here for, I'll call it, two weeks.  We had the snow delay.  You've been

sitting here.  You've heard the government's case.  You've heard them talk about Hummin Lee.  You've heard them talk about Ricky.

Who do you now think Hummin Lee is?

A.    A spy.

Q.    And knowing that, how does that make you feel?

A.    Duped.  He was my friend.

MR. GITLEN:  Thank you, Your Honor.

THE COURT:  All right.  I think we're going to break for lunch now.  It's 1:00.

Ladies and gentlemen, I will have you come back at 5 minutes before 2:00, and we will start at 2:00 with cross-examination.

Just a reminder to not talk about the case or do any research.  Thank you, ladies and gentlemen.

(Jury exited courtroom.)

THE COURT:  Mr. Rogers, you may step down.  Everyone can have a seat.

Any issues to address before we adjourn for lunch?

MR. BARRY:  Not for the government, Your Honor.

MR. SALTZBURG:  Nor for the defense.

THE COURT:  All right.  We will see you back at 2:00 sharp.  Thank you.

(Recess taken at 1:00 p.m.)

(Afternoon session reported by Elizabeth Davila.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick_____         January 31, 2026_____

SIGNATURE OF COURT REPORTER             DATE

| | | | | |
|---|---|---|---|---|
| **$** | **2000** [1] - 1:19 | 90:22, 106:25 | **accept** [9] - 30:22, | 77:15 |
| | **20001** [1] - 2:7 | **404(b** [1] - 13:1 | 41:16, 44:11, 48:19, | **admittedly** [1] - 44:8 |
| **$1,000** [1] - 89:21 | **20006** [1] - 2:4 | **413A** [1] - 101:14 | 48:24, 49:2, 49:24, | **advance** [1] - 62:15 |
| **$10,000** [1] - 105:16 | **2005** [1] - 6:13 | **418A** [1] - 105:22 | 68:14, 95:23 | **advanced** [1] - 30:3 |
| **$150** [1] - 9:11 | **20052** [1] - 1:20 | **421** [1] - 102:22 | **accepted** [2] - 93:18, | **advantage** [3] - 11:4, |
| **$250** [1] - 7:16 | **2010** [4] - 6:22, 35:4, | **4704-B** [1] - 2:7 | 94:25 | 26:3, 26:4 |
| **$300,000** [4] - 95:4, | 35:5, 35:10 | | **accepting** [1] - 49:6 | **advice** [1] - 70:20 |
| 97:12, 99:11 | **2013** [3] - 39:18, 40:8, | **5** | **access** [3] - 93:7, | **advise** [2] - 100:24, |
| **$400** [1] - 9:4 | 40:19 | | 104:19, 104:20 | 101:4 |
| **$5,000** [1] - 89:22 | **2016** [5] - 6:22, 41:22, | **5** [5] - 3:4, 62:15, 63:7, | **accommodations** [1] | **advisor** [7] - 33:16, |
| **$50** [4] - 89:4, 89:12, | 42:12, 43:8, 53:8 | 106:8, 108:10 | - 45:19 | 34:8, 34:9, 35:3, |
| 89:13, 89:14 | **2017** [10] - 45:7, 50:4, | **50** [1] - 47:1 | **accompanied** [2] - | 35:5, 35:14 |
| **$7,000** [1] - 105:18 | 51:15, 52:8, 52:12, | **500** [1] - 2:3 | 63:8, 82:5 | **affect** [4] - 56:17, |
| | 52:13, 52:16, 53:5, | **57** [1] - 56:16 | **accompany** [1] - | 57:1, 63:17, 64:5 |
| **/** | 53:14, 54:25 | | 59:12 | **afternoon** [1] - 108:24 |
| | **2018** [2] - 61:20, 62:10 | **6** | **accomplished** [3] - | **age** [3] - 56:16, 86:19, |
| **/s** [1] - 109:11 | **2019** [1] - 79:25 | | 38:16, 44:20, 79:20 | 88:16 |
| | **202-354-3284** [1] - 2:8 | **6** [1] - 106:8 | **account** [5] - 13:5, | **agencies** [1] - 9:12 |
| **0** | **2020** [4] - 34:22, 39:7, | **601** [1] - 1:14 | 71:2, 79:12, 79:15, | **Agency** [1] - 10:23 |
| | 90:20, 106:25 | **64** [1] - 29:16 | 86:6 | **agent** [5] - 16:9, |
| **033** [1] - 4:5 | **2021** [5] - 6:24, 35:10, | | **accumulation** [2] - | 81:23, 82:25, 83:6, |
| | 94:1, 94:2, 97:4 | **7** | 6:16, 6:19 | 92:15 |
| **1** | **2022** [4] - 97:6, 97:11, | | **accurate** [4] - 15:4, | **Agent** [5] - 39:8, 41:5, |
| | 98:25, 99:1 | **7** [2] - 102:25, 105:16 | 38:5, 59:10, 92:23 | 90:23, 92:13, 104:11 |
| **1** [10] - 34:23, 62:16, | **2023** [4] - 97:23, 98:2, | **700** [1] - 8:20 | **acquittal** [1] - 12:18 | **agents** [1] - 91:14 |
| 62:23, 70:2, 81:19, | 98:11, 98:24 | **7th** [1] - 100:14 | **Act** [1] - 17:7 | **ages** [1] - 35:20 |
| 81:20, 84:4, 97:4, | **2024** [5] - 38:2, 98:15, | | **act** [1] - 17:7 | **ago** [1] - 33:24 |
| 97:11, 98:4 | 98:16, 98:19, 98:22 | **9** | **actions** [4] - 15:13, | **agree** [8] - 17:20, |
| **1.1** [1] - 9:10 | **2026** [2] - 1:6, 109:11 | | 16:8, 100:24, 101:1 | 17:22, 26:8, 67:6, |
| **1.5** [1] - 9:16 | **20530** [1] - 1:18 | **900** [1] - 2:3 | **activities** [4] - 46:3, | 78:3, 80:12, 93:8, |
| **10:00** [2] - 5:14, 5:15 | **20579** [1] - 1:14 | **95** [6] - 37:14, 37:16, | 47:8, 61:15, 61:22 | 106:13 |
| **10:03** [1] - 26:21 | **20th** [1] - 56:25 | 37:21, 38:9, 38:12, | **acts** [1] - 22:14 | **agreed** [3] - 16:4, |
| **10:15** [2] - 12:8, 12:9 | **25-cr-33** [1] - 1:3 | 38:13 | **actual** [1] - 103:18 | 20:11, 67:14 |
| **10:21** [1] - 26:21 | **29** [3] - 3:5, 75:4 | **950** [1] - 1:17 | **ADAM** [1] - 1:16 | **agreement** [4] - 18:8, |
| **11:46** [1] - 77:8 | **2:00** [3] - 108:11, | **9:26** [1] - 1:6 | **Adam** [1] - 4:9 | 19:18, 22:6, 22:15 |
| **12:00** [1] - 76:23 | 108:21 | **9:30** [1] - 45:22 | **add** [4] - 21:5, 22:14, | **agreements** [3] - |
| **12:01** [1] - 77:8 | | | 23:9, 69:13 | 38:23, 39:2, 93:2 |
| **15** [7] - 22:24, 81:19, | **3** | **A** | **added** [2] - 21:23, | **ahead** [2] - 19:11, |
| 81:20, 81:23, 82:22, | | | 22:12 | 28:21 |
| 84:10, 93:25 | **3** [1] - 62:10 | **a.m** [5] - 1:6, 5:14, | **adding** [3] - 15:7, | **aided** [1] - 2:9 |
| **15-minute** [1] - 24:9 | **30** [3] - 1:6, 60:9, 61:5 | 5:15, 26:21, 77:8 | 21:23, 22:17 | **aim** [1] - 84:18 |
| **15-person** [1] - 23:4 | **300,000** [1] - 99:8 | **a.m.** [1] - 26:21 | **addition** [1] - 53:1 | **air** [2] - 23:22, 82:3 |
| **150,000** [3] - 98:5, | **31** [1] - 109:11 | **Aaron** [4] - 73:1, 73:4, | **additional** [3] - 20:1, | **airport** [9] - 62:24, |
| 98:14, 98:21 | **315** [2] - 96:3, 100:9 | 74:8, 74:18 | 24:10, 27:3 | 63:3, 81:22, 82:5, |
| **18** [1] - 89:24 | **315A** [1] - 94:12 | **able** [14] - 20:11, 26:4, | **additions** [2] - 21:12, | 82:19, 82:23, 83:6, |
| **1979** [1] - 70:8 | **33** [2] - 21:2, 102:21 | 40:23, 54:19, 54:20, | 21:15 | 84:21, 84:23 |
| **1983** [1] - 30:2 | **333** [2] - 2:6, 101:24 | 55:15, 62:6, 67:4, | **address** [9] - 4:16, | **Alain** [1] - 70:20 |
| **1989** [1] - 30:6 | **335** [1] - 102:11 | 68:25, 73:16, 76:24, | 12:23, 13:19, 22:11, | **alien** [1] - 81:16 |
| **1994** [1] - 31:11 | **35** [2] - 60:9, 61:5 | 80:19, 81:11, 95:6 | 26:10, 27:10, 70:12, | **alleged** [1] - 17:6 |
| **19th** [1] - 2:3 | **351** [1] - 70:14 | **above-entitled** [1] - | 78:2, 108:18 | **allow** [2] - 79:13, |
| **1:00** [2] - 108:9, | **351B** [1] - 71:15 | 109:7 | **addressed** [3] - 21:4, | 80:24 |
| 108:23 | **353** [1] - 72:21 | **abroad** [2] - 36:4, | 69:23, 69:25 | **allowed** [8] - 48:19, |
| **1st** [2] - 81:13, 84:3 | **353B** [1] - 74:3 | 92:17 | **adequate** [2] - 28:7, | 56:24, 65:16, 82:8, |
| | **3D** [1] - 67:25 | **absolutely** [1] - 10:23 | 28:20 | 82:13, 92:21, 104:20 |
| **2** | **3E** [1] - 69:7 | **academic** [9] - 30:13, | **adjourn** [1] - 108:18 | **allows** [1] - 64:10 |
| | **3F** [1] - 69:7 | 43:5, 72:9, 72:16, | **adjust** [3] - 11:8, | **alluded** [1] - 51:25 |
| **2** [1] - 97:13 | | 74:18, 94:25, 97:10, | 50:25, 56:3 | **almost** [3] - 7:5, |
| **20** [3] - 5:3, 36:10, | **4** | 104:17, 105:17 | **adjusting** [2] - 11:6, | 42:17, 105:21 |
| 93:25 | | **academics** [2] - 48:23, | 85:6 | **alone** [4] - 21:9, 21:18, |
| **20-weeks** [1] - 61:19 | **4** [4] - 39:7, 89:22, | 48:25 | **admitted** [2] - 38:12, | 28:5, 75:21 |

**ambiguity** [1] - 26:17
**amenable** [1] - 67:1
**America** [10] - 4:5, 54:20, 55:1, 55:3, 56:4, 57:23, 81:24, 82:6, 97:17
**AMERICA** [1] - 1:3
**amount** [4] - 8:10, 9:14, 65:15, 97:11
**analogy** [1] - 10:1
**Anna** [3] - 70:20, 70:21, 71:21
**announcement** [3] - 103:1, 103:17, 103:19
**answer** [1] - 69:19
**anticipated** [1] - 13:18
**anyway** [1] - 53:13
**apartment** [2] - 63:4, 63:5
**appealed** [1] - 31:2
**appear** [1] - 79:25
**appearance** [1] - 4:7
**APPEARANCES** [2] - 1:12, 2:1
**appeared** [1] - 87:4
**appendix** [1] - 104:23
**appetite** [1] - 76:19
**application** [3] - 55:3, 81:2, 81:4
**applied** [5] - 54:25, 62:16, 62:20, 96:23, 99:1
**apply** [7] - 64:7, 64:15, 95:6, 95:11, 95:23, 96:10, 98:24
**applying** [2] - 96:19, 100:18
**appointment** [1] - 94:25
**appreciate** [6] - 12:9, 12:14, 13:11, 20:12, 20:22, 23:2
**appreciation** [1] - 70:6
**approach** [2] - 4:6, 13:12
**appropriate** [1] - 19:16
**appropriately** [1] - 13:21
**approval** [7] - 44:17, 44:19, 45:3, 45:4, 66:3, 106:21, 106:22
**approved** [1] - 37:4
**April** [5] - 84:3, 84:4, 85:14, 94:2, 100:14
**area** [1] - 82:18
**argue** [3] - 14:25, 18:24, 18:25
**arguments** [1] - 26:1

**arrangement** [1] - 79:24
**arrangements** [1] - 45:18
**arrive** [1] - 97:6
**arrived** [3] - 79:10, 81:22, 95:10
**Ashley** [1] - 4:14
**Asia** [8] - 10:22, 50:3, 50:6, 50:20, 50:21, 50:22, 50:25, 62:4
**aside** [1] - 58:24
**aspect** [2] - 33:7, 54:3
**aspects** [1] - 39:25
**assist** [2] - 58:4, 83:4
**assistance** [2] - 63:1, 63:25
**assistant** [3] - 30:9, 42:18, 61:12
**assisted** [1] - 4:13
**assisting** [1] - 58:6
**associate** [4] - 32:9, 33:14, 43:22, 47:15
**assume** [1] - 73:22
**assumed** [1] - 61:10
**assumption** [1] - 59:8
**Atlanta** [1] - 50:7
**attach** [2] - 21:8, 21:17
**attached** [3] - 73:18, 84:22, 84:23
**attachment** [1] - 71:11
**attachments** [2] - 71:12, 73:14
**attend** [1] - 50:18
**attention** [1] - 11:14
**attorney** [1] - 28:8
**Attorney's** [1] - 1:13
**attorneys** [1] - 4:10
**attracted** [4] - 30:24, 52:25, 54:7, 54:14
**attraction** [1] - 52:18
**attractive** [1] - 52:22
**audience** [2] - 46:22, 46:25
**August** [1] - 75:4
**AUSA** [2] - 1:13, 4:9
**Authority** [1] - 50:8
**authorization** [2] - 16:5, 93:5
**available** [6] - 23:14, 73:18, 74:2, 104:7, 104:15, 105:3
**Avenue** [2] - 1:17, 2:6
**avoid** [1] - 15:5
**award** [1] - 99:11
**awarded** [4] - 96:21, 98:22, 98:24, 99:3
**aware** [2] - 77:10,

96:14

**B**

**baby** [15] - 58:11, 62:13, 63:9, 63:11, 63:17, 63:22, 64:3, 81:24, 82:8, 82:13, 82:24, 83:19, 84:11, 84:20, 85:2
**background** [3] - 6:7, 6:8, 73:2
**backing** [1] - 9:13
**bad** [1] - 45:3
**Bank** [8] - 8:5, 10:13, 36:19, 39:23, 42:2, 50:7, 50:18, 79:15
**bank** [4] - 10:14, 11:7, 79:12, 105:17
**BARRY** [4] - 1:16, 13:23, 38:11, 108:19
**Barry** [1] - 4:9
**based** [8] - 8:22, 8:24, 9:3, 9:6, 10:22, 13:5, 14:14, 26:12
**basic** [1] - 44:22
**basics** [1] - 41:1
**basis** [1] - 8:14
**bear** [2] - 86:12, 86:14
**bearing** [1] - 11:7
**beautiful** [7] - 52:24, 55:22, 86:11, 86:12, 86:18, 87:3, 88:25
**became** [3] - 33:16, 54:7, 74:18
**become** [4] - 33:10, 35:2, 56:15, 94:16
**becoming** [2] - 51:8, 87:13
**bed** [4] - 46:1, 85:11, 85:16, 85:20
**bedroom** [2] - 85:18
**BEFORE** [2] - 1:1, 1:9
**began** [1] - 98:25
**begin** [2] - 29:5, 97:4
**beginning** [5] - 41:15, 79:11, 81:11, 91:10, 97:19
**begins** [1] - 21:16
**behind** [2] - 100:25, 101:5
**Beijing** [6] - 41:24, 75:11, 75:12, 75:14, 84:17
**Belgium** [1] - 9:6
**belief** [2] - 72:11, 72:13
**bend** [1] - 73:10
**benefit** [1] - 16:8
**best** [8] - 59:22, 59:24,

60:11, 60:13, 60:14, 60:16, 80:7, 101:5
**better** [5] - 58:18, 73:23, 76:17, 86:13, 97:25
**between** [9] - 15:16, 42:25, 50:22, 51:21, 54:9, 54:24, 70:18, 72:25, 75:11
**big** [15] - 7:25, 8:24, 9:22, 10:3, 15:16, 32:15, 33:2, 36:10, 43:3, 84:1, 95:8, 104:12
**bigger** [1] - 10:18
**biggest** [5] - 8:4, 8:17, 11:10, 11:12
**billion** [4] - 8:20, 9:5, 9:11, 9:17
**billions** [1] - 10:4
**birth** [6] - 62:13, 63:2, 63:9, 63:10, 63:21, 84:8
**birthplace** [3] - 83:15, 83:16, 83:22
**bit** [11] - 9:8, 18:21, 24:22, 33:21, 44:6, 54:15, 75:20, 89:17, 90:8, 105:5, 105:17
**black** [1] - 89:2
**black-and-white** [1] - 89:2
**blackmail** [2] - 107:13, 107:17
**Bloomberg** [1] - 104:16
**blown** [1] - 18:9
**blush** [1] - 53:1
**board** [1] - 65:21
**Board** [17] - 30:21, 30:23, 33:8, 34:23, 36:8, 37:10, 50:7, 93:12, 96:11, 96:14, 96:19, 100:7, 100:18, 101:5, 104:1, 104:3, 106:21
**boat** [1] - 79:22
**bolts** [1] - 71:8
**bond** [2] - 7:3, 11:15
**bonds** [3] - 7:23, 8:2, 9:11
**Book** [1] - 22:18
**boring** [1] - 86:18
**born** [2] - 29:18, 57:5
**boss** [2] - 39:9, 74:8
**Boston** [1] - 36:25
**Bowl** [1] - 90:20
**bracketed** [1] - 20:3
**Brad** [1] - 6:2
**BRADLEY** [3] - 3:4,

5:18, 6:1
**Bradley** [2] - 5:17, 6:1
**brand** [1] - 31:22
**brand-new** [1] - 31:22
**bread** [2] - 69:22, 72:6
**bread-and-butter** [2] - 69:22, 72:6
**break** [13] - 5:9, 5:15, 12:7, 12:22, 24:9, 25:21, 27:2, 76:25, 77:2, 77:3, 77:5, 105:17, 108:8
**breaks** [1] - 40:3
**breathe** [1] - 82:3
**Brian** [4] - 90:14, 90:16, 93:9, 93:10
**brief** [2] - 5:15, 11:18
**briefly** [3] - 7:21, 78:13, 106:24
**bring** [6] - 22:25, 28:24, 80:19, 91:17, 92:14, 99:25
**broad** [1] - 71:1
**brother** [4] - 56:3, 60:13, 60:14, 60:16
**brought** [5] - 76:15, 84:10, 91:16, 91:18, 92:11
**buddy** [1] - 57:21
**Budget** [1] - 31:6
**budget** [2] - 7:25, 9:25
**Buffalo** [1] - 29:18
**building** [1] - 88:10
**bullet** [1] - 100:21
**bunch** [1] - 8:18
**burden** [1] - 59:6
**Bureau** [2] - 61:18, 83:8
**business** [1] - 18:7
**butter** [2] - 69:22, 72:6
**buy** [1] - 105:12
**buyers** [1] - 8:4
**BY** [6] - 5:22, 29:11, 37:19, 38:14, 78:12, 94:10
**bye** [2] - 93:4, 93:5

**C**

**C-section** [2] - 62:14, 63:8
**calendar** [1] - 97:10
**Canada's** [1] - 10:2
**cannot** [3] - 100:22, 100:24, 101:2
**car** [1] - 90:7
**Card** [1] - 81:3
**card** [3] - 89:5, 89:14
**cards** [1] - 89:13
**care** [3] - 37:11, 63:23,

63:25
**Case** [1] - 1:3
**case** [16] - 4:5, 5:7, 5:12, 7:15, 12:10, 14:6, 17:18, 23:10, 24:1, 24:24, 25:13, 26:13, 29:5, 33:21, 108:1, 108:13
**cases** [3] - 33:20, 82:2, 95:18
**cell** [1] - 105:6
**Central** [1] - 10:23
**central** [2] - 10:14, 11:7
**ceremony** [3] - 59:20, 60:2, 60:6
**certain** [7] - 9:1, 13:20, 60:1, 77:22, 86:1, 86:3, 88:12
**certainly** [14] - 30:14, 30:24, 33:7, 34:15, 53:5, 54:3, 54:7, 56:13, 66:9, 69:21, 91:20, 93:15, 107:16
**CERTIFICATE** [1] - 109:3
**certify** [1] - 109:5
**cetera** [4] - 16:5, 20:6, 22:1
**Chaboud** [1] - 70:20
**chain** [2] - 33:14, 73:21
**Challenges** [1] - 71:19
**challenges** [2] - 71:21, 89:1
**chance** [2] - 25:17, 92:5
**change** [10] - 20:17, 26:14, 32:15, 42:12, 43:24, 54:1, 76:5, 79:17, 79:19, 88:13
**changed** [3] - 56:9, 85:12, 88:17
**changes** [5] - 10:25, 22:9, 22:25, 26:25, 70:6
**changing** [1] - 32:12
**characterization** [1] - 92:20
**characterize** [3] - 51:4, 52:5, 63:12
**charge** [1] - 14:15
**chart** [1] - 104:15
**check** [2] - 67:3, 81:22
**checked** [2] - 58:18, 59:13
**Cheers** [1] - 75:17
**Chicago** [6] - 50:18, 50:20, 50:22, 50:23, 51:21

**chief** [6] - 6:21, 32:9, 32:24, 32:25, 33:10, 34:5
**child** [3] - 57:3, 57:5, 63:25
**chill** [1] - 50:16
**China** [47] - 8:5, 8:20, 8:21, 9:4, 9:10, 9:23, 10:14, 10:20, 11:2, 11:4, 11:5, 11:12, 11:13, 39:4, 57:14, 57:17, 59:9, 59:25, 61:1, 62:4, 62:22, 63:2, 66:21, 70:21, 70:22, 71:9, 71:19, 71:22, 72:8, 74:21, 79:13, 79:15, 82:15, 83:5, 83:7, 84:5, 95:7, 97:6, 97:25, 98:1, 101:2, 101:18, 101:21, 102:5, 102:8, 102:16, 102:19
**China's** [17] - 4:23, 6:4, 6:12, 6:13, 6:15, 6:18, 7:1, 7:2, 7:11, 8:14, 9:3, 10:14, 10:20, 11:1, 11:7, 99:4
**Chinese** [25] - 5:2, 8:7, 8:11, 9:15, 9:20, 10:9, 10:11, 10:24, 38:21, 38:25, 39:4, 43:2, 51:13, 55:8, 55:19, 58:14, 64:1, 71:22, 72:15, 73:12, 100:22, 100:25, 101:4
**choice** [2] - 92:21, 93:24
**choose** [1] - 92:25
**chose** [2] - 31:1, 79:19
**Christmas** [1] - 80:18
**Chuan** [1] - 38:24
**circle** [1] - 19:12
**circles** [1] - 74:18
**circulate** [1] - 22:9
**circulated** [1] - 13:1
**circulation** [1] - 14:18
**cities** [1] - 43:3
**citizen** [4] - 57:4, 57:5, 57:6, 83:1
**City** [3] - 84:7, 84:13, 84:14
**civil** [3] - 59:20, 60:2, 60:6
**clarity** [1] - 23:3
**class** [7] - 66:24, 67:14, 68:20, 72:5, 72:10, 75:1

**Class** [1] - 107:2
**classes** [8] - 43:6, 67:7, 67:13, 68:8, 68:19, 69:2, 72:19, 75:2
**classic** [2] - 69:22, 72:16
**classified** [1] - 70:11
**classroom** [1] - 46:20
**clear** [10] - 5:23, 12:14, 17:10, 18:23, 20:15, 21:22, 25:5, 27:13, 53:17, 87:25
**Clearstream** [2] - 8:24, 9:8
**clips** [2] - 41:4, 90:23
**clock** [1] - 26:16
**close** [5] - 25:3, 25:9, 43:2, 43:4, 66:5
**closely** [1] - 103:25
**closer** [3] - 50:21, 51:9, 63:15
**closings** [7] - 23:6, 24:21, 25:12, 25:14, 25:16, 25:24, 26:10
**co** [1] - 17:6
**co-conspirators** [1] - 17:6
**coauthor** [1] - 107:7
**coauthored** [1] - 34:6
**coauthoring** [1] - 31:3
**coffee** [1] - 73:7
**cold** [1] - 76:12
**colleague** [2] - 73:1, 103:7
**colleagues** [6] - 43:10, 51:5, 70:19, 93:6, 93:11, 96:15
**collect** [1] - 105:10
**college** [2] - 29:20, 53:12
**colloquy** [1] - 27:17
**COLUMBIA** [1] - 1:1
**combination** [3] - 21:8, 21:16, 21:25
**combined** [2] - 9:9, 21:5
**comfort** [1] - 86:3
**comfortable** [2] - 16:11, 21:24
**coming** [3] - 41:9, 56:2, 66:9
**commensurately** [1] - 98:6
**commit** [1] - 16:2
**commitment** [1] - 67:4
**committees** [3] - 30:15, 30:16
**common** [5] - 48:24, 51:12, 59:5, 93:12,

104:25
**communicated** [1] - 80:8
**communicating** [1] - 55:11
**communication** [3] - 41:11, 53:6, 96:17
**communications** [1] - 88:13
**compatibility** [1] - 86:21
**compatible** [3] - 53:1, 54:7, 54:13
**compensate** [1] - 49:9
**compensated** [6] - 7:6, 68:24, 69:1, 79:18, 98:12, 106:15
**compensation** [4] - 94:18, 94:24, 98:16, 98:19
**competitive** [2] - 44:5, 99:3
**compilation** [1] - 21:7
**compilations** [1] - 20:6
**compiled** [1] - 21:5
**complain** [1] - 82:4
**complete** [3] - 25:11, 25:15, 25:25
**completed** [2] - 5:14, 80:22
**completely** [1] - 76:8
**completion** [2] - 84:12, 84:15
**complicated** [2] - 50:12, 56:7
**component** [4] - 30:14, 31:19, 34:11, 41:15
**computer** [1] - 2:9
**computer-aided** [1] - 2:9
**concern** [3] - 40:25, 57:22, 95:13
**concerns** [2] - 95:15, 95:22
**conclude** [1] - 26:5
**conclusion** [2] - 8:10, 8:12
**conclusions** [1] - 7:10
**conduct** [1] - 49:8
**conducted** [1] - 34:22
**conducting** [1] - 72:5
**conference** [15] - 36:11, 39:20, 39:22, 39:23, 40:14, 40:20, 40:21, 42:1, 43:9, 50:8, 50:18, 50:23, 51:21, 51:22
**conferences** [2] -

36:4, 36:8
**confined** [1] - 36:15
**conflict** [2] - 48:22, 67:10
**confrontational** [1] - 86:23
**confronted** [1] - 81:25
**confused** [3] - 18:18, 57:1, 104:8
**confusion** [1] - 15:5
**Congressional** [1] - 31:6
**connection** [4] - 7:6, 7:15, 9:7, 77:17
**connections** [1] - 43:4
**consent** [2] - 92:4, 92:8
**consequences** [1] - 93:16
**consider** [1] - 22:21
**consist** [2] - 36:9, 36:10
**consistent** [2] - 56:13, 67:18
**conspiracy** [2] - 14:16, 26:25
**conspirators** [1] - 17:6
**conspired** [4] - 15:25, 16:4, 17:12, 19:8
**constitutes** [1] - 68:23
**Constitution** [1] - 2:6
**constraints** [1] - 73:19
**construct** [1] - 105:5
**contact** [6] - 40:6, 40:8, 40:9, 62:18, 90:17, 99:17
**contacted** [3] - 90:19, 90:20, 96:1
**contacting** [1] - 93:10
**contacts** [3] - 90:18, 92:15, 107:21
**contains** [1] - 71:1
**contemplating** [4] - 53:4, 54:22, 54:23, 55:24
**content** [1] - 71:7
**contents** [1] - 102:7
**continue** [5] - 14:17, 76:23, 78:10, 89:22, 94:4
**continued** [6] - 1:22, 6:18, 6:22, 86:22, 97:17, 100:20
**CONTINUED** [1] - 2:1
**continuing** [1] - 99:17
**contract** [16] - 65:11, 65:22, 67:22, 68:11, 68:13, 94:16, 94:22, 95:13, 97:4, 97:11,

98:13, 98:21, 106:1, 106:15, 106:17, 106:23
**contribute** [1] - 52:2
**contributing** [1] - 34:4
**contribution** [5] - 31:19, 35:16, 35:21, 70:8, 71:20
**control** [1] - 28:5
**convenience** [1] - 60:7
**convenient** [1] - 84:17
**conversation** [6] - 42:6, 49:22, 76:20, 92:17, 107:20, 107:22
**conversations** [1] - 87:6
**convey** [2] - 101:20, 102:18
**convicted** [1] - 15:1
**cop** [1] - 76:17
**cop/bad** [1] - 76:16
**copy** [6] - 14:14, 14:18, 16:5, 23:20, 26:24, 38:5
**copying** [1] - 103:18
**correct** [12] - 8:8, 14:13, 14:21, 21:12, 22:5, 28:11, 28:12, 37:17, 90:24, 92:2, 94:23, 109:6
**correctly** [3] - 71:4, 79:2, 101:7
**Council** [3] - 6:20, 6:23
**counsel** [1] - 13:24
**count** [1] - 26:25
**couple** [8] - 27:6, 36:9, 60:8, 68:18, 84:8, 94:5, 101:12, 104:2
**couples** [1] - 31:8
**course** [6] - 35:19, 52:7, 68:22, 91:17, 98:11, 100:16
**courses** [2] - 97:21, 98:9
**COURT** [96] - 1:1, 4:11, 4:15, 4:20, 4:22, 4:25, 5:4, 5:8, 5:11, 5:19, 11:21, 11:24, 12:2, 12:6, 12:12, 12:16, 12:19, 12:24, 13:3, 13:10, 13:12, 13:17, 14:3, 14:11, 14:21, 14:24, 15:11, 15:22, 16:17, 16:20, 16:23, 17:1, 17:11, 17:19, 17:24,

18:2, 18:13, 19:3, 19:17, 19:25, 20:12, 20:23, 21:1, 21:14, 21:24, 22:3, 22:6, 22:8, 22:20, 22:24, 23:7, 23:13, 23:16, 23:19, 23:24, 24:3, 24:8, 24:13, 24:17, 24:25, 25:6, 25:9, 25:14, 26:6, 26:10, 26:20, 26:24, 27:16, 27:21, 27:25, 28:4, 28:7, 28:10, 28:13, 28:16, 28:19, 28:23, 29:1, 29:4, 29:8, 37:16, 38:12, 77:2, 77:4, 77:14, 77:20, 78:1, 78:6, 78:8, 78:10, 94:9, 108:8, 108:16, 108:21, 109:3, 109:12
**Court** [16] - 2:6, 12:22, 13:9, 16:12, 17:10, 17:17, 18:19, 19:19, 21:4, 24:15, 26:16, 26:17, 27:13, 74:4, 77:1, 77:10
**court** [3] - 4:2, 5:24, 26:22
**Court's** [1] - 94:8
**courtroom** [7] - 5:10, 12:11, 29:3, 77:7, 77:16, 78:9, 108:15
**COURTROOM** [1] - 4:4
**covered** [1] - 22:17
**covers** [1] - 13:4
**COVID** [2] - 97:7, 97:25
**COVID-related** [2] - 97:7, 97:25
**crass** [1] - 54:16
**crazy** [2] - 58:15, 64:2
**create** [2] - 64:20, 67:14
**creates** [3] - 21:8, 21:17, 21:25
**creditor** [1] - 11:13
**crime** [1] - 16:2
**criminal** [1] - 4:4
**criterion** [1] - 68:22
**cross** [2] - 11:21, 108:12
**cross-examination** [1] - 108:12
**Croston** [5] - 68:16, 80:8, 96:1, 96:7, 96:18
**CRR** [1] - 2:6
**Cui** [21] - 43:12, 43:13,

43:18, 45:25, 47:23, 47:25, 48:9, 48:14, 49:3, 49:17, 60:20, 75:6, 75:16, 75:17, 76:5, 76:12, 76:15, 76:18, 78:15, 78:23, 107:15
**Cui's** [1] - 61:6
**culmination** [1] - 92:20
**culture** [1] - 64:1
**cumbersome** [2] - 57:12, 59:6
**currency** [1] - 11:5
**current** [6] - 14:25, 15:4, 15:23, 17:4, 52:11, 71:2
**curriculum** [1] - 38:1
**custodial** [1] - 8:15
**custodian** [2] - 8:23, 9:6
**custodians** [2] - 8:18, 8:22
**cut** [3] - 93:7, 93:9, 98:5
**CV** [5] - 13:25, 14:9, 37:24, 38:1, 38:6

## D

**D.C** [18] - 1:5, 1:14, 1:18, 1:20, 2:4, 2:7, 30:21, 31:7, 31:8, 36:18, 36:22, 36:23, 50:15, 50:16, 50:19, 50:21, 62:8, 84:20
**DABNEY** [1] - 1:9
**dah** [5] - 70:6
**daily** [1] - 7:5
**Dallas** [1] - 39:24
**data** [17] - 8:14, 8:20, 73:18, 74:2, 103:21, 104:5, 104:7, 104:9, 104:10, 104:14, 104:17, 104:20, 104:23, 104:24, 105:1, 105:3, 105:8
**DATE** [1] - 109:12
**date** [5] - 58:18, 58:19, 62:14, 62:15, 63:8
**dated** [2] - 37:24, 38:1
**dates** [1] - 44:22
**dating** [2] - 52:19, 57:24
**daughter** [3] - 56:5, 63:2, 107:18
**Davila** [1] - 108:24
**day-of** [2] - 61:15, 61:22
**days** [3] - 36:9, 62:6,

67:19
**days'** [1] - 84:10
**deal** [1] - 11:13
**dean** [2] - 67:3, 68:6
**December** [1] - 75:4
**decide** [2] - 30:22, 100:15
**decided** [4] - 56:23, 57:7, 66:2, 99:2
**decides** [1] - 24:20
**deciding** [2] - 27:14, 28:11
**decision** [6] - 28:5, 28:8, 28:14, 79:17, 93:24, 94:1
**decisively** [1] - 94:5
**decline** [1] - 100:2
**declined** [3] - 41:18, 100:1, 100:3
**deep** [1] - 10:24
**Defendant** [4] - 1:7, 1:19, 2:2, 38:13
**DEFENDANT** [7] - 27:24, 28:3, 28:6, 28:9, 28:12, 28:15, 28:18
**defendant** [13] - 4:14, 15:24, 16:4, 16:6, 16:7, 16:21, 17:6, 17:11, 17:12, 18:25, 19:8, 22:13, 27:6
**Defendant's** [2] - 37:21, 38:9
**defendant's** [3] - 13:22, 22:20, 24:2
**Defense** [1] - 37:14
**DEFENSE** [1] - 29:7
**defense** [12] - 4:13, 12:17, 18:24, 19:19, 20:7, 21:12, 23:4, 24:20, 29:5, 38:9, 77:12, 108:20
**defense's** [2] - 5:7, 18:22
**deficit** [2] - 7:25, 9:24
**define** [8] - 16:17, 16:24, 17:14, 17:15, 18:3, 18:16, 19:10, 19:11
**defined** [3] - 15:2, 16:12, 16:13
**defines** [1] - 17:7
**definition** [17] - 15:6, 15:14, 15:18, 17:13, 17:25, 18:6, 18:14, 18:19, 19:1, 19:4, 19:7, 19:9, 19:18, 19:20, 19:21, 19:25, 20:4
**definitions** [1] - 20:1

**degree** [3] - 29:24, 41:15, 87:20
**degrees** [1] - 30:3
**Delaware** [2] - 29:19, 29:23
**delay** [2] - 77:18, 107:25
**demanded** [1] - 89:19
**denied** [1] - 55:4
**Department** [3] - 1:17, 30:9, 101:3
**department** [1] - 30:16
**deposit** [1] - 79:14
**DEPUTY** [1] - 4:4
**deputy** [1] - 77:17
**describe** [1] - 57:8
**described** [8] - 37:8, 43:25, 59:2, 62:21, 74:10, 91:2, 92:16, 94:17
**description** [2] - 52:21, 72:14
**descriptions** [1] - 52:20
**DesiGov** [2] - 71:1, 71:20
**desire** [2] - 64:6, 97:17
**detailed** [1] - 55:2
**details** [3] - 44:22, 103:16, 103:18
**developed** [1] - 85:8
**Development** [1] - 71:19
**developments** [2] - 71:21, 72:8
**device** [1] - 91:21
**devices** [7] - 87:17, 91:11, 91:15, 91:17, 91:24, 92:5, 92:9
**devolved** [1] - 87:13
**difference** [1] - 15:16
**different** [7] - 20:8, 27:6, 31:25, 33:21, 35:20, 43:14, 89:13
**differential** [1] - 50:25
**difficult** [2] - 44:5, 85:6
**difficulties** [4] - 54:18, 54:21, 56:1
**difficulty** [1] - 81:25
**dinner** [1] - 45:21
**DIRECT** [2] - 5:21, 29:10
**direct** [4] - 8:14, 11:7, 34:21, 38:18
**Direct** [2] - 3:4, 3:5
**directly** [2] - 8:16, 11:1
**director** [3] - 32:10,

33:14, 74:9
**disclosed** [1] - 65:24
**discount** [1] - 105:17
**discuss** [6] - 5:7, 20:18, 28:7, 46:3, 55:2, 71:7
**discussed** [3] - 26:25, 46:5, 107:7
**discussing** [1] - 42:3
**discussion** [6] - 6:9, 12:10, 47:21, 71:1, 72:16, 75:1
**discussions** [4] - 70:22, 72:9, 76:10, 101:3
**disinclined** [1] - 101:9
**dissertation** [5] - 30:16, 40:23, 41:8, 41:13, 44:7
**distance** [2] - 54:8, 54:9
**DISTRICT** [3] - 1:1, 1:1, 1:10
**dive** [1] - 7:20
**Division** [8] - 31:13, 32:2, 33:22, 33:23, 34:12, 34:13, 37:3, 70:19
**division** [5] - 31:25, 32:18, 32:20, 74:8, 74:9
**divisions** [2] - 31:25, 34:23
**document** [8] - 37:20, 71:16, 71:24, 72:14, 74:13, 96:4, 103:14, 107:6
**documents** [3] - 39:12, 72:2, 72:11
**dollar** [5] - 9:14, 10:17, 10:18, 11:6, 70:5
**dollars** [9] - 9:21, 9:22, 9:24, 89:10, 89:11, 98:5, 98:14, 98:21, 99:8
**domestic** [1] - 37:1
**domestically** [2] - 36:16, 92:17
**done** [13] - 7:7, 7:14, 8:6, 16:16, 25:22, 33:25, 35:11, 46:19, 55:3, 58:17, 81:21, 94:6, 101:13
**doubt** [3] - 10:24, 11:13, 47:15
**down** [6] - 24:23, 33:9, 66:24, 67:2, 106:8, 108:16
**Doyle** [3] - 90:14,

90:16, 93:9
**dozen** [1] - 60:9
**dozens** [1] - 69:25
**Dr** [30] - 4:14, 5:17, 5:23, 6:3, 13:25, 29:12, 31:24, 37:20, 38:21, 38:23, 39:2, 64:22, 68:1, 69:9, 70:15, 71:16, 72:22, 74:5, 89:25, 94:13, 95:20, 96:4, 98:18, 100:10, 101:15, 101:25, 102:13, 102:23, 105:7, 105:23
**draft** [1] - 15:4
**drafted** [3] - 17:20, 65:7, 67:22
**dramatically** [1] - 56:19
**drew** [1] - 21:20
**dropped** [1] - 46:13
**dropping** [1] - 45:12
**drove** [1] - 90:8
**due** [2] - 58:18, 62:14
**dumplings** [2] - 45:23, 46:6
**duped** [1] - 108:6
**during** [16] - 25:21, 40:2, 40:21, 48:6, 55:3, 64:25, 67:19, 70:4, 75:6, 75:7, 81:5, 82:22, 93:8, 101:2, 107:7, 107:10

## E

**e-mail** [13] - 14:15, 40:12, 55:22, 70:18, 71:12, 72:25, 73:2, 73:15, 74:11, 90:3, 93:11, 96:9, 100:12
**e-mailed** [2] - 73:4, 96:6
**e-mails** [6] - 40:13, 74:23, 86:7, 86:15, 93:4, 93:5
**ear** [2] - 25:19, 73:10
**early** [3] - 5:9, 25:4, 62:14
**earn** [2] - 29:24, 30:5
**earned** [3] - 30:7, 42:15, 44:8
**easiest** [1] - 59:1
**easing** [1] - 102:25
**ECB** [2] - 102:25, 103:16
**Economic** [3] - 6:20, 17:7, 71:19
**economic** [9] - 16:2,

21:8, 21:17, 21:25, 71:21, 72:7, 76:10, 76:11, 101:3
**economics** [7] - 6:11, 29:25, 30:4, 30:5, 30:7, 31:16, 41:13
**Economics** [9] - 6:15, 30:9, 42:22, 44:9, 45:6, 65:20, 79:7, 106:3, 106:5
**economist** [12] - 6:21, 31:13, 32:6, 32:8, 32:14, 32:21, 32:23, 34:17, 38:16, 44:21
**economists** [8] - 31:2, 33:2, 33:3, 35:22, 36:18, 36:22, 39:24, 81:9
**economists's** [1] - 33:25
**economy** [12] - 6:12, 6:17, 7:1, 8:1, 9:23, 10:2, 10:3, 10:6, 11:10, 11:12, 71:22, 72:15
**ecstatic** [2] - 56:13, 57:20
**Edith** [1] - 104:19
**educated** [1] - 6:10
**effects** [4] - 73:12, 74:19, 76:13, 76:14
**efficient** [1] - 45:2
**efforts** [2] - 35:19, 35:21
**eight** [2] - 7:19, 56:6
**either** [9] - 25:17, 26:17, 36:4, 46:15, 75:13, 75:24, 76:20, 80:22, 106:8
**electronically** [1] - 53:6
**element** [2] - 15:9, 16:20
**elements** [4] - 14:16, 17:2, 18:5, 18:10
**elite** [2] - 103:12
**Elizabeth** [1] - 108:24
**ELMO** [2] - 42:23, 45:10
**elsewhere** [2] - 86:3, 100:20
**embarrassed** [1] - 91:12
**embarrassing** [2] - 93:16, 93:20
**employee** [4] - 31:18, 48:20, 95:23, 100:23
**employee's** [1] - 101:1
**employees** [3] - 24:5, 48:25, 100:6

**employment** [1] - 106:1
**encouraged** [2] - 93:11, 95:10
**end** [16] - 7:17, 20:4, 46:18, 47:22, 47:24, 47:25, 49:23, 50:14, 51:3, 78:14, 78:25, 81:8, 92:3, 92:24, 94:2, 97:6
**ended** [2] - 25:4, 75:5
**ends** [1] - 19:5
**enforcement** [1] - 90:17
**engage** [2] - 27:16, 86:22
**engagement** [3] - 55:25, 56:1
**English** [7] - 43:20, 43:21, 48:15, 48:16, 55:6, 55:12, 55:22
**enhances** [2] - 49:9, 95:17
**enjoyed** [2] - 34:18, 40:15
**entail** [1] - 57:9
**enter** [2] - 38:23, 56:24
**entered** [8] - 5:10, 29:3, 67:24, 69:6, 70:13, 71:14, 72:20, 78:9
**entire** [2] - 7:17, 32:3
**entitled** [1] - 109:7
**entries** [1] - 105:6
**entry** [1] - 31:16
**entry-level** [1] - 31:16
**Entry/Exit** [1] - 83:8
**equivalent** [1] - 99:4
**Erica** [1] - 4:13
**escorted** [1] - 46:14
**especially** [6] - 5:2, 37:2, 54:6, 54:19, 64:1, 70:21
**espionage** [1] - 16:2
**Espionage** [1] - 17:7
**ESQ** [5] - 1:15, 1:16, 1:16, 1:19, 2:2
**essentially** [4] - 35:12, 61:10, 84:23, 104:10
**establish** [1] - 37:9
**established** [1] - 62:19
**estimate** [1] - 9:9
**et** [4] - 16:5, 20:6, 22:1
**ethical** [3] - 95:13, 95:15, 95:22
**ethics** [2] - 13:6, 100:18
**Euroclear** [2] - 8:23,

9:5
**evaluating** [1] - 70:9
**Eve** [2] - 53:7, 53:12
**evening** [2] - 45:15, 45:17
**evenings** [2] - 67:10, 67:17
**event** [1] - 23:14
**eventually** [3] - 49:13, 49:14, 67:23
**evidence** [14] - 13:25, 14:10, 38:10, 38:13, 67:25, 69:7, 70:13, 71:15, 72:21, 74:4, 94:12, 101:14, 102:12, 105:22
**evolved** [3] - 9:4, 65:4, 87:13
**exact** [5] - 49:21, 62:15, 74:19, 76:3, 104:24
**exactly** [1] - 23:12
**examination** [1] - 108:12
**EXAMINATION** [2] - 5:21, 29:10
**Examination............. .** [2] - 3:4, 3:5
**examining** [1] - 74:19
**example** [4] - 22:13, 25:16, 70:2, 101:2
**Excel** [1] - 103:24
**except** [2] - 14:8, 18:8
**exchange** [8] - 6:16, 7:2, 40:6, 70:18, 72:25, 73:15, 87:6, 87:9
**exchanged** [1] - 40:22
**exchanging** [2] - 40:24, 55:10
**exclusively** [1] - 77:25
**excuse** [3] - 37:25, 58:9, 94:7
**excused** [2] - 5:7, 11:25
**exhibit** [18] - 13:24, 69:9, 69:11, 70:15, 72:22, 74:5, 100:10, 101:15, 101:17, 101:20, 101:25, 102:4, 102:7, 102:13, 102:15, 102:19, 102:23, 105:23
**Exhibit** [18] - 37:14, 37:16, 37:21, 38:9, 38:13, 69:7, 70:14, 71:15, 74:3, 94:11, 96:3, 100:9, 101:14, 101:23, 102:11,

102:21, 102:22, 105:22
**exhibiting** [1] - 32:17
**exhibits** [7] - 13:18, 13:20, 14:2, 77:11, 77:13, 77:14, 77:25
**exit** [5] - 83:4, 83:7, 83:9, 83:13, 84:15
**exited** [3] - 12:11, 77:7, 108:15
**expect** [1] - 25:1
**expectation** [2] - 26:12, 91:20
**expected** [3] - 32:15, 34:3, 85:3
**expenses** [1] - 42:10
**expensive** [1] - 105:3
**experience** [2] - 7:17, 34:2
**Expert** [1] - 106:9
**expert** [3] - 70:21, 91:6, 103:11
**experts** [2] - 23:23, 69:14
**explain** [9] - 6:8, 7:21, 35:17, 44:19, 62:18, 64:8, 79:25, 81:17, 93:13
**explained** [5] - 33:24, 34:25, 49:6, 49:19, 83:6
**explains** [1] - 17:20
**explicit** [1] - 85:23
**expressed** [1] - 90:16
**expression** [1] - 86:13
**extortion** [2] - 107:13, 107:17
**extra** [2] - 25:21, 25:23
**extremely** [1] - 43:19
**eyes** [1] - 52:24

**F**

**face** [1] - 43:20
**Facebook** [1] - 81:15
**faced** [1] - 79:16
**fact** [3] - 17:21, 19:14, 57:22
**factual** [1] - 103:16
**faculty** [13] - 31:5, 31:18, 44:4, 44:8, 46:14, 46:18, 47:6, 47:9, 47:18, 47:25, 97:13, 97:15
**fair** [8] - 21:21, 25:16, 33:17, 35:9, 38:15, 57:12, 92:1, 92:20
**fairly** [7] - 44:21, 45:22, 51:6, 52:7, 55:2, 67:20, 87:11

**fake** [1] - 86:17
**familiar** [2] - 41:1, 88:20
**familiarity** [1] - 57:9
**family** [9] - 54:6, 56:5, 64:1, 84:2, 90:6, 90:8, 91:3, 97:16, 97:17
**famous** [1] - 74:18
**Fanhai** [2] - 94:20, 97:16
**Fannie** [1] - 9:12
**farewell** [2] - 93:11, 93:13
**father** [6] - 56:3, 56:14, 56:15, 57:22, 57:25, 58:11
**favor** [1] - 26:18
**FBI** [2] - 90:18, 91:14
**February** [4] - 39:7, 81:10, 90:22, 106:25
**Fed** [73] - 8:18, 10:19, 10:25, 11:3, 11:6, 11:14, 11:15, 11:16, 24:4, 30:24, 30:25, 31:1, 31:18, 31:20, 31:23, 31:25, 32:3, 32:13, 32:16, 34:17, 35:11, 37:5, 37:11, 39:25, 42:3, 44:14, 45:3, 50:23, 51:21, 62:12, 62:16, 62:17, 64:5, 64:9, 64:16, 65:5, 65:24, 65:25, 66:3, 67:18, 68:8, 68:23, 69:17, 69:19, 69:24, 70:4, 70:19, 70:23, 72:25, 80:1, 81:20, 87:24, 88:1, 88:8, 88:9, 88:11, 90:2, 90:17, 91:17, 93:6, 93:7, 95:2, 95:3, 95:23, 97:12, 104:18, 104:20, 104:25, 106:17, 107:23
**Fed's** [1] - 37:7
**Federal** [27] - 5:1, 8:16, 10:12, 10:25, 11:9, 11:10, 23:18, 24:4, 30:21, 30:22, 31:12, 38:25, 39:4, 39:12, 39:23, 42:2, 48:25, 49:7, 50:6, 50:7, 50:18, 75:25, 76:2, 76:4, 100:6, 104:1, 104:3
**feedback** [1] - 73:6
**feelings** [1] - 54:1
**fellow** [1] - 6:23

**felt** [9] - 53:13, 54:5, 54:13, 69:21, 76:8, 76:17, 82:4, 89:4
**female** [1] - 47:18
**few** [4] - 30:24, 51:9, 55:21, 61:1
**figured** [1] - 32:16
**filed** [1] - 80:1
**filing** [1] - 79:21
**fill** [1] - 50:24
**filled** [1] - 84:7
**fills** [1] - 44:21
**final** [3] - 4:16, 33:16, 105:19
**finally** [2] - 49:23, 83:24
**finance** [5] - 69:22, 70:7, 70:23, 72:7, 72:17
**Finance** [17] - 31:13, 32:2, 32:4, 33:22, 33:23, 34:12, 34:13, 37:3, 42:22, 44:9, 45:5, 65:20, 70:19, 79:7, 94:21, 106:2, 106:5
**financial** [6] - 7:4, 8:24, 10:5, 11:17, 18:6, 71:23
**fine** [5] - 13:14, 16:22, 16:23, 20:10, 27:21
**finish** [2] - 76:24, 98:18
**finished** [2] - 42:17, 81:1
**first** [38] - 6:6, 15:8, 30:7, 31:12, 32:8, 33:1, 39:17, 40:1, 41:18, 46:13, 46:17, 47:5, 49:20, 51:3, 52:8, 52:16, 53:1, 53:10, 54:5, 55:21, 56:5, 58:6, 68:18, 70:8, 70:25, 73:16, 79:10, 81:4, 83:8, 85:12, 88:16, 89:14, 97:2, 97:8, 97:9, 97:20, 98:9, 99:1
**five** [2] - 30:19, 98:9
**Flaaen** [1] - 73:1
**Fleet** [1] - 10:22
**flew** [4] - 45:9, 52:13, 81:12, 84:17
**flight** [2] - 81:18, 81:23
**flirtations** [1] - 88:14
**fly** [2] - 45:8, 84:18
**focus** [4] - 4:23, 13:9, 39:15, 51:14
**folks** [1] - 70:22

**follow** [3] - 6:22, 6:25, 19:25
**following** [5] - 14:18, 17:25, 61:11, 94:17, 98:7
**FOMC** [1] - 107:2
**foolishly** [2] - 84:9, 86:6
**FOR** [3] - 1:1, 5:18, 29:7
**foregoing** [1] - 109:5
**foreign** [5] - 6:16, 6:19, 7:2, 16:8, 107:21
**Foreign** [2] - 6:23, 106:9
**forget** [3] - 46:16, 47:4, 104:12
**forgot** [1] - 105:21
**form** [5] - 24:11, 26:7, 34:6, 44:21, 80:1
**former** [1] - 95:23
**forms** [1] - 18:6
**forward** [3] - 25:7, 25:8, 33:17
**forwarded** [2] - 72:2, 103:4
**Foundation** [1] - 99:5
**four** [9] - 23:5, 38:18, 39:7, 53:10, 56:14, 64:10, 65:9, 97:21, 103:10
**four-month** [1] - 65:9
**FR** [2] - 107:2
**frame** [1] - 75:3
**Freddy** [1] - 9:11
**French** [1] - 6:11
**frequently** [2] - 6:15, 36:25
**Friday** [1] - 67:9
**FRIEDRICH** [1] - 1:9
**friend** [3] - 63:16, 69:5, 108:6
**friendly** [1] - 43:19
**friends** [4] - 51:9, 57:23, 59:14, 66:5
**friendship** [1] - 63:14
**frightened** [1] - 90:9
**front** [6] - 37:21, 52:23, 99:9, 99:10, 99:13, 105:23
**Fudan** [20] - 39:20, 65:10, 65:12, 66:10, 66:25, 68:6, 79:3, 79:4, 94:5, 94:17, 94:21, 94:22, 95:1, 95:13, 97:1, 98:19, 98:20, 103:7, 103:11, 107:7
**full** [8] - 18:5, 18:9,

19:4, 97:13, 97:15, 97:21, 98:10
**full-blown** [1] - 18:9
**full-time** [4] - 97:13, 97:15, 97:21, 98:10
**functionally** [1] - 55:15
**Fund** [2] - 36:19, 36:20
**fund** [2] - 7:24, 8:1
**funding** [1] - 95:9
**furthermore** [1] - 68:17
**future** [2] - 53:4, 79:23

**G**

**gamesmanship** [1] - 24:22
**gap** [2] - 50:22, 50:24
**General** [1] - 90:21
**general** [2] - 52:21, 56:10
**generally** [3] - 8:1, 21:7, 40:13
**generous** [1] - 60:24
**gentlemen** [6] - 5:11, 12:6, 29:4, 77:6, 108:10, 108:14
**genuinely** [1] - 10:3
**geographic** [1] - 54:9
**geographically** [2] - 43:2, 43:4
**Georgetown** [1] - 36:24
**gift** [5] - 56:16, 89:4, 89:5, 89:13, 89:14
**GITLEN** [22] - 2:2, 28:25, 29:2, 29:9, 29:11, 37:13, 37:17, 37:19, 38:8, 38:14, 76:22, 77:3, 77:10, 77:16, 77:24, 78:3, 78:7, 78:11, 78:12, 94:7, 94:10, 108:7
**Gitlen** [5] - 2:2, 4:13, 29:1, 29:8, 78:10
**given** [9] - 10:9, 19:15, 23:21, 37:2, 54:18, 56:1, 65:5, 69:12, 92:21
**global** [3] - 6:12, 7:1, 8:3
**Global** [1] - 6:14
**Gmail** [2] - 93:10
**goals** [5] - 33:5, 53:2, 54:5, 56:14, 86:21
**God** [1] - 56:16
**good-bye** [2] - 93:4, 93:5

**goods** [1] - 73:12
**Google** [2] - 55:17, 55:18
**gossip** [3] - 75:24, 75:25, 76:2
**governing** [1] - 15:2
**government** [63] - 4:6, 5:3, 5:6, 5:13, 5:17, 6:24, 7:3, 7:24, 8:2, 8:7, 8:11, 9:13, 9:15, 9:19, 9:20, 10:9, 10:11, 10:20, 10:24, 12:4, 13:20, 15:3, 15:6, 15:12, 15:24, 16:3, 16:8, 17:5, 17:21, 18:3, 18:4, 18:10, 18:13, 19:5, 19:7, 19:13, 19:23, 21:2, 21:11, 21:14, 23:2, 23:22, 24:4, 25:17, 26:4, 48:20, 69:11, 72:1, 72:21, 74:22, 77:11, 81:14, 91:4, 92:9, 100:7, 100:23, 100:25, 101:1, 101:4, 102:8, 108:19
**Government** [14] - 67:25, 69:7, 70:14, 71:15, 74:3, 94:11, 96:3, 100:9, 101:14, 101:23, 102:11, 102:21, 105:21
**GOVERNMENT** [1] - 5:18
**government's** [5] - 5:12, 18:18, 21:23, 103:11, 108:1
**governments** [1] - 8:1
**governor** [1] - 10:13
**graduate** [1] - 31:4
**grant** [10] - 95:6, 95:9, 95:18, 96:12, 99:3, 99:4, 99:6, 99:7, 99:11, 105:14
**grants** [12] - 95:11, 95:12, 95:24, 96:10, 96:20, 96:22, 98:22, 98:23, 99:1, 99:3, 100:19, 105:15
**graphs** [1] - 104:11
**great** [8] - 7:3, 11:13, 14:11, 22:8, 36:24, 51:5, 57:19, 63:15
**Great** [1] - 5:4
**greatest** [1] - 75:18
**Green** [1] - 81:3
**grew** [2] - 29:18, 52:7
**group** [1] - 31:2
**grown** [1] - 63:15

**growth** [1] - 6:18
**guess** [3] - 42:16, 57:1, 104:8
**guest** [2] - 60:25, 85:19
**guests** [2] - 60:9, 60:18
**guidance** [1] - 34:1
**guy** [5] - 61:6, 75:18, 82:14, 86:18, 89:14
**guys** [1] - 55:11
**gym** [1] - 88:10
**GYN** [2] - 58:7, 58:12

## H

**hair** [1] - 52:25
**half** [8] - 10:1, 45:11, 77:5, 98:2, 98:4, 98:5, 98:13, 98:20
**half-time** [2] - 98:2, 98:20
**handle** [1] - 58:18
**handsome** [1] - 88:16
**hang** [1] - 64:11
**Hanzhong** [3] - 84:7, 84:13, 84:14
**happy** [4] - 21:22, 27:18, 66:9, 84:2
**hard** [2] - 9:17, 20:18
**HAROLD** [1] - 1:6
**Harold** [1] - 4:5
**Harvard** [1] - 6:10
**hassles** [2] - 97:7, 97:25
**head** [1] - 10:14
**hear** [1] - 18:13
**heard** [13] - 18:23, 31:24, 39:7, 43:13, 58:21, 69:14, 76:13, 77:16, 93:4, 108:1, 108:2
**hearing** [2] - 24:23, 90:23
**hearsay** [1] - 14:2
**heart** [1] - 7:20
**heavy** [1] - 55:12
**held** [3] - 8:15, 60:5, 82:24
**hello** [1] - 29:2
**help** [12] - 9:18, 17:18, 57:14, 57:20, 61:13, 61:21, 63:22, 64:3, 64:6, 82:5, 84:6, 90:18
**helped** [1] - 58:24
**helpful** [4] - 24:3, 24:11, 24:18, 26:8
**helping** [4] - 59:6, 77:11, 82:18, 82:22

**helpless** [1] - 82:4
**helps** [1] - 37:9
**Hershkowitz** [4] - 39:9, 41:5, 90:23, 92:13
**high** [1] - 45:11
**high-speed** [1] - 45:11
**higher** [2] - 11:5, 43:6
**highlight** [1] - 77:22
**highlighting** [1] - 13:7
**highly** [1] - 34:19
**Hill** [1] - 4:14
**himself** [1] - 40:2
**hire** [1] - 35:19
**hiring** [2] - 35:18, 35:21
**his/her** [1] - 89:1
**historical** [1] - 9:3
**hold** [3] - 8:25, 94:19, 96:6
**holding** [4] - 6:4, 7:11, 9:2, 10:10
**holdings** [6] - 4:23, 6:13, 8:14, 8:15, 9:14, 11:1
**holds** [4] - 8:20, 9:4, 9:10, 9:11
**home** [3] - 53:13, 64:11, 88:4
**hometown** [1] - 83:13
**honest** [1] - 48:11
**Hong** [15] - 50:8, 50:16, 50:23, 51:21, 56:23, 60:5, 60:8, 60:10, 60:12, 61:1, 61:14, 61:18, 61:22
**Honor** [33] - 4:8, 4:12, 4:21, 5:16, 11:20, 11:23, 12:1, 12:4, 12:15, 12:21, 18:12, 18:20, 19:15, 20:9, 20:22, 22:7, 22:22, 22:23, 23:11, 24:7, 26:3, 26:9, 27:12, 28:25, 29:2, 29:9, 37:17, 76:22, 78:4, 78:7, 78:11, 108:7, 108:19
**HONORABLE** [1] - 1:9
**honoraria** [6] - 48:24, 48:25, 49:6, 49:20, 49:21, 49:24
**honorarium** [5] - 48:3, 48:5, 48:17, 49:2, 49:21
**honorariums** [1] - 48:19
**hope** [1] - 77:20
**hoped** [1] - 40:15
**hopefully** [1] - 78:1

**hoping** [1] - 53:3
**hospital** [4] - 58:14, 58:16, 59:13, 63:8
**hospitals** [1] - 58:15
**host** [3] - 42:10, 46:5, 65:10
**hosted** [1] - 65:15
**hot** [1] - 61:19
**hotel** [4] - 45:20, 60:6, 84:22
**hour** [4] - 7:16, 76:24, 77:4, 89:22
**hourly** [1] - 7:14
**hours** [4] - 7:18, 24:24, 25:20, 45:11
**house** [2] - 53:11, 85:19
**huge** [1] - 82:7
**Hummin** [72] - 38:23, 39:14, 39:15, 39:17, 40:1, 41:7, 41:10, 41:20, 42:4, 43:8, 43:21, 43:22, 45:14, 45:20, 45:25, 46:5, 46:10, 47:7, 47:8, 48:11, 51:4, 51:24, 57:16, 58:3, 58:23, 58:24, 59:5, 59:21, 59:22, 61:8, 61:9, 61:13, 61:19, 62:25, 63:6, 63:8, 63:10, 63:13, 66:3, 66:20, 66:22, 68:13, 68:21, 69:5, 72:2, 74:24, 74:25, 75:13, 75:19, 75:24, 76:10, 76:15, 76:17, 76:19, 82:5, 82:7, 82:17, 83:3, 83:19, 83:21, 84:7, 92:11, 92:14, 99:17, 99:20, 100:5, 101:10, 107:14, 107:20, 108:2, 108:3
**Hummin's** [4] - 46:13, 61:10, 61:12, 68:6
**hundreds** [2] - 10:4, 89:11
**hung** [2] - 63:6
**Hunter** [1] - 4:10
**HUNTER** [1] - 1:15

## I

**iconic** [1] - 52:23
**idea** [3] - 18:14, 34:5, 91:13
**ideally** [1] - 50:24
**ideas** [4] - 32:18, 33:25, 40:22, 40:24
**identical** [1] - 77:15

**identification** [2] - 37:14, 38:10
**identified** [3] - 22:16, 83:20, 103:21
**identity** [2] - 89:2, 89:3
**ll** [1] - 107:2
**illegal** [1] - 81:15
**image** [1] - 92:4
**imbalances** [1] - 71:2
**immediately** [3] - 17:25, 27:1, 80:17
**impact** [6] - 7:1, 7:2, 10:7, 10:18, 11:1
**impacting** [1] - 6:17
**implicit** [2] - 9:13
**important** [4] - 8:17, 30:14, 51:11, 56:22
**imports** [1] - 74:21
**impressed** [2] - 44:6, 51:5
**impression** [1] - 49:11
**in-person** [1] - 81:3
**inaccurate** [1] - 15:3
**inappropriate** [1] - 76:8
**incentive** [1] - 54:15
**inclined** [1] - 41:16
**include** [3] - 20:6, 22:3, 65:13
**included** [1] - 65:25
**includes** [1] - 20:5
**including** [1] - 16:3
**incredibly** [1] - 63:24
**indicating** [1] - 86:10
**indispensable** [1] - 61:16
**individual** [5] - 21:6, 39:3, 60:24, 99:20, 101:10
**individuals** [1] - 86:25
**indulgence** [1] - 94:8
**industry** [1] - 74:20
**influence** [4] - 48:22, 100:24, 101:1, 101:5
**influences** [1] - 11:11
**inform** [2] - 44:14
**information** [32] - 4:20, 5:2, 11:2, 11:6, 11:14, 11:16, 11:17, 15:17, 15:20, 15:25, 16:7, 16:21, 17:13, 17:21, 18:7, 19:9, 19:13, 20:6, 21:9, 21:18, 40:6, 69:17, 69:24, 70:11, 72:12, 72:14, 74:16, 101:20, 102:18, 103:17, 104:15, 105:11

**Information** [1] - 21:5
**informed** [3] - 93:24, 106:20
**initial** [2] - 52:18, 107:16
**initiate** [2] - 40:8, 40:9
**initiated** [1] - 40:10
**inquire** [1] - 76:22
**insert** [2] - 19:6, 19:19
**inserting** [1] - 20:15
**insertion** [2] - 21:10, 21:16
**Inspector** [1] - 90:21
**Instagram** [3] - 86:6, 86:7, 86:16
**Instead** [3] - 17:11, 19:5, 19:7
**instead** [2] - 19:10, 32:19
**institute** [5] - 43:23, 61:11, 66:23, 106:4, 106:5
**Institute** [1] - 106:2
**institution** [7] - 8:25, 10:18, 36:14, 37:9, 64:11, 65:10, 65:15
**institutions** [5] - 8:15, 8:19, 8:24, 10:25, 36:21
**instruct** [4] - 18:11, 25:14, 25:15, 25:24
**instruction** [18] - 13:1, 13:4, 13:13, 14:12, 14:25, 15:4, 15:23, 16:15, 17:5, 17:19, 17:25, 19:24, 21:3, 22:14, 22:18, 27:5
**instructions** [9] - 12:23, 13:18, 14:14, 18:25, 20:11, 20:17, 22:12, 26:7, 27:3
**instructs** [2] - 18:15, 26:16
**instrumental** [1] - 59:5
**instrumentality** [1] - 16:9
**instruments** [1] - 9:15
**Intelligence** [1] - 10:23
**intelligently** [1] - 27:14
**intended** [2] - 16:8, 18:24
**intensely** [1] - 52:7
**intent** [2] - 100:23, 100:25
**interact** [1] - 40:1
**interacting** [1] - 87:2
**interaction** [1] - 43:17

**interactions** [5] - 41:6, 47:9, 47:11, 47:14, 88:21
**interest** [16] - 7:3, 10:11, 10:17, 10:19, 10:20, 10:24, 11:6, 11:8, 11:11, 37:7, 48:23, 70:4, 70:8, 86:10, 94:4
**interested** [8] - 27:8, 70:23, 75:13, 86:18, 99:25, 103:16, 104:4, 104:17
**interests** [2] - 51:12, 52:21
**interim** [1] - 94:3
**internal** [3] - 34:21, 68:23, 107:2
**international** [9] - 6:21, 32:2, 37:1, 39:25, 69:22, 70:7, 70:23, 72:7, 72:17
**International** [12] - 31:13, 32:4, 33:22, 33:23, 34:11, 34:13, 36:18, 36:20, 37:2, 70:19, 94:20, 106:2
**internationally** [2] - 36:16, 38:16
**interpreted** [1] - 80:15
**interrogation** [1] - 91:7
**intervals** [1] - 67:20
**interview** [9] - 39:8, 41:4, 81:3, 92:4, 92:11, 106:24, 107:8, 107:10, 107:11
**interviewed** [1] - 39:11
**intimate** [4] - 53:15, 53:17, 54:1, 85:21
**introduce** [2] - 13:24, 43:8
**introduced** [2] - 13:25, 40:2
**invitation** [4] - 40:20, 42:9, 51:16, 75:12
**invite** [1] - 60:20
**invited** [6] - 39:24, 42:1, 50:12, 50:17, 51:23, 60:19
**involved** [4] - 31:22, 36:1, 66:6, 107:21
**IOUs** [1] - 7:23
**iPad** [6] - 87:16, 87:17, 87:18, 87:19, 91:18
**iPhone** [1] - 91:17
**issue** [8] - 14:2, 16:10,

21:2, 21:3, 21:4, 65:4, 78:2, 97:22
**issued** [1] - 9:11
**issues** [8] - 6:23, 7:24, 14:19, 22:16, 70:24, 72:6, 77:17, 108:18
**IT** [2] - 77:21, 78:2
**item** [2] - 21:9, 21:17
**itinerary** [2] - 46:2, 50:11
**itself** [3] - 8:18, 70:10, 103:17
**iTunes** [3] - 89:5, 89:12, 89:14

**J**

**January** [5] - 1:6, 81:9, 81:10, 97:11, 109:11
**Japan's** [1] - 10:2
**Jin** [1] - 38:24
**Jinan** [10] - 42:24, 43:3, 45:11, 66:14, 66:20, 75:9, 75:10, 75:11, 75:13, 78:16
**job** [18] - 30:8, 30:14, 30:22, 31:1, 31:12, 31:14, 31:17, 34:9, 36:2, 41:12, 64:5, 93:18, 94:4, 94:17, 95:17, 100:14, 100:18, 100:20
**jobs** [1] - 44:5
**John** [4] - 4:5, 29:14, 39:9, 75:18
**JOHN** [4] - 1:6, 3:5, 29:7, 29:14
**joined** [2] - 4:9, 53:7
**joint** [1] - 47:18
**JONATHAN** [1] - 2:2
**Jonathan** [2] - 2:2, 4:13
**journals** [1] - 30:13
**jovial** [2] - 75:17, 76:11
**JUDGE** [1] - 1:10
**judge** [1] - 18:15
**judgment** [4] - 12:17, 73:25, 74:1
**Judson** [1] - 31:24
**July** [7] - 62:14, 62:15, 62:16, 62:23, 63:7, 97:4
**jump** [1] - 33:17
**June** [2] - 38:2, 41:22
**Jury** [8] - 4:3, 5:10, 12:11, 29:3, 77:7, 77:9, 78:9, 108:15
**jury** [26] - 5:6, 5:23,

6:8, 12:9, 12:23, 13:5, 13:12, 13:17, 14:12, 14:14, 16:12, 16:25, 17:10, 17:18, 17:25, 18:15, 18:25, 19:13, 20:1, 20:11, 22:21, 25:12, 26:23, 27:10, 28:24, 32:11
**JURY** [1] - 1:9
**Justice** [1] - 1:17

**K**

**kept** [2] - 66:5, 82:25
**key** [1] - 18:17
**kidnap** [3] - 89:23, 90:9, 107:18
**kidnapping** [1] - 107:13
**kids** [2] - 53:10, 56:14
**kind** [23] - 11:16, 41:12, 46:16, 47:20, 50:21, 53:13, 58:20, 60:24, 61:23, 62:15, 63:1, 63:5, 63:25, 68:18, 76:17, 79:22, 86:16, 86:24, 88:21, 89:9, 90:7, 103:18, 104:25
**kinds** [2] - 54:21, 91:8
**Kistler** [2] - 104:12, 105:4
**knocked** [1] - 82:3
**knowing** [5] - 56:17, 62:11, 92:3, 92:8, 108:5
**knowingly** [3] - 16:4, 27:14, 39:11
**knowledge** [1] - 15:12
**known** [4] - 8:22, 21:7, 70:8, 74:9
**knows** [2] - 13:20, 16:25
**Kong** [15] - 50:8, 50:9, 50:16, 50:23, 51:22, 56:23, 60:5, 60:8, 60:10, 60:12, 61:1, 61:14, 61:18, 61:22

**L**

**lack** [2] - 76:17, 86:13
**ladies** [6] - 5:11, 12:6, 29:4, 77:5, 108:10, 108:14
**laid** [1] - 68:21
**language** [9] - 15:23, 18:9, 19:23, 20:5, 20:7, 20:8, 20:10, 21:5, 59:5

**large** [7] - 9:5, 24:23, 31:2, 36:20, 50:24, 54:8, 60:25
**largely** [1] - 31:17
**larger** [3] - 36:21, 60:8, 85:18
**largest** [2] - 11:2, 99:4
**last** [5] - 10:8, 13:3, 23:21, 36:9, 85:23
**late** [5] - 45:22, 68:11, 68:12, 68:15, 79:21
**Law** [1] - 2:2
**law** [7] - 15:4, 15:13, 57:4, 64:4, 84:14, 90:17
**lawyers** [1] - 36:22
**lay** [1] - 16:15
**layman's** [2] - 7:21, 9:18
**lazy** [1] - 103:17
**leading** [1] - 35:19
**lean** [1] - 26:18
**learned** [1] - 57:11
**learning** [2] - 57:10, 100:1
**least** [5] - 37:12, 51:11, 63:6, 86:11, 104:2
**leave** [11] - 31:9, 62:12, 62:16, 62:19, 82:8, 82:9, 82:13, 83:5, 83:7, 84:21, 96:14
**leaves** [1] - 20:3
**lectures** [3] - 72:5, 72:6, 72:9
**led** [2] - 31:7, 64:7
**Lee** [35] - 38:24, 39:14, 39:15, 39:17, 40:1, 41:7, 41:20, 42:4, 43:8, 43:22, 47:7, 51:4, 51:24, 57:16, 58:3, 59:22, 61:9, 61:13, 63:10, 63:13, 66:3, 72:2, 74:24, 74:25, 76:15, 82:17, 83:3, 92:12, 92:14, 99:17, 99:20, 101:10, 107:14, 108:2, 108:3
**Lee's** [2] - 47:8, 66:20
**left** [5] - 30:20, 47:17, 63:24, 78:13, 96:15
**less** [3] - 8:21, 9:16, 10:16
**letter** [4] - 54:25, 55:2, 68:6, 68:15
**letting** [1] - 78:8
**LEU** [1] - 90:17
**level** [3] - 31:16, 32:6,

43:5
**levels** [1] - 35:20
**License** [1] - 61:18
**lie** [1] - 39:11
**life** [2] - 85:2, 85:6
**lifting** [1] - 55:12
**light** [2] - 5:1, 49:18
**likely** [1] - 54:18
**limitations** [2] - 64:24, 65:1
**limited** [1] - 6:4
**line** [4] - 14:14, 14:18, 15:7, 71:11
**lined** [1] - 26:24
**lines** [1] - 20:17
**lining** [1] - 63:11
**linked** [2] - 87:19, 87:20
**links** [1] - 11:5
**list** [7] - 23:4, 23:19, 23:20, 24:23, 60:25, 107:2
**listened** [1] - 41:4
**listening** [1] - 82:24
**literally** [1] - 55:18
**literature** [5] - 34:4, 69:25, 70:7, 104:5, 104:21
**litigation** [1] - 77:12
**Liu** [3] - 52:11, 104:19, 105:7
**live** [1] - 63:18
**lived** [1] - 52:16
**living** [1] - 83:14
**load** [3] - 97:21, 98:5, 98:10
**loan** [1] - 8:1
**locally** [2] - 36:15, 36:24
**logistical** [1] - 33:6
**London** [4] - 9:8, 50:13, 50:15, 50:20
**long-term** [1] - 11:11
**Look** [1] - 57:24
**look** [12] - 17:2, 20:18, 26:7, 27:2, 38:5, 59:19, 68:21, 69:13, 69:15, 69:18, 87:9, 103:3
**looked** [4] - 69:21, 78:4, 89:18, 94:3
**looking** [5] - 50:24, 63:5, 64:2, 77:25, 82:25
**Lorenzana** [1] - 4:14
**loser** [1] - 53:13
**lost** [1] - 44:7
**loud** [1] - 5:23
**Louis** [1] - 42:2

**love** [3] - 18:14, 56:14, 88:17
**lovely** [1] - 52:25
**lower** [1] - 44:8
**luggage** [2] - 82:6, 82:7
**lugging** [1] - 82:23
**lunch** [7] - 25:21, 25:23, 26:12, 46:16, 77:2, 108:9, 108:18
**lunchtime** [1] - 24:20

# M

**M.B.A** [1] - 66:25
**Mac** [1] - 9:12
**machine** [2] - 74:21, 74:23
**macroeconomics** [1] - 69:23
**Mae** [1] - 9:12
**mail** [13] - 14:15, 40:12, 55:22, 70:18, 71:12, 72:25, 73:2, 73:15, 74:11, 90:3, 93:11, 96:9, 100:12
**mailed** [2] - 73:4, 96:6
**mails** [6] - 40:13, 74:23, 86:7, 86:15, 93:4, 93:5
**main** [2] - 35:16, 65:4
**mainland** [1] - 56:24
**maintained** [1] - 104:1
**male** [1] - 89:3
**man** [6] - 59:22, 59:24, 60:11, 60:13, 60:14, 60:16
**manage** [1] - 33:4
**managed** [1] - 33:8
**management** [6] - 32:19, 32:20, 33:1, 33:11, 33:15, 33:18
**managers** [1] - 34:1
**manages** [1] - 11:4
**managing** [2] - 33:2, 34:11
**manipulations** [1] - 105:5
**March** [12] - 61:20, 62:10, 81:12, 81:13, 81:19, 81:20, 81:23, 82:22, 93:25, 102:25
**marital** [3] - 85:11, 85:16, 85:20
**marked** [3] - 37:13, 37:20, 94:11
**market** [5] - 6:14, 7:2, 8:3, 11:15, 31:1
**marketable** [7] - 4:24, 6:5, 7:11, 7:22, 7:23,

8:7, 10:10
**markets** [5] - 7:3, 7:4, 10:5, 11:17, 71:23
**marriage** [2] - 53:11, 56:6
**Marriage** [1] - 61:18
**married** [7] - 56:18, 56:23, 57:2, 57:7, 61:25, 62:2, 85:2
**marry** [3] - 54:10, 54:12, 55:24
**Maryland** [1] - 36:24
**master** [1] - 85:18
**match** [1] - 95:2
**material** [5] - 69:17, 73:17, 73:20, 74:1, 74:19
**materials** [2] - 69:20, 93:8
**mathematical** [1] - 105:5
**matter** [4] - 7:20, 14:4, 57:5, 109:7
**matters** [2] - 10:7, 86:20
**McQuaig** [2] - 37:18, 38:8
**mean** [47] - 24:17, 27:16, 31:14, 33:4, 33:5, 36:5, 36:6, 41:1, 41:18, 43:2, 47:17, 49:16, 53:11, 54:3, 54:17, 55:15, 56:13, 58:10, 58:19, 61:5, 61:14, 61:16, 64:2, 64:6, 65:11, 67:2, 68:12, 69:5, 70:2, 71:6, 73:24, 76:16, 77:2, 77:3, 79:14, 86:14, 87:5, 88:8, 91:16, 93:2, 93:15, 95:17, 97:5, 97:9, 104:9, 104:24, 107:20
**meaning** [1] - 37:11
**meaningful** [1] - 54:2
**means** [4] - 17:16, 18:6, 35:18, 45:12
**medication** [1] - 84:9
**meet** [17] - 39:17, 45:13, 46:14, 48:1, 56:2, 62:24, 67:16, 67:17, 68:20, 73:7, 75:8, 84:18, 88:17, 99:20, 100:7, 101:9
**meeting** [15] - 40:15, 47:22, 54:5, 67:19, 75:6, 75:15, 78:15, 78:18, 90:22, 91:1, 91:13, 93:8, 93:23,

100:1
**meetings** [1] - 47:18
**meets** [1] - 41:12
**member** [5] - 44:4, 47:19, 64:17, 97:13, 97:15
**members** [1] - 47:9
**memo** [2] - 74:8, 74:10
**memorable** [2] - 53:7, 53:9
**mentioned** [2] - 13:16, 49:7
**mentions** [1] - 103:20
**message** [7] - 18:23, 55:19, 86:10, 89:17, 89:25, 90:5, 93:13
**messages** [7] - 55:10, 55:23, 86:7, 86:8, 86:15, 86:16, 99:19
**met** [18] - 17:13, 19:9, 40:8, 40:19, 42:12, 46:17, 47:20, 51:13, 52:12, 52:14, 52:15, 52:19, 53:5, 57:24, 78:15, 92:18, 97:12, 99:25
**method** [1] - 44:23
**mid** [2] - 77:2, 77:3
**mid-morning** [2] - 77:2, 77:3
**middle** [1] - 50:17
**might** [11] - 12:23, 13:5, 14:4, 14:7, 23:5, 23:7, 25:2, 40:23, 77:18, 80:13, 90:19
**million** [4] - 9:17, 9:21, 97:13, 98:4
**mind** [6] - 13:22, 14:5, 20:2, 63:12, 64:24, 97:3
**mine** [2] - 57:23, 103:7
**minute** [2] - 33:24, 77:5
**minutes** [4] - 5:3, 22:24, 25:4, 108:11
**misappropriate** [3] - 15:25, 17:13, 19:8
**misappropriating** [1] - 15:20
**missed** [1] - 79:22
**missing** [1] - 33:19
**misunderstood** [1] - 80:13
**mixture** [1] - 47:6
**modern** [1] - 8:1
**modified** [1] - 15:5
**modify** [1] - 20:16
**moment** [4] - 11:18,

17:14, 19:10, 96:6
**Monday** [3] - 25:12, 25:18, 26:14
**monetary** [2] - 39:25, 42:3
**Monetary** [3] - 36:19, 36:20, 50:8
**money** [11] - 9:21, 9:22, 48:3, 89:9, 89:19, 95:9, 95:19, 96:12, 96:25, 97:8, 105:14
**monitor** [1] - 77:12
**month** [2] - 65:9, 85:13
**monthly** [1] - 8:13
**months** [3] - 55:21, 64:10, 89:24
**morning** [13] - 4:8, 4:11, 4:12, 4:15, 5:9, 5:19, 10:15, 25:1, 45:15, 46:1, 46:7, 77:2, 77:3
**MORNING** [1] - 1:9
**most** [12] - 8:17, 9:21, 11:17, 30:14, 33:20, 34:21, 36:3, 47:4, 56:22, 84:17, 89:23, 94:5
**mostly** [3] - 31:20, 33:11, 47:6
**mother** [7] - 56:2, 64:3, 64:4, 83:14, 84:14
**mother-in-law** [2] - 64:4, 84:14
**motions** [1] - 12:16
**motivate** [2] - 72:9, 72:16
**motivation** [1] - 107:16
**move** [7] - 11:3, 17:24, 20:9, 25:7, 25:8, 31:8, 82:18
**moved** [1] - 42:18
**movement** [1] - 32:14
**moves** [1] - 12:17
**moving** [3] - 18:14, 18:21, 82:15
**MR** [93] - 4:8, 4:12, 4:18, 4:21, 4:23, 5:1, 5:5, 5:16, 5:22, 11:18, 11:22, 12:1, 12:4, 12:15, 12:17, 12:21, 12:25, 13:8, 13:11, 13:15, 13:23, 14:7, 14:20, 14:23, 15:10, 15:15, 16:11, 16:19, 16:22, 16:25, 17:9, 17:17, 17:23,

18:1, 18:12, 18:20,
19:15, 19:21, 20:8,
20:22, 20:24, 21:13,
21:20, 22:2, 22:5,
22:7, 22:19, 22:22,
22:23, 23:2, 23:11,
23:15, 23:17, 23:21,
23:25, 24:6, 24:7,
24:10, 24:15, 24:19,
25:3, 25:7, 25:10,
26:2, 26:9, 26:15,
27:12, 27:19, 28:22,
28:25, 29:2, 29:9,
29:11, 37:13, 37:17,
37:19, 38:8, 38:11,
38:14, 76:22, 77:3,
77:10, 77:16, 77:24,
78:3, 78:7, 78:11,
78:12, 94:7, 94:10,
108:7, 108:19,
108:20
**multitask** [1] - 58:15
**must** [6] - 15:24, 16:3,
17:12, 19:5, 19:7,
48:12
**mystery** [1] - 78:6

## N

**name** [10] - 5:24, 6:1,
29:12, 38:24, 43:12,
47:19, 58:16,
104:19, 105:2
**named** [1] - 61:6
**names** [2] - 23:21,
24:4
**nascent** [1] - 52:1
**National** [3] - 6:20,
99:5
**nature** [2] - 89:7,
92:16
**navigate** [1] - 59:6
**Navy** [1] - 10:22
**near** [1] - 84:14
**nearby** [2] - 42:19,
42:20
**necessary** [4] - 17:5,
19:23, 53:23, 70:11
**need** [21] - 4:16, 5:6,
5:14, 17:1, 17:21,
19:13, 22:11, 22:13,
25:9, 27:7, 28:13,
46:9, 55:2, 57:2,
57:7, 77:21, 80:24,
83:1, 83:13, 90:10
**needed** [4] - 56:21,
81:2, 83:2, 83:7
**Never** [1] - 107:4
**never** [2] - 91:18,
106:22

**New** [4] - 8:18, 29:18,
53:7, 53:12
**new** [15] - 4:20, 31:18,
31:22, 35:18, 35:19,
35:21, 37:10, 63:17,
73:6, 81:25, 85:6,
85:9, 104:4, 104:18
**new-found** [1] - 81:25
**newborn** [3] - 63:22,
63:23, 64:7
**news** [6] - 9:6, 57:19,
66:6, 66:7, 84:15,
84:16
**next** [16] - 17:20, 27:1,
30:20, 32:23, 41:20,
46:1, 46:7, 46:9,
50:3, 56:10, 72:20,
83:12, 93:17, 93:21,
93:22, 97:15
**nice** [3] - 31:6, 40:14,
60:6
**NICHOLAS** [1] - 1:15
**Nick** [1] - 4:10
**Nigeria** [1] - 89:3
**night** [4] - 13:3, 23:21,
45:21, 85:25
**nomenclature** [1] -
104:25
**none** [2] - 35:9, 35:12
**noon** [1] - 25:22
**normal** [1] - 46:19
**Northwest** [5] - 1:14,
1:17, 1:19, 2:3, 2:6
**note** [1] - 71:8
**Note** [1] - 71:1
**nothing** [3] - 24:9,
68:16, 78:5
**notice** [1] - 71:11
**noticed** [1] - 97:3
**noting** [1] - 104:21
**novel** [6] - 21:6, 21:10,
21:15, 22:3, 22:4,
34:4
**November** [1] - 68:12
**nude** [3] - 13:5, 87:25,
91:23
**Number** [1] - 1:3
**number** [6] - 9:1, 10:3,
34:23, 70:2, 86:19,
88:16
**numbers** [1] - 9:17
**nuts** [1] - 71:8

## O

**OB** [3] - 58:7, 58:12,
58:17
**OB-GYN** [2] - 58:7,
58:12
**object** [6] - 14:1,

14:25, 16:20, 17:9,
21:14, 21:15
**objecting** [1] - 17:4
**objection** [3] - 20:10,
20:13, 38:11
**objections** [4] - 14:17,
14:22, 20:7, 20:23
**obligated** [1] - 76:18
**obligations** [1] - 84:10
**oblique** [1] - 103:20
**observe** [2] - 47:8,
47:11
**obtain** [1] - 16:5
**obviously** [1] - 86:17
**occasion** [1] - 47:8
**occurred** [1] - 13:3
**occurring** [1] - 75:2
**October** [9] - 50:4,
50:9, 51:15, 52:12,
52:15, 53:14, 53:16,
54:24, 56:11
**odd** [3] - 41:6, 82:10,
82:12
**OF** [5] - 1:1, 1:3, 1:9,
109:3, 109:12
**offense** [1] - 15:11
**offer** [14] - 13:10, 14:4,
30:25, 31:6, 41:16,
43:24, 44:11, 48:5,
48:10, 48:24, 68:6,
68:13, 68:15, 100:14
**offered** [3] - 48:17,
49:2, 49:21
**offers** [1] - 38:9
**Office** [4] - 1:13, 2:2,
31:6, 90:21
**office** [3] - 46:13,
47:17, 88:11
**Officer** [2] - 104:11,
105:4
**offices** [1] - 88:9
**official** [7] - 32:9,
33:15, 64:9, 65:25,
68:13, 100:24, 101:1
**Official** [1] - 2:6
**OFFICIAL** [1] - 109:3
**officials** [2] - 100:8,
101:6
**OIG** [8] - 39:8, 41:4,
43:13, 90:21, 91:14,
92:4, 93:17, 106:24
**okayed** [2] - 65:25,
66:1
**old** [5] - 4:22, 29:15,
56:6, 86:18, 89:24
**once** [9] - 26:10,
59:11, 66:2, 66:22,
67:21, 75:7, 84:6,
84:7, 95:6
**one** [65] - 5:13, 8:4,

8:17, 10:15, 14:17,
14:25, 15:24, 16:3,
16:5, 17:12, 19:8,
21:4, 22:9, 23:5,
24:13, 24:16, 26:8,
27:7, 34:22, 36:11,
36:13, 39:24, 40:2,
40:21, 41:12, 43:5,
43:10, 47:5, 47:18,
47:20, 50:6, 51:11,
51:17, 52:20, 56:21,
57:4, 59:1, 59:3,
61:16, 71:20, 74:20,
74:22, 82:2, 82:11,
82:23, 84:1, 84:9,
88:19, 88:25, 89:7,
89:15, 89:16, 90:2,
98:10, 98:11, 99:4,
99:9, 99:13, 100:21,
101:2, 103:11,
105:19, 105:20
**one-off** [1] - 36:13
**one-on-one** [1] -
47:20
**one-time** [1] - 99:13
**one-year** [1] - 101:2
**ones** [2] - 67:8, 77:15
**online** [1] - 44:22
**open** [1] - 79:12
**opinion** [4] - 43:24,
74:15, 74:17, 76:5
**opportunities** [1] -
36:23
**opportunity** [1] -
56:15
**opposed** [1] - 80:13
**option** [1] - 57:6
**oral** [1] - 102:9
**order** [5] - 4:2, 26:22,
27:4, 80:24, 105:16
**organized** [2] - 36:9,
42:2
**organizers** [1] - 50:6
**original** [3] - 16:1,
50:14, 98:13
**originally** [2] - 29:18,
30:25
**otherwise** [1] - 66:16
**outgoing** [1] - 43:19
**outline** [1] - 46:6
**outside** [6] - 57:17,
68:23, 68:24, 73:22,
97:18, 104:20
**overseas** [1] - 92:19
**owed** [1] - 69:5
**own** [5] - 11:8, 33:25,
36:7, 36:13
**owned** [1] - 87:23
**owns** [3] - 8:7, 8:11,
87:18

**Oxford** [2] - 6:10,
50:13

## P

**p.m** [2] - 77:8, 108:23
**packet** [1] - 27:3
**packets** [1] - 48:2
**page** [6] - 4:19, 19:3,
20:20, 21:2, 22:10,
106:8
**paid** [11] - 64:12, 65:4,
65:5, 79:3, 79:7,
80:3, 89:4, 89:10,
99:9, 99:10, 99:15
**panel** [1] - 42:3
**paper** [7] - 14:11,
36:6, 74:19, 104:18,
104:21
**papers** [7] - 34:4,
36:8, 36:10, 103:8,
103:9, 104:2
**paperwork** [10] - 59:3,
59:6, 79:21, 80:22,
81:1, 81:7, 81:21,
84:7, 84:12
**paragraph** [9] - 17:4,
17:20, 17:22, 19:5,
20:4, 21:10, 22:4,
70:25, 73:16
**paragraphs** [1] - 20:15
**paralegal** [1] - 77:21
**paranoid** [2] - 85:8,
85:10
**parents** [3] - 57:4,
59:21, 61:24
**parity** [1] - 70:9
**part** [21] - 10:8, 10:22,
19:24, 24:22, 35:25,
36:2, 45:3, 45:18,
52:8, 58:17, 59:1,
59:14, 61:18, 67:9,
75:1, 86:11, 95:8,
95:17, 97:24, 100:3,
101:9
**participant** [1] - 11:15
**participate** [1] - 42:3
**particular** [18] - 14:16,
15:14, 30:17, 35:20,
36:14, 51:12, 57:23,
64:4, 67:19, 74:20,
85:8, 88:10, 95:11,
96:15, 100:4,
100:13, 104:21
**parties** [3] - 24:12,
24:21, 26:7
**partner** [1] - 54:18
**Party** [1] - 106:9
**passed** [1] - 42:17
**passport** [4] - 80:23,

81:2, 81:8, 83:2
**past** [1] - 70:5
**paternity** [3] - 62:12, 62:16, 62:19
**path** [1] - 34:25
**patient** [1] - 56:8
**patterns** [1] - 9:3
**pay** [12] - 42:10, 44:23, 65:15, 65:16, 80:11, 80:12, 80:14, 88:22, 89:6, 89:20, 89:21, 97:10
**paycheck** [1] - 79:14
**paying** [1] - 88:25
**payment** [1] - 99:13
**payments** [1] - 88:24
**pays** [2] - 11:13, 49:8
**Penn** [8] - 30:9, 30:18, 30:20, 31:1, 31:5, 31:9, 31:18, 31:21
**Pennsylvania** [1] - 1:17
**Pentagon** [2] - 9:25, 10:21
**people** [13] - 9:21, 31:3, 46:22, 46:24, 61:1, 71:9, 83:20, 87:2, 88:13, 89:14, 92:18, 93:12, 104:20
**People's** [2] - 8:4, 10:13
**per** [2] - 97:13, 97:21
**Perez** [1] - 39:9
**perfect** [1] - 26:2
**perfectly** [1] - 16:11
**perform** [1] - 8:19
**perhaps** [2] - 33:17, 95:20
**period** [5] - 26:12, 75:6, 75:7, 79:1, 101:2
**persisted** [1] - 49:19
**persistency** [1] - 49:18
**persistent** [4] - 41:10, 41:11, 49:17
**person** [8] - 15:24, 17:12, 19:8, 41:21, 52:14, 52:15, 57:16, 81:3
**personal** [5] - 52:21, 63:14, 87:19, 87:24, 91:18
**personally** [1] - 54:24
**persons** [1] - 16:3
**perspective** [3] - 73:19, 90:25, 100:18
**PhD** [19] - 30:4, 30:5, 30:7, 30:12, 30:16, 35:21, 40:5, 40:23,

41:12, 41:13, 41:15, 42:15, 42:18, 44:7, 66:22, 66:24, 67:14
**PhDs** [1] - 37:10
**Philadelphia** [1] - 36:25
**phone** [9] - 87:15, 87:17, 87:20, 87:21, 87:23, 87:24, 88:1, 91:10, 91:21
**photo** [5] - 52:23, 81:14, 87:9, 87:11, 89:3
**photographs** [1] - 52:20
**photos** [18] - 13:5, 48:1, 86:11, 87:7, 87:14, 87:20, 88:1, 88:3, 88:6, 91:5, 91:6, 91:8, 91:10, 91:23, 92:6, 93:16, 93:19
**phrase** [2] - 21:25, 80:12
**physical** [1] - 54:3
**physically** [6] - 52:22, 52:25, 53:14, 53:17, 53:25, 85:21
**pick** [1] - 46:8
**pieces** [1] - 82:7
**place** [3] - 61:6, 84:17
**placed** [1] - 100:5
**placement** [1] - 16:17
**places** [3] - 47:6, 94:3, 94:5
**Plaintiff** [1] - 1:4
**plan** [4] - 13:24, 14:1, 50:14, 64:17
**planned** [1] - 62:15
**plans** [3] - 56:10, 56:22, 63:18
**play** [1] - 25:19
**played** [1] - 41:4
**plenty** [3] - 35:24, 36:23, 81:21
**Po** [1] - 6:10
**podium** [3] - 4:6, 27:21, 27:22
**point** [28] - 12:13, 14:22, 14:25, 15:8, 16:10, 16:24, 35:2, 35:9, 38:15, 41:16, 53:4, 54:10, 55:5, 57:11, 60:1, 62:2, 62:4, 63:10, 75:5, 86:3, 88:12, 91:22, 95:5, 96:21, 100:21, 105:15, 107:24
**pointed** [1] - 100:5
**points** [1] - 86:1

**poked** [2] - 86:12, 86:14
**policies** [1] - 11:8
**policy** [18] - 10:25, 31:20, 31:21, 31:23, 33:7, 33:10, 33:11, 33:23, 35:1, 35:6, 35:8, 35:10, 39:25, 42:3, 48:22, 64:9, 102:25, 103:16
**policymaking** [1] - 76:11
**politely** [1] - 41:18
**political** [1] - 29:25
**portion** [2] - 21:6
**posed** [1] - 88:25
**position** [8] - 6:14, 15:15, 18:22, 31:16, 33:16, 34:7, 42:19, 44:8
**possible** [3] - 11:15, 24:1, 94:3
**possibly** [3] - 9:8, 23:17
**post** [1] - 81:17
**potential** [3] - 35:13, 48:22, 54:17
**potentially** [1] - 107:23
**pour** [1] - 76:12
**praise** [1] - 75:21
**precisely** [1] - 81:12
**prefer** [4] - 13:13, 13:15, 25:10, 76:25
**pregnancy** [1] - 56:25
**pregnant** [12] - 53:24, 56:11, 56:17, 56:24, 57:19, 57:25, 58:19, 59:12, 61:19, 62:3, 62:11, 85:25
**preparation** [2] - 7:7, 7:12
**prepare** [3] - 7:7, 7:10, 26:19
**prepared** [5] - 24:21, 24:24, 25:5, 25:7, 25:9
**present** [7] - 4:3, 26:23, 36:3, 36:5, 36:12, 49:8, 77:9
**presentation** [1] - 44:24
**pressure** [1] - 28:16
**presumably** [2] - 46:1, 55:17
**pretty** [3] - 50:19, 50:24, 59:17
**previous** [1] - 74:11
**previously** [1] - 43:23
**primarily** [3] - 9:5,

33:21, 55:12
**private** [1] - 6:14
**problem** [9] - 77:23, 78:6, 82:19, 83:4, 83:24, 94:9, 96:19, 100:17, 100:19
**problems** [1] - 81:5
**Proceedings** [1] - 2:9
**proceedings** [1] - 109:6
**process** [14] - 44:17, 44:19, 45:1, 45:3, 57:9, 57:11, 57:15, 58:13, 62:17, 64:15, 81:6, 81:7, 84:12
**produced** [1] - 2:9
**produces** [1] - 8:13
**productive** [3] - 34:17, 34:18, 34:19
**professional** [1] - 51:7
**professionally** [1] - 51:7
**professor** [6] - 30:9, 42:18, 43:23, 47:16, 61:12, 94:16
**Professor** [21] - 43:12, 43:13, 43:18, 45:25, 47:23, 47:25, 48:9, 48:14, 49:3, 60:20, 61:6, 75:6, 75:16, 75:17, 76:5, 76:11, 76:14, 76:18, 78:15, 78:23, 107:14
**professor's** [2] - 30:14, 95:8
**professors** [1] - 47:14
**professors'** [1] - 95:10
**profile** [1] - 52:23
**program** [1] - 62:19
**prohibit** [1] - 96:12
**promoted** [1] - 32:8
**promotion** [3] - 32:7, 33:13, 61:12
**pronouncing** [1] - 43:14
**proposal** [6] - 64:20, 65:6, 65:8, 65:9, 65:14, 66:1
**propose** [1] - 24:13
**proposed** [5] - 21:3, 22:15, 24:11, 56:9, 66:22
**proposes** [1] - 64:17
**proposing** [2] - 32:17, 32:18
**propping** [1] - 77:19
**proprietary** [1] - 15:16
**protect** [1] - 90:6
**protection** [6] - 53:20, 90:10, 91:2, 92:10,

107:18
**prove** [9] - 15:24, 16:3, 17:6, 17:12, 17:21, 19:6, 19:7, 19:13, 19:23
**provide** [4] - 38:25, 39:4, 63:1, 105:8
**provision** [1] - 15:14
**public** [6] - 7:4, 20:6, 21:9, 21:18, 103:17, 103:18
**publicly** [5] - 73:18, 74:2, 104:7, 104:14, 105:3
**publish** [1] - 34:3
**published** [1] - 104:3
**publishing** [2] - 30:13, 74:18
**pull** [15] - 67:24, 69:6, 70:13, 71:14, 72:20, 74:3, 77:24, 94:7, 96:3, 100:9, 101:14, 101:23, 102:11, 102:21, 105:21
**purpose** [2] - 91:1, 92:4
**purposes** [1] - 105:10
**put** [2] - 27:20, 71:10

## Q

**qualifications** [1] - 6:6
**qualifies** [1] - 6:9
**qualify** [1] - 15:21
**quantify** [1] - 8:6
**quarter** [2] - 10:2, 76:23
**questioning** [1] - 92:13
**questions** [11] - 6:6, 11:19, 11:22, 27:23, 38:19, 69:19, 69:22, 69:24, 101:12, 107:12, 107:14
**quick** [3] - 45:1, 51:1, 59:14
**quickly** [3] - 52:7, 57:10, 59:17
**quiet** [1] - 47:20
**quite** [6] - 43:3, 44:5, 54:6, 66:9, 80:8, 83:21
**quote** [2] - 76:3, 86:20
**quote/unquote** [1] - 69:15
**quotes** [1] - 69:16

## R

**R-o-g-e-r-s** [1] - 29:14

**rail** [1] - 45:11
**raise** [2] - 64:7, 95:13
**raised** [1] - 70:4
**raising** [1] - 63:22
**range** [1] - 89:21
**rank** [1] - 32:6
**ranked** [3] - 34:23, 43:7, 44:9
**rapid** [1] - 6:16
**rate** [2] - 7:14, 70:8
**rates** [7] - 10:17, 10:19, 11:7, 11:8, 11:11, 11:12, 70:4
**rather** [5] - 13:9, 25:11, 33:22, 60:6, 97:10
**rationale** [1] - 49:7
**raw** [1] - 105:3
**reach** [1] - 8:11
**reaching** [1] - 41:10
**reaction** [2] - 66:7, 90:1
**read** [3] - 71:4, 100:11, 101:7
**reading** [1] - 21:21
**ready** [1] - 28:24
**real** [2] - 10:7, 86:24
**really** [21] - 9:22, 10:6, 31:2, 31:23, 33:8, 33:24, 44:5, 56:2, 56:16, 60:6, 63:7, 66:5, 67:2, 76:19, 77:24, 77:25, 84:22, 86:20, 90:4, 91:16, 105:14
**reason** [5] - 47:15, 80:3, 82:17, 93:14, 107:19
**reasonably** [1] - 43:2
**reasons** [4] - 30:24, 51:9, 51:10, 84:9
**rebalancing** [1] - 71:2
**receive** [2] - 65:16, 94:25
**received** [5] - 23:3, 38:13, 80:23, 89:2, 100:15
**recent** [2] - 72:7, 73:11
**recently** [1] - 100:15
**receptive** [1] - 86:22
**Recess** [3] - 26:21, 77:8, 108:23
**reciprocate** [1] - 87:12
**reciprocating** [1] - 87:11
**recognize** [9] - 37:23, 68:3, 69:9, 70:15, 71:16, 101:15, 102:2, 102:13,

102:23
**recognized** [1] - 38:16
**recollection** [2] - 78:13, 80:7
**recommended** [1] - 90:16
**record** [7] - 4:4, 4:7, 5:25, 12:25, 27:19, 29:13, 109:6
**recorded** [1] - 2:9
**recruiting** [7] - 35:15, 35:18, 35:21, 36:1, 37:11, 81:9, 81:10
**recurring** [1] - 78:6
**red** [5] - 14:14, 14:18, 15:7, 20:17, 26:24
**Red** [1] - 22:18
**red-line** [3] - 14:14, 14:18, 15:7
**red-lined** [1] - 26:24
**red-lines** [1] - 20:17
**referenced** [1] - 13:21
**regarded** [2] - 56:15, 63:15
**regarding** [1] - 101:3
**regular** [3] - 67:19, 67:20, 95:17
**reimbursed** [1] - 79:22
**reimbursement** [2] - 68:14, 80:1
**reiterated** [1] - 42:9
**relate** [1] - 107:23
**related** [3] - 97:7, 97:25, 103:25
**relates** [1] - 107:22
**Relations** [1] - 6:23
**relationship** [10] - 42:25, 47:3, 51:4, 52:1, 52:5, 54:4, 54:16, 63:12, 63:14, 78:21
**relatively** [1] - 45:2
**relocating** [2] - 82:6, 82:15
**rely** [1] - 14:9
**remainder** [1] - 77:13
**remaining** [2] - 5:13, 14:19
**remember** [17] - 24:14, 47:19, 48:11, 50:10, 52:22, 58:6, 59:16, 63:4, 63:24, 82:6, 83:21, 88:25, 90:19, 93:23, 107:5, 107:9
**remembered** [2] - 58:19, 78:3
**remembering** [1] - 98:25
**remind** [1] - 41:3

**reminder** [2] - 12:10, 108:13
**rented** [1] - 63:4
**rephrase** [3] - 34:16, 42:13, 48:18
**replace** [1] - 31:19
**replicate** [1] - 104:9
**reply** [1] - 86:19
**report** [3] - 7:10, 8:16, 106:17
**reported** [1] - 108:24
**reporter** [1] - 5:24
**Reporter** [1] - 2:6
**REPORTER** [2] - 109:3, 109:12
**represent** [2] - 100:22, 101:2
**representation** [1] - 23:10
**represented** [1] - 47:16
**reputation** [4] - 37:9, 37:11, 49:9, 95:18
**request** [6] - 18:18, 62:18, 75:22, 75:23, 76:1, 105:7
**requests** [1] - 103:20
**require** [1] - 35:23
**required** [2] - 83:5, 98:10
**requirement** [1] - 66:19
**requirements** [2] - 67:18, 68:21
**Research** [1] - 74:9
**research** [48] - 8:6, 12:10, 30:12, 30:13, 31:20, 31:21, 32:18, 33:5, 33:7, 33:8, 33:22, 33:24, 34:1, 34:3, 34:11, 34:12, 34:14, 34:17, 34:18, 35:1, 35:7, 36:3, 36:5, 36:8, 36:12, 40:16, 40:22, 40:24, 41:15, 49:8, 61:11, 64:12, 66:23, 73:6, 76:11, 95:10, 95:11, 95:18, 96:12, 100:19, 103:8, 104:17, 105:10, 105:14, 105:15, 106:5, 108:14
**reservations** [1] - 81:18
**Reserve** [27] - 5:2, 8:16, 10:12, 10:25, 11:9, 11:10, 23:18, 24:4, 30:21, 30:22, 31:12, 38:25, 39:4,

39:12, 39:23, 42:2, 48:25, 49:8, 50:6, 50:7, 50:18, 75:25, 76:2, 76:4, 100:6, 104:1, 104:3
**reserve** [2] - 6:18, 12:19
**reserves** [4] - 6:16, 9:3, 9:7, 11:4
**resolution** [1] - 67:12
**resolved** [1] - 19:2
**respect** [4] - 14:15, 27:5, 54:6
**respectively** [1] - 85:17
**respond** [2] - 25:18, 27:1
**responded** [2] - 86:6, 86:12
**response** [4] - 70:25, 73:3, 76:1, 92:13
**responsibilities** [12] - 30:11, 31:15, 31:17, 32:12, 33:15, 33:19, 34:10, 34:14, 35:13, 95:9, 97:18, 98:8
**responsibility** [3] - 33:1, 33:11, 34:2
**responsible** [1] - 35:14
**rest** [3] - 5:6, 23:3, 24:1
**restricted** [1] - 73:21
**restrictions** [2] - 96:13, 100:5
**rests** [2] - 12:5, 24:20
**results** [2] - 104:4, 104:22
**resume** [1] - 5:12
**retire** [4] - 92:22, 93:1, 100:6, 100:16
**retired** [1] - 93:12
**retirement** [3] - 35:10, 96:11, 100:22
**retiring** [1] - 93:14
**retread** [1] - 4:22
**retroactive** [1] - 83:9
**return** [5] - 11:5, 50:1, 80:16, 81:18, 84:24
**returned** [2] - 6:24, 62:21
**returning** [1] - 75:14
**reveal** [2] - 91:7, 93:15
**revealed** [2] - 89:3, 93:17
**review** [2] - 71:24, 74:13
**revise** [1] - 68:13
**revised** [2] - 26:6, 66:1
**revisit** [1] - 97:22

**rewarding** [1] - 51:7
**Ricky** [14] - 39:3, 61:6, 61:7, 61:9, 61:10, 61:21, 61:23, 62:25, 76:10, 82:5, 82:17, 83:20, 108:2
**ride** [1] - 63:3
**RIIPE** [1] - 43:23
**rise** [2] - 89:21, 89:22
**risque** [2] - 87:11, 87:13
**RMB** [2] - 97:13, 98:4
**Rogers** [39] - 4:5, 4:14, 15:1, 15:12, 24:25, 25:20, 26:11, 27:9, 27:13, 27:22, 28:21, 28:23, 29:6, 29:12, 29:14, 37:20, 38:21, 38:23, 39:2, 64:22, 68:1, 69:9, 70:15, 71:16, 72:22, 74:5, 75:18, 89:25, 94:13, 95:20, 96:4, 98:18, 100:10, 101:15, 101:25, 102:13, 102:23, 105:23, 108:16
**ROGERS** [3] - 1:6, 3:5, 29:7
**Rogers's** [2] - 13:25, 23:8
**role** [5] - 6:12, 9:7, 35:8, 47:2, 61:10
**room** [2] - 12:9, 85:19
**Room** [1] - 2:7
**Roubini** [1] - 6:14
**roughly** [5] - 6:13, 9:24, 9:25, 45:16, 75:2
**RPR** [1] - 2:6
**rule** [1] - 56:23
**rules** [3] - 48:23, 49:6, 73:23
**ruling** [1] - 12:20
**rumors** [6] - 75:24, 75:25, 76:1, 76:3, 78:19
**run** [5] - 7:24, 50:10, 64:15, 77:22, 84:9
**running** [1] - 34:13
**Russia** [1] - 9:7

# S

**S-e-t-s-e-r** [1] - 6:2
**sabbatical** [19] - 64:7, 64:8, 64:9, 64:13, 64:16, 64:25, 65:9, 65:14, 66:1, 66:2, 66:8, 68:13, 73:5,

73:9, 75:3, 78:14, 79:1, 79:11, 94:6
**sake** [1] - 60:7
**salacious** [1] - 91:5
**salary** [4] - 95:2, 95:3, 97:12, 98:4
**sALTZBURG** [1] - 22:22
**Saltzburg** [8] - 4:13, 14:13, 18:23, 20:21, 21:19, 23:9, 24:25, 26:13
**SALTZBURG** [46] - 1:19, 4:12, 11:22, 12:17, 12:21, 12:25, 13:8, 13:11, 13:15, 14:7, 14:20, 14:23, 15:10, 15:15, 16:11, 16:19, 16:22, 16:25, 17:9, 17:17, 17:23, 18:1, 18:12, 20:8, 20:22, 20:24, 21:13, 21:20, 22:2, 22:5, 22:7, 22:19, 23:11, 23:15, 23:17, 23:21, 23:25, 24:6, 25:3, 25:7, 25:10, 26:2, 27:12, 27:19, 28:22, 108:20
**sanctions** [1] - 101:4
**Sara** [2] - 109:5, 109:11
**SARA** [1] - 2:6
**sat** [2] - 47:17, 47:18
**satisfy** [2] - 59:14, 68:22
**Saturdays** [1] - 67:21
**SAUNDERS** [24] - 1:13, 4:8, 4:18, 4:21, 4:23, 5:1, 5:5, 5:16, 5:22, 11:18, 12:1, 12:4, 12:15, 18:20, 19:15, 19:21, 22:23, 23:2, 24:7, 24:10, 24:15, 24:19, 26:9, 26:15
**Saunders** [2] - 4:9, 12:13
**saw** [4] - 41:20, 93:22, 99:19, 106:7
**scale** [1] - 9:18
**scam** [3] - 86:7, 86:8
**scammer** [1] - 88:25
**scamming** [1] - 88:21
**scams** [1] - 87:1
**scare** [1] - 69:15
**scared** [1] - 90:6
**scenes** [2] - 100:25, 101:5
**schedule** [3] - 46:3,

46:6, 46:7
**schizophrenia** [2] - 85:8, 85:10
**school** [3] - 6:11, 31:4, 65:18
**School** [1] - 94:20
**schools** [1] - 42:25
**science** [1] - 29:25
**Science** [1] - 99:5
**Sciences** [1] - 6:10
**scope** [1] - 14:2
**scroll** [1] - 106:8
**scrolling** [1] - 38:3
**SDUFE** [1] - 47:5
**Sean** [6] - 68:16, 80:8, 80:10, 96:1, 96:7, 100:13
**search** [4] - 92:9, 94:4, 94:17, 100:20
**seat** [1] - 108:17
**seated** [1] - 12:12
**second** [10] - 21:2, 21:3, 52:3, 52:14, 52:15, 65:21, 68:14, 97:22, 97:24, 100:21
**secret** [26] - 15:1, 15:7, 15:17, 16:1, 16:7, 16:13, 16:14, 16:18, 16:21, 16:24, 17:8, 17:10, 17:14, 17:15, 17:22, 18:4, 18:5, 18:17, 19:4, 19:9, 19:11, 19:14, 19:18, 20:5
**secretive** [1] - 70:11
**secrets** [4] - 15:21, 16:6, 38:25, 39:5
**section** [8] - 32:8, 32:24, 32:25, 33:3, 33:10, 34:4, 62:14, 63:8
**securities** [14] - 4:24, 6:5, 6:19, 7:11, 7:22, 7:23, 8:2, 8:8, 8:14, 8:21, 9:2, 9:5, 9:10, 10:10
**Security** [1] - 6:20
**see** [29] - 10:4, 24:11, 24:12, 29:1, 37:20, 38:3, 42:4, 42:24, 56:3, 57:3, 68:1, 70:25, 72:22, 73:14, 73:17, 74:5, 78:23, 82:22, 91:20, 94:13, 95:25, 96:4, 100:10, 100:21, 101:25, 103:3, 105:23, 106:8, 108:21
**seeing** [2] - 20:19, 42:23

**seek** [2] - 86:3, 107:18
**seeking** [4] - 21:11, 21:12, 91:2, 96:12
**self** [3] - 32:16, 32:17, 75:18
**self-starter** [2] - 32:16, 32:17
**sell** [1] - 7:25
**selling** [1] - 8:2
**sells** [2] - 8:3
**semester** [1] - 68:17
**seminal** [1] - 70:8
**seminar** [7] - 40:20, 43:25, 44:25, 46:17, 46:19, 75:12
**seminars** [3] - 36:4, 36:13, 51:17
**send** [4] - 73:2, 74:25, 89:15, 93:5
**sending** [3] - 55:20, 107:1, 107:5
**senior** [14] - 6:23, 32:8, 32:14, 32:21, 32:23, 33:3, 33:16, 34:8, 34:9, 35:2, 35:5, 35:14, 47:25, 76:18
**sense** [8] - 26:2, 31:7, 32:17, 35:1, 36:11, 44:4, 64:6, 76:21
**sensitive** [9] - 39:12, 69:17, 69:19, 69:24, 72:12, 72:13, 74:1, 74:15, 107:6
**sent** [6] - 14:15, 73:14, 74:24, 93:4, 107:1, 107:3
**separate** [2] - 56:5, 67:14
**separation** [2] - 93:2, 93:9
**September** [2] - 50:14
**seriously** [1] - 88:15
**service** [8] - 8:19, 30:12, 30:15, 31:20, 31:21, 33:7, 33:12, 35:16
**serving** [1] - 30:15
**session** [1] - 108:24
**SESSION** [1] - 1:9
**set** [2] - 8:20, 104:24
**sets** [3] - 11:10, 103:21, 105:8
**SETSER** [2] - 3:4, 5:18
**Setser** [4] - 5:17, 5:23, 6:1, 6:3
**settle** [1] - 60:7
**seven** [1] - 68:20
**Seventh** [1] - 10:21
**several** [2] - 70:4,

104:2
**sex** [2] - 53:18, 85:24
**shall** [1] - 28:21
**Shandong** [19] - 40:5, 40:17, 41:17, 42:22, 43:6, 44:1, 44:9, 44:11, 45:4, 45:5, 47:5, 51:3, 51:17, 52:2, 61:11, 66:11, 66:14, 67:11, 67:13
**Shanghai** [30] - 39:20, 39:21, 40:22, 45:9, 45:10, 52:13, 52:16, 52:17, 52:23, 58:7, 59:21, 60:24, 63:7, 65:10, 65:18, 65:20, 66:17, 67:7, 67:15, 73:5, 73:9, 75:11, 79:6, 79:11, 81:12, 83:8, 83:11, 83:15, 106:2, 106:4
**share** [4] - 71:3, 74:2, 102:7, 103:14
**shared** [2] - 51:11, 86:21
**shares** [1] - 52:20
**sharing** [6] - 39:12, 73:19, 73:22, 85:11, 85:16, 85:20
**sharp** [1] - 108:22
**shepherding** [1] - 47:7
**shift** [2] - 32:21, 51:8
**shifted** [2] - 107:20, 107:22
**shifting** [1] - 19:16
**shirt** [2] - 87:11, 87:12
**shoot** [1] - 67:2
**short** [3] - 4:19, 11:11, 63:18
**short-term** [1] - 11:11
**shortened** [1] - 55:25
**shorthand** [1] - 2:9
**show** [5] - 13:21, 14:5, 15:12, 37:14, 82:20
**showed** [3] - 104:12, 105:4
**showing** [3] - 70:5, 87:10, 94:11
**shown** [3] - 72:1, 74:22, 107:6
**shows** [1] - 8:20
**Shu** [24] - 80:19, 80:23, 81:1, 81:8, 82:25, 83:5, 83:6, 83:9, 84:13, 84:15, 85:1, 89:23, 90:9, 97:5
**Shu's** [4] - 81:1, 81:8, 82:25, 84:15

**Shu-Shu** [10] - 80:19, 80:23, 83:5, 83:6, 83:9, 84:13, 85:1, 89:23, 90:9, 97:5
**Shu-Shu's** [4] - 81:1, 81:8, 82:25, 84:15
**SHUFE** [10] - 66:11, 66:24, 66:25, 67:5, 67:8, 79:6, 79:20, 79:25, 106:1, 106:21
**shuffle** [1] - 46:8
**side** [10] - 33:22, 33:23, 34:12, 55:13, 55:14, 59:3, 59:4, 63:14, 69:7, 69:8
**sides** [2] - 26:18, 59:8
**sign** [1] - 93:2
**signature** [2] - 106:10, 106:11
**SIGNATURE** [1] - 109:12
**signed** [3] - 94:16, 106:13, 106:20
**significant** [3] - 10:10, 54:4, 70:5
**significantly** [3] - 44:2, 50:20, 76:6
**similar** [3] - 79:24, 89:7, 104:11
**similarly** [2] - 18:3, 103:24
**simply** [2] - 25:12, 73:20
**single** [2] - 11:13, 99:12
**sister** [2] - 64:4
**sister-in-law** [1] - 64:4
**sisters** [1] - 56:3
**sit** [2] - 66:24, 67:6
**site** [1] - 53:3
**sitting** [4] - 78:3, 105:20, 107:24, 108:1
**situation** [1] - 97:16
**six** [2] - 41:14, 68:20
**size** [3] - 9:19, 10:2
**skeptical** [1] - 59:14
**sleeping** [1] - 85:17
**slept** [1] - 85:19
**slightly** [1] - 15:5
**slipped** [1] - 68:19
**small** [7] - 59:20, 60:2, 60:6, 94:4, 97:24, 100:3, 100:20
**smile** [2] - 43:20, 52:24
**smoothly** [1] - 34:13
**snow** [1] - 107:25
**solicit** [1] - 95:9
**solicitous** [1] - 88:14

**solve** [2] - 83:3, 83:24
**someone** [2] - 64:2, 84:18
**sometime** [1] - 89:19
**sometimes** [2] - 77:17, 86:22
**sonogram** [1] - 58:17
**soon** [1] - 68:19
**sorry** [5] - 61:17, 71:10, 79:21, 86:16, 89:4
**sort** [16] - 31:8, 33:6, 34:25, 44:17, 51:25, 54:2, 69:24, 71:8, 73:7, 76:16, 87:9, 87:13, 88:14, 95:13, 97:16, 97:19
**sorts** [4] - 9:15, 58:3, 58:4, 61:22
**sounds** [6] - 5:8, 18:8, 19:2, 20:20, 22:15, 60:1
**source** [1] - 105:11
**soured** [1] - 78:21
**speaking** [2] - 9:24, 9:25
**specialized** [1] - 69:16
**specific** [4] - 15:13, 15:18, 95:21, 96:2
**specifically** [3] - 13:7, 13:16, 61:14
**specified** [1] - 97:11
**sped** [1] - 56:19
**speed** [1] - 45:11
**spell** [3] - 5:24, 9:1, 29:12
**spelled** [1] - 65:1
**spend** [2] - 65:9, 97:17
**spent** [1] - 55:5
**spikes** [1] - 104:13
**spillover** [2] - 76:13, 76:14
**sponsor** [1] - 55:1
**sponsored** [2] - 39:23, 50:8
**sports** [1] - 51:12
**spot** [1] - 52:23
**spreadsheet** [1] - 105:2
**spreadsheets** [3] - 103:24, 103:25, 105:6
**spy** [2] - 38:21, 108:4
**St** [1] - 42:2
**staff** [17] - 31:17, 31:22, 32:9, 33:15, 34:24, 35:18, 35:19, 35:20, 36:8, 39:24, 47:14, 64:10, 64:17,

77:12, 96:13, 104:1, 104:3
**staffer** [1] - 104:19
**stage** [1] - 41:13
**stand** [9] - 5:17, 22:13, 25:1, 25:20, 26:11, 27:9, 27:15, 27:20, 28:21
**standard** [2] - 22:12, 22:17
**standing** [2] - 21:9, 21:18
**stands** [1] - 19:16
**start** [3] - 25:24, 87:10, 108:11
**started** [4] - 14:7, 67:19, 68:17, 97:10
**starter** [2] - 32:16, 32:17
**starting** [4] - 4:6, 32:9, 62:16, 104:18
**State** [9] - 8:18, 30:10, 30:18, 30:20, 31:1, 31:5, 31:9, 31:18, 31:21
**state** [5] - 4:7, 5:24, 13:22, 14:5, 29:12
**statement** [2] - 15:3, 76:9
**STATES** [3] - 1:1, 1:3, 1:10
**states** [1] - 20:2
**States** [18] - 1:13, 1:13, 4:5, 4:9, 8:23, 9:23, 10:12, 50:1, 80:16, 80:25, 81:16, 81:19, 82:16, 84:1, 84:5, 84:24, 85:1, 85:9
**station** [2] - 45:12, 45:13
**Statistics** [1] - 74:9
**statute** [7] - 15:2, 15:9, 15:18, 16:15, 18:9, 21:20, 21:21
**statutory** [3] - 15:14, 19:1, 19:20
**stay** [6] - 30:18, 32:6, 45:19, 62:4, 62:6, 64:11
**stayed** [5] - 33:21, 84:13, 84:22, 98:17, 98:20
**stenotype** [1] - 2:9
**step** [11] - 18:20, 32:23, 33:2, 51:1, 54:4, 81:4, 88:20, 93:21, 93:22, 94:19, 108:16
**Stephen** [1] - 4:12

**STEPHEN** [1] - 1:19
**steps** [5] - 32:11, 32:12, 64:3, 80:24, 93:17
**sticks** [1] - 97:3
**still** [14] - 19:17, 22:13, 34:14, 44:9, 50:14, 52:22, 64:12, 69:2, 81:2, 83:25, 92:8, 97:15, 98:21, 100:15
**straightforward** [1] - 44:21
**street** [2] - 36:19, 63:5
**Street** [5] - 1:14, 1:19, 2:3, 8:18, 96:16
**stressed** [1] - 63:25
**strictly** [1] - 49:1
**strongly** [1] - 9:4
**struggle** [1] - 41:13
**student** [1] - 40:5
**students** [12] - 30:12, 41:12, 43:5, 47:4, 47:6, 47:11, 47:14, 66:22, 66:23, 67:4, 67:6, 67:15
**studied** [1] - 6:11
**study** [1] - 34:22
**stuff** [6] - 4:22, 46:13, 47:17, 48:1, 58:20, 70:3
**subject** [2] - 6:7, 72:19
**submits** [1] - 15:3
**submitted** [1] - 73:21
**substance** [1] - 102:18
**substantive** [2] - 14:15, 76:10
**success** [1] - 32:18
**successful** [1] - 96:24
**succinct** [1] - 12:13
**suggest** [1] - 9:10
**suggested** [6] - 14:4, 15:6, 20:8, 21:13, 99:24, 101:10
**suggesting** [1] - 17:2
**suggestion** [1] - 12:21
**suitcases** [1] - 82:23
**Suite** [1] - 2:3
**sum** [2] - 9:22, 10:1
**summer** [2] - 34:22, 54:25
**sums** [1] - 10:4
**Sunday** [1] - 90:20
**Super** [1] - 90:20
**supervise** [1] - 33:5
**supervisor** [3] - 62:18, 90:11, 106:22
**supervisors** [1] - 90:2

**support** [1] - 77:12
**supporting** [1] - 37:8
**supportive** [2] - 59:13, 60:23
**supposed** [2] - 66:21, 99:14
**surprise** [1] - 89:2
**swamped** [1] - 81:9
**switched** [1] - 98:1
**switching** [1] - 77:11
**sworn** [1] - 29:6
**SWORN** [2] - 5:18, 29:7
**sympathetic** [2] - 76:20, 85:7
**sympathy** [1] - 90:16
**symptoms** [1] - 85:8
**system** [1] - 73:22
**System** [1] - 8:16

## T

**table** [1] - 77:17
**take-away** [1] - 96:17
**target** [1] - 18:22
**tariffs** [3] - 73:12, 74:20, 74:23
**taskings** [3] - 69:12, 69:15, 69:16
**taught** [1] - 98:9
**tax** [1] - 15:11
**teach** [11] - 51:16, 65:19, 66:19, 66:20, 66:22, 80:11, 80:12, 80:13, 80:14, 97:21, 98:10
**teaching** [23] - 30:12, 31:19, 43:25, 65:17, 66:10, 66:11, 66:16, 66:25, 67:5, 67:12, 67:22, 68:15, 68:24, 69:2, 79:3, 79:6, 79:18, 80:5, 97:18, 98:5, 98:7
**teed** [1] - 77:19
**ten** [2] - 25:4, 77:5
**ten-minute** [1] - 77:5
**tended** [1] - 44:25
**tenor** [1] - 88:12
**tenure** [1] - 32:3
**term** [7] - 11:11, 20:5, 53:2, 54:5, 56:14, 63:18
**terminal** [1] - 34:7
**terminated** [1] - 92:22
**terms** [10] - 7:21, 9:18, 18:16, 18:22, 23:10, 32:12, 33:14, 53:2, 54:19, 55:2
**testified** [1] - 22:20

**testifies** [1] - 4:17
**testify** [7] - 6:3, 23:25, 28:1, 28:5, 28:11, 28:17
**testifying** [2] - 27:6, 27:18
**TESTIMONY** [1] - 3:3
**testimony** [7] - 5:13, 7:7, 7:12, 22:21, 23:8, 23:12, 24:2
**thanking** [1] - 40:14
**Thanksgiving** [1] - 59:16
**THE** [107] - 1:1, 1:1, 1:9, 4:11, 4:15, 4:20, 4:22, 4:25, 5:4, 5:8, 5:11, 5:18, 5:19, 5:20, 11:21, 11:24, 12:2, 12:3, 12:6, 12:12, 12:16, 12:19, 12:24, 13:3, 13:10, 13:12, 13:17, 14:3, 14:11, 14:21, 14:24, 15:11, 15:22, 16:17, 16:20, 16:23, 17:1, 17:11, 17:19, 17:24, 18:2, 18:13, 19:3, 19:17, 19:25, 20:12, 20:23, 21:1, 21:14, 21:24, 22:3, 22:6, 22:8, 22:20, 22:24, 23:7, 23:13, 23:16, 23:19, 23:24, 24:3, 24:8, 24:13, 24:17, 24:25, 25:6, 25:9, 25:14, 26:6, 26:10, 26:20, 26:24, 27:16, 27:21, 27:24, 27:25, 28:3, 28:4, 28:6, 28:7, 28:9, 28:10, 28:12, 28:13, 28:15, 28:16, 28:18, 28:19, 28:23, 29:1, 29:4, 29:7, 29:8, 37:16, 38:12, 77:2, 77:4, 77:14, 77:20, 78:1, 78:6, 78:8, 78:10, 94:9, 108:8, 108:16, 108:21
**themselves** [2] - 8:2, 52:21
**theories** [1] - 72:17
**theory** [2] - 70:9
**thereabout** [1] - 85:14
**thereby** [1] - 73:21
**they've** [1] - 91:4
**thinking** [3] - 10:5, 10:6, 11:3
**third** [1] - 41:14
**Thomas** [1] - 4:8

**THOMAS** [1] - 1:13
**thousands** [1] - 89:10
**threat** [1] - 107:17
**threatened** [2] - 89:23, 90:9
**threatening** [4] - 88:15, 88:18, 88:19, 89:16
**three** [18] - 16:7, 17:1, 23:17, 24:4, 39:2, 42:16, 42:17, 45:10, 53:11, 62:6, 94:6, 95:11, 96:23, 99:4, 99:8, 99:10, 103:10
**three-year** [1] - 99:4
**throughout** [1] - 6:11
**Thursday** [1] - 67:9
**ticket** [2] - 81:23, 82:25
**ties** [1] - 97:17
**tight** [2] - 5:3, 103:21
**tightandwide.xls** [5] - 104:6, 104:10, 104:23, 104:24, 105:2
**timetable** [1] - 56:18
**timing** [3] - 50:19, 93:23, 99:1
**title** [1] - 104:12
**today** [12] - 6:3, 6:25, 7:8, 7:12, 10:9, 18:23, 23:5, 24:21, 25:3, 25:11, 25:16, 25:24
**together** [6] - 17:2, 31:5, 40:21, 58:8, 99:24, 103:8
**Tom** [2] - 60:13, 60:14
**took** [7] - 41:19, 45:20, 54:4, 62:12, 74:23, 81:19, 83:25
**top** [3] - 33:8, 94:20, 103:3
**topic** [5] - 6:4, 7:3, 44:24, 70:10, 73:6
**topics** [3] - 40:22, 44:7, 70:1
**total** [1] - 99:11
**touched** [1] - 78:4
**tourist** [3] - 79:12, 79:13, 79:17
**toward** [1] - 78:25
**towards** [6] - 50:13, 51:8, 78:14, 80:18, 92:18, 107:22
**town** [1] - 84:8
**track** [1] - 6:18
**trade** [31] - 9:24, 15:1, 15:7, 15:17, 15:21, 16:1, 16:6, 16:7,

16:12, 16:14, 16:18, 16:21, 16:24, 17:7, 17:10, 17:13, 17:15, 17:22, 18:4, 18:5, 18:17, 19:4, 19:9, 19:11, 19:14, 19:18, 20:4, 20:5, 38:25, 39:4
**traditionally** [1] - 8:4
**train** [2] - 45:12, 45:13
**transcript** [1] - 109:6
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 2:9
**transcription** [1] - 2:9
**transfer** [3] - 101:17, 102:4, 102:15
**translate** [1] - 76:18
**Translate** [2] - 55:17, 55:18
**translated** [5] - 43:21, 55:19, 75:19, 75:24, 97:12
**translating** [3] - 48:12, 55:13, 99:7
**translation** [1] - 55:14
**translations** [1] - 55:22
**transmission** [1] - 102:9
**travel** [18] - 35:23, 35:24, 35:25, 36:1, 36:3, 36:15, 36:23, 37:1, 37:2, 37:4, 37:8, 44:20, 44:23, 44:24, 60:23, 80:25, 92:18
**traveling** [2] - 44:23, 92:17
**travels** [2] - 36:11, 42:11
**treasuries** [3] - 6:13, 9:1, 11:1
**Treasury** [16] - 4:24, 6:4, 6:22, 7:11, 7:22, 7:23, 7:24, 8:7, 8:13, 8:17, 8:21, 9:5, 9:10, 10:10, 101:3, 101:6
**tremendous** [1] - 84:6
**TRIAL** [1] - 1:9
**trial** [3] - 4:10, 26:14, 28:1
**tried** [3] - 68:12, 79:13, 83:8
**trillion** [6] - 9:10, 9:16, 9:17, 9:22, 9:23, 10:5
**trip** [9] - 44:22, 50:11, 50:12, 51:15, 51:19, 52:13, 52:15, 56:11, 59:15

**true** [7] - 15:10, 33:20, 38:5, 38:24, 89:1, 89:3, 93:13
**truly** [3] - 21:6, 21:15, 22:3
**truncate** [2] - 18:19, 19:17
**truncating** [1] - 15:6
**truth** [1] - 14:4
**try** [2] - 25:24, 79:23
**trying** [6] - 8:6, 67:20, 71:7, 82:21, 104:8, 104:22
**Tsinghua** [2] - 42:1, 75:12
**turn** [2] - 13:17, 87:21
**turned** [4] - 67:18, 84:19, 88:15, 92:18
**turning** [1] - 89:16
**turns** [2] - 14:8, 83:2
**twice** [1] - 67:5
**two** [28] - 14:19, 16:3, 16:6, 16:10, 18:5, 18:8, 18:10, 21:23, 23:17, 24:10, 24:23, 25:20, 31:9, 36:21, 38:23, 42:25, 46:6, 47:19, 56:7, 66:16, 68:18, 70:5, 70:18, 71:11, 87:17, 89:13, 107:25
**two-day** [1] - 46:6
**type** [6] - 35:14, 40:15, 54:16, 55:1, 76:20, 105:4
**types** [2] - 18:6, 46:11
**typical** [3] - 40:20, 46:17, 52:20
**typically** [6] - 27:17, 36:7, 41:14, 64:11, 88:4, 91:19

## U

**U.S** [54] - 1:17, 4:24, 6:4, 6:13, 6:17, 6:19, 6:22, 6:24, 7:11, 7:21, 7:23, 7:24, 8:2, 8:7, 8:13, 8:14, 8:15, 8:17, 8:21, 8:25, 9:12, 9:13, 9:20, 9:24, 10:6, 10:10, 10:16, 10:17, 10:18, 10:22, 11:9, 36:4, 36:17, 57:4, 57:5, 57:6, 73:12, 74:20, 79:16, 79:17, 79:19, 80:23, 83:1, 97:18, 98:1, 98:5, 98:14, 98:21, 99:5, 99:8,

100:23, 101:1
**ultimately** [15] - 56:22, 60:5, 67:6, 67:12, 68:11, 68:19, 79:18, 81:3, 81:7, 83:5, 86:12, 97:5, 100:16, 106:22
**unable** [1] - 79:12
**uncertainty** [1] - 9:9
**uncomfortable** [2] - 75:20, 75:21
**unconditional** [1] - 28:1
**under** [2] - 15:18, 62:20
**undergrads** [1] - 30:13
**underlying** [3] - 104:5, 104:7, 104:14
**understandably** [1] - 85:7
**understood** [6] - 15:13, 15:22, 26:20, 43:1, 43:20, 49:11
**undue** [1] - 48:22
**union** [1] - 56:7
**unique** [1] - 34:25
**unit** [1] - 90:17
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [18] - 1:13, 1:13, 4:5, 4:9, 8:23, 9:23, 10:12, 50:1, 80:16, 80:25, 81:16, 81:19, 82:16, 84:1, 84:5, 84:24, 85:1, 85:9
**universities** [6] - 36:24, 37:12, 47:3, 51:6, 66:16, 103:12
**University** [21] - 29:23, 30:4, 30:10, 39:20, 40:5, 41:17, 42:1, 42:22, 44:9, 44:12, 45:5, 50:13, 52:2, 65:10, 65:20, 66:14, 75:12, 79:6, 94:17, 106:4
**university** [16] - 36:14, 40:16, 42:19, 42:20, 43:5, 44:10, 47:4, 47:16, 60:23, 66:11, 66:20, 68:7, 95:19, 97:14, 106:6
**university's** [1] - 95:18
**unless** [2] - 25:25, 27:17
**unlike** [1] - 48:23
**up** [57] - 10:15, 17:25,

18:14, 20:13, 20:23, 25:24, 27:22, 29:18, 33:14, 35:19, 36:19, 40:2, 46:8, 54:4, 54:17, 56:19, 62:14, 63:11, 64:10, 67:22, 67:24, 69:6, 70:13, 71:10, 71:14, 72:20, 73:16, 74:3, 75:5, 75:6, 77:19, 77:24, 79:12, 79:23, 80:16, 81:5, 82:19, 82:20, 84:18, 88:17, 89:20, 89:21, 89:22, 92:11, 92:14, 94:7, 96:3, 99:9, 99:10, 99:13, 100:9, 101:14, 101:23, 102:11, 102:21, 105:21
**update** [1] - 104:22
**updating** [1] - 104:4
**urged** [2] - 57:24, 93:8
**urgency** [1] - 57:2
**usual** [1] - 75:17

## V

**validity** [1] - 70:9
**valuable** [2] - 5:2, 11:17
**value** [4] - 11:1, 21:8, 21:17, 21:25
**various** [4] - 30:15, 46:14, 69:14, 70:23
**verdict** [2] - 24:11, 26:7
**verification** [2] - 58:7, 58:9
**verifying** [1] - 58:11
**version** [2] - 15:7, 21:23
**versions** [1] - 27:6
**versus** [1] - 4:5
**via** [1] - 14:15
**view** [2] - 15:18, 25:3
**views** [2] - 70:23, 71:3
**violated** [1] - 15:13
**violation** [1] - 13:6
**Virginia** [1] - 30:4
**vis** [2] - 58:4
**vis-a-vis** [1] - 58:4
**visa** [19] - 54:19, 55:1, 79:10, 79:12, 79:13, 79:17, 79:18, 79:19, 80:23, 81:4, 81:8, 83:1, 83:2, 83:4, 83:7, 83:9, 83:13, 84:15
**visit** [16] - 41:17, 44:11, 45:4, 47:22,

48:6, 51:3, 51:5, 52:2, 53:14, 53:25, 54:25, 55:3, 58:7, 59:12, 64:10, 75:13
**visited** [2] - 58:14, 59:11
**visiting** [3] - 46:4, 46:12, 47:3
**vitae** [1] - 38:1
**voice** [1] - 5:23
**voided** [1] - 106:23
**voluntarily** [2] - 27:14, 28:11
**vs** [1] - 1:5

## W

**wait** [2] - 13:19, 19:6
**waited** [2] - 84:11, 84:15
**waive** [1] - 20:25
**waiving** [1] - 20:24
**Wall** [1] - 96:16
**wants** [2] - 18:10, 27:12
**warranted** [1] - 20:13
**washing** [2] - 74:21, 74:23
**Washington** [12] - 1:5, 1:14, 1:18, 1:20, 2:4, 2:7, 30:21, 31:6, 36:18, 36:22, 36:23, 50:21
**wasting** [1] - 26:5
**watch** [1] - 26:16
**watched** [1] - 61:23
**water** [2] - 28:24, 76:12
**ways** [2] - 43:14, 101:5
**weather** [1] - 61:20
**web** [1] - 53:3
**website** [5] - 8:13, 52:19, 53:7, 57:24, 68:23
**WeChat** [1] - 99:19
**wedding** [16] - 58:5, 59:18, 60:5, 60:8, 60:10, 60:12, 60:16, 60:20, 61:2, 61:4, 61:14, 61:17, 61:22, 62:5, 62:9, 63:24
**Wednesday** [1] - 25:4
**week** [5] - 50:16, 56:25, 67:5, 67:19, 67:21
**weekend** [1] - 25:12
**weekends** [1] - 67:17
**weeks** [2] - 68:18, 107:25

**welcome** [2] - 5:11, 29:4
**well-spelled-out** [1] - 65:1
**well-used** [1] - 86:20
**Wenbin** [2] - 103:6, 103:15
**wenbinwu@fudan. edu.cn** [1] - 103:4
**whereas** [1] - 88:15
**whirlwind** [1] - 51:19
**white** [1] - 89:2
**whole** [4] - 19:20, 19:21, 107:1, 107:2
**Wick** [2] - 109:5, 109:11
**WICK** [1] - 2:6
**wide** [1] - 103:21
**wife** [11] - 31:4, 52:11, 57:17, 61:19, 63:17, 81:24, 84:11, 84:13, 84:19, 85:2, 85:9
**wife's** [3] - 79:14, 80:22, 84:8
**willfulness** [1] - 15:8
**willing** [2] - 18:17, 66:12
**Wilmington** [1] - 29:19
**withdraw** [1] - 20:10
**withdrawing** [1] - 21:24
**witness** [12] - 4:16, 4:19, 5:13, 5:14, 11:22, 11:24, 23:4, 23:5, 23:19, 23:20, 24:23, 37:15
**WITNESS** [4] - 5:18, 5:20, 12:3, 29:7
**witnessed** [1] - 54:24
**witnesses** [3] - 23:13, 23:18, 24:21
**woke** [1] - 10:15
**woman** [8] - 51:13, 52:1, 52:6, 52:9, 86:18, 87:3, 87:10, 89:1
**women** [2] - 56:24, 86:11
**wondering** [1] - 96:1
**Wong** [1] - 70:20
**word** [3] - 21:10, 54:16, 76:17
**words** [3] - 21:15, 21:23, 80:9
**World** [1] - 36:19
**world** [4] - 11:2, 59:4, 59:8
**world's** [2] - 11:10, 11:12

**worrisomely** [1] - 89:23
**worse** [1] - 98:1
**worth** [1] - 84:10
**wound** [1] - 62:14
**wrap** [1] - 25:24
**write** [2] - 41:8, 93:11
**writing** [2] - 55:18, 73:11
**written** [3] - 70:10, 103:7, 103:9
**wrote** [3] - 6:15, 54:25, 90:2
**Wu** [2] - 103:6, 103:15

## X

**Xi'an** [2] - 84:14, 84:19

## Y

**year** [31] - 30:5, 35:2, 41:14, 50:9, 59:16, 81:10, 84:3, 95:4, 97:2, 97:8, 97:9, 97:10, 97:12, 97:13, 97:15, 97:20, 97:21, 97:22, 97:24, 98:7, 98:9, 99:2, 99:4, 99:9, 99:12, 100:22, 101:2
**Year's** [2] - 53:7, 53:12
**years** [11] - 30:19, 31:9, 41:14, 42:16, 42:17, 56:6, 69:25, 70:5, 94:6, 99:8, 99:10
**yesterday** [5] - 13:2, 14:3, 104:12, 104:15, 105:4
**Yifei** [1] - 4:10
**YIFEI** [1] - 1:16
**York** [2] - 8:18, 29:18
**young** [1] - 89:3
**yourself** [3] - 34:14, 88:1, 91:24
**Yu** [53] - 52:11, 52:18, 53:4, 53:15, 53:18, 54:1, 55:5, 56:17, 57:19, 58:23, 59:4, 59:11, 59:21, 61:23, 62:2, 62:11, 62:14, 63:4, 63:25, 80:19, 81:2, 83:19, 83:22, 85:2, 85:19, 85:24
**Yu's** [2] - 61:23, 83:22

## Z

**ZHENG** [1] - 1:16
**Zheng** [1] - 4:10
**zoom** [1] - 73:16